UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ——————————————— x | | |
| In re ICONIX BRAND GROUP, INC., et al. | : | Civil Action No. 1:15-cv-04860-PGG |
| ——————————————— | : | |
| | : | CLASS ACTION |
| This Document Relates To: | : | |
| | : | |
| ALL ACTIONS. | : | |
| ——————————————— x | | |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

By and through their undersigned counsel, Lead Plaintiffs City of Atlanta Firefighters'
Pension Fund and City of Atlanta Police Officers' Pension Fund ("Lead Plaintiffs" or "Plaintiffs")
allege the following against Defendants Iconix Brand Group, Inc. ("Iconix" or the "Company"), Neil
Cole ("Cole"), Warren Clamen ("Clamen"), Jeff Lupinacci ("Lupinacci"), David Blumberg
("Blumberg"), Seth Horowitz ("Horowitz"), David K. Jones ("Jones"), and F. Peter Cuneo
("Cuneo") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning
Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without
limitation: (a) review and analysis of public filings made by Iconix and other publications
disseminated by certain of the Defendants and other related non-parties; (b) review of news articles
and shareholder communications; and (c) review of other publicly available information concerning
Iconix, the other Defendants, and related non-parties.  Plaintiffs believe that substantial additional
evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for
discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all persons or entities who
purchased Iconix securities (the "Class") between February 22, 2012 and November 5, 2015,
inclusive (the "Class Period") seeking to pursue claims under Sections 10(b) and 20(a) of the
Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and United
States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R.
§240.10b-5.

2.      Defendant Iconix is a brand management company that owns a diversified portfolio
of 35 global brands in the women and men's apparel, entertainment, and home industry segments.
This case concerns an accounting fraud.  Iconix has admitted that its financial statements for fiscal
years 2011, 2012, 2013, 2014, and the first two quarters of 2015 should no longer be relied upon and

has twice restated those financial statements to correct a multiplicity of accounting manipulations, as detailed further herein.

3.      Defendant Iconix owns brands which it monetizes by licensing their intellectual property rights ("IP") to retailers and wholesalers, who are responsible for manufacturing and distributing the brands' products, while Iconix is responsible for the brands' advertising, public relations and management.  In turn, licensees pay royalties to Iconix or one of its joint ventures based upon net sales with a guaranteed minimum if sales targets are not reached.

4.      Borrowing heavily, Iconix was able to acquire and monetize dozens of brands. However, there were significant risks inherent to the Company's new business, which materialized prior to the start of the Class Period.  As times and tastes changed, it was inevitable that the popularity of the Company's brands (particularly fashion and entertainment) would wane over time, generating declining amounts of royalty revenue and profit.  In order to offset slowing revenue streams from older brands, the Company's business model relied on regular acquisitions of new desirable brands, which became difficult as economic times worsened in 2008 and competitors increased, thus diminishing Iconix's ability to achieve organic revenue growth.  In particular, the Company's young men's apparel brands, Ecko, Rocawear, Ed Hardy, and Zoo York, which it had acquired for the hefty price tag of $508 million, were nearly defunct.  Yet, Defendants led the market to believe the opposite, highlighting the Company's international joint ventures as a mechanism to keep those brands relevant.

5.      With its growth prospects diminished, Iconix embarked on a new business strategy: selling its brands to joint ventures.  This strategy entailed the Company forming joint ventures or Variable Interest Entities ("VIEs") with partners in the U.S. and globally to which it sold certain of its brand rights and recognized significant gains on these sales.  Defendants highlighted these joint

ventures as a means to bring Iconix's brands to market and gain a global presence more quickly and efficiently.

6.      By the start of the Class Period, however, unbeknownst to investors, Defendants were engaging in a host of accounting manipulations to prop up the Company's financial metrics and mask the Company's true financial condition.   In violation of Generally Accepted Accounting Principles ("GAAP"), Defendants, among other things, improperly recognized revenue, inflated the Company's cash flows, misclassified expenses, inflated gains on sales of trademarks, failed to consolidate certain joint ventures on Iconix's financial statements, and failed to timely write down uncollectible accounts receivable, goodwill and trademarks.   At the same time, Defendants highlighted the Company's "record" revenues, strong cash flows, brand health and business growth further deceiving the market as to the Company's true financial condition and future prospects.

7.      In November 2013, Iconix received a comment letter from the SEC raising concerns about the Company's accounting for and disclosure of non-GAAP free cash flow.   As part of their response, Defendants undertook a detailed analysis of this metric and promised to make certain reporting changes in future filings.   Just three months later, on March 18, 2014, Defendant Clamen, who had responded to the SEC's comments, resigned as the Company's Chief Financial Officer ("CFO"), after serving in this position for 9 years.

8.      Knowing it was just a matter of time before the SEC would uncover the myriad accounting issues and errors that riddled the Company's financial statements, on October 30-31, 2014, Defendants Cole and Blumberg unloaded massive quantities of Iconix stock while it traded near its Class Period high for combined proceeds of more than $40 million.   Just one week later, on November 7, 2014, the Company issued its third quarter 10-Q for 2014, in which it subtly changed

its financial reporting, carefully tucking a new line item (gains on sale of trademarks) into its cash flow statement.  Such changes did not go unnoticed.

9.      Armed with this new information, a third party analyst, Off Wall Street Consulting Group, Inc. ("Off Wall Street"), undertook a complex forensic accounting of the Company's financials and revealed on December 14 2014 that the Company was engaged in questionable accounting that obscured its deteriorating financial health.  The price of Iconix stock declined precipitously, falling 8.7%, which would mark the beginning of the free fall of Iconix's stock price as the truth regarding its multi-year, multi-faceted fraud began to emerge.

10.     In the year that followed, the market slowly learned of Defendants' accounting improprieties and Iconix's true financial condition through a series of events, including:

- the successive and suspicious resignations of the Company's then-CFO (Defendant Lupinacci), Chief Operating Officer ("COO") (Defendant Horowitz), and Chief Executive Officer ("CEO") for over 22 years (Defendant Cole);

- a series of articles posted on the financial website Seeking Alpha further challenging the propriety of the Company's accounting practices and revealing its true deteriorating financial condition;

- the Company's announcement that the SEC was reviewing the Company's accounting for joint ventures and that the Company had formed a Special Committee consisting of independent directors to review the accounting treatment of these transactions; and

- various disclosures regarding the Company's declining financial health, including reductions in 2015 earnings and revenue guidance.

11.     As detailed herein, the market's swift and negative reaction to these events resulted in significant stock price declines.  But more bad news was yet to come.  On November 5, 2015, Iconix revealed that through the investigation of its Special Committee, it had identified errors in accounting pertaining to its classification of expenses and recognition of revenue, among other items, which led it to restate over two years of financial statements.  The Company also reduced its

guidance and revealed the dire state of its declining brands.  The market was stunned, causing the price of Iconix stock to collapse by more than 57% on unusually high trading day volume.  As one analyst summarized:

> Coming on the recent earnings and revenue guidance cuts in August, ***it is blatantly obvious that the visibility for Iconix is nearing historically low levels and that current management will have its work cut out, cleaning up the accounting morass that the prior team left behind***. . . . we believe the company, with no full time CEO, two major top and bottom line cuts in four months, and increasing worries over debt paydowns, ***has to rebuild credibility from the lowest depths of any licensing company in recent history***.[1]

12.     Even after the end of the Class Period, Defendants' fraud continued to be revealed. Following an elevation of the SEC's inquiry to a formal investigation, the Company announced another set of restatements, this time pertaining to its accounting for joint venture transactions. Finally, on March 28, 2016, the Company announced disappointing financial results for the fourth quarter and fiscal year 2015, as well as massive impairment charge of $437.5 linked to its poorly performing men's brands and a downward revision of earnings guidance for 2016.  On March 29, 2016, Iconix's stock traded at a mere $7.40, an 83% decline from its Class Period high of $44.22 per share.

13.     The following chart summarizes Defendants' fraud and its significant impact on investors:

---

[1]     Citations, internal quotations, and footnotes omitted and emphasis added unless noted otherwise.



## JURISDICTION AND VENUE

14.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C.

§§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange

Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of

the United States.

15.     Venue is proper in this District under Section 27(c) of the Exchange Act, 15 U.S.C.

§78aa(c), and 28 U.S.C. §1391(b) – (d).  Many of the acts and transactions that constitute the alleged

violations of law occurred in this District and Iconix maintains its principal executive offices in this

District.

16.     In connection with the acts and transactions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone and other electronic communications, and the facilities of a national securities exchange.

## PARTIES

17.     Lead Plaintiff City of Atlanta Firefighters' Pension Fund is a pension plan that provides defined pension and disability benefits for the firefighters of the city of Atlanta, Georgia. As set forth in the certification attached hereto as **Exhibit A**, City of Atlanta Firefighters' Pension Fund purchased shares of Iconix common stock during the Class Period and has suffered damages as a result of the fraud alleged herein.

18.     Lead Plaintiff City of Atlanta Police Officers' Pension Fund is a pension plan that provides defined pension and disability benefits for the police officers of the city of Atlanta, Georgia.  As set forth in the certification attached hereto as **Exhibit B**, City of Atlanta Police Officers' Pension Fund purchased shares of Iconix common stock during the Class Period and has suffered damages as a result of the fraud alleged herein.

19.     Defendant Iconix is a brand management company that currently owns a diversified portfolio of over 35 global consumer brands in the women's and men's apparel, entertainment, and home industry segments.  Iconix common stock is listed and trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ICON."

20.     Defendant Cole was President, CEO, and Chairman of the Board of Directors from 1993 until his resignation on August 5, 2015.

21.     Defendant Clamen served as both Executive Vice President and CFO of Iconix from November 11, 2008 until his resignation on March 18, 2014.  Prior to holding those titles, Clamen served as CFO of Iconix since joining the Company in March 2005.

- 7 -

22.     Defendant Lupinacci was CFO of Iconix from April 7, 2014 until his resignation less than a year later, effective March 30, 2015.

23.     Defendant Blumberg currently serves as Executive Vice President and Chief Strategy Officer of Iconix, positions he has held since March 2016.  Prior to holding that title, Blumberg was the Company's Head of Strategic Development from February 2009 to February 2016.  In addition, following the resignation of Defendant Lupinacci, Blumberg served as Interim CFO of Iconix from March 2015 to June 2015.  From November 2006 to January 2009, Blumberg served the Company as a full-time consultant, overseeing the merger and acquisition activities.

24.     Defendant Horowitz was COO of the Company from March 18, 2014 until his resignation approximately one year later on April 13, 2015.

25.     Defendant Jones served as Iconix's Executive Vice President and CFO beginning on June 17, 2015, following the resignation of Defendant Lupinacci.

26.     Defendant Cuneo served as Interim CEO and Chairman of the Board of Directors of Iconix beginning on August 6, 2015, following the sudden resignation of Defendant Cole.

27.     Defendants Cole, Clamen, Lupinacci, Blumberg, Horowitz, Jones, and Cuneo are collectively referred to as the "Individual Defendants."

28.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Iconix, were privy to confidential and proprietary information concerning Iconix's accounting practices related to the licensing costs and revenues, joint venture gains, free-cash flow, and prospects for organic growth.  The Individual Defendants also had access to material adverse, non-public information concerning Iconix, as discussed in detail below.  Because of their positions with Iconix, the Individual Defendants had access to non-public information about the Company's business and growth prospects through access to internal corporate documents,

- 8 -

conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

29.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Iconix's business.

30.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Iconix's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false statements pleaded herein.

31.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities are registered with the SEC, traded on the NASDAQ, and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Iconix's business, accounting practices and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Iconix securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

### CLASS ACTION ALLEGATIONS

32.     Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Iconix during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members of the proposed Class.  Throughout the Class Period, Iconix common stock was actively traded on the NASDAQ (an open and efficient market) and as of November 3, 2015, the Company had 48,393,703 shares of common stock outstanding.  Class members who purchased Iconix securities may be identified from records maintained by Iconix and/or its transfer agent(s) and

may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

34.     Lead Plaintiffs' claims are typical of the claims of Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

35.     Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained competent counsel experienced in class and securities litigation.

36.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether Defendants violated the federal securities laws;

        (b)     whether Defendants misrepresented material facts concerning Iconix and its reported financial results;

        (c)     whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

        (d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

        (e)     whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

        (f)     whether the prices of Iconix securities were artificially inflated; and

        (g)     the extent of damages sustained by Class members and the appropriate measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by individual Class members is relatively small so that the burden and expense of individual litigation make it impossible for such members to individually seek redress for the wrongs complained of herein. There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

38.     Defendant Iconix was formed in 1993 under the name Candie's, Inc. ("Candie's"), when it acquired the Candie's brand from Defendant Cole's former company, New Retail Concepts, Inc. As founder of the Company, and in his role as Chairman, CEO, and President, Cole marshaled the Company's transition from a traditional apparel and footwear manufacturing entity to a brand management company beginning in May 2003. On July 1, 2005, the Company changed its name from Candie's to Iconix. Since 2005, Iconix's brand portfolio has grown from two brands to over 35 brands.[2]

39.     From 1993 to 2003, the Company operated primarily as a designer, marketer, and distributor of its flagship footwear and apparel brand, Candie's. The Company also owned and operated Candie's retail stores throughout the United States. In 1999, under the leadership of Defendant Cole, Candie's came under fire from the SEC as a result of its accounting practices, including improper "bill and hold" accounting techniques and "illusory sales transactions with a

_____

[2]     As of December 31, 2015, the Company's brand portfolio includes Candie's®, Bongo®, Badgley Mischka®, Joe Boxer®, Rampage®, Mudd®, London Fog®, Mossimo®, Ocean Pacific/OP®, Danskin/Danskin Now®, Rocawear® /Roc Nation®, Cannon®, Royal Velvet®, Fieldcrest®, Charisma®, Starter®, Waverly®, Ecko Unltd®/Marc Ecko Cut & Sew®, Zoo York®, Sharper Image®, Umbro®, Lee Cooper®, Strawberry Shortcake®, and Artful Dodger®; and interest in Material Girl®, Peanuts®, Ed Hardy®, Truth or Dare®, Billionaire Boys Club®, Ice Cream®, Modern Amusement®, Buffalo®, Nick Graham®, Hydraulic®, and PONY®.

barter company" that inflated Candies' reported revenue.  This resulted in a formal SEC investigation launched on August 4, 1999, an accounting restatement by Candie's on September 22, 1999, and settlements with the SEC announced on April 30, 2003, including Defendant Cole's $75,000 fine paid by Defendant Cole.  Pursuant to the SEC settlements, Candie's and Cole consented to the entry of administrative orders to cease and desist from violating or causing the violation of certain books and records, internal controls, and periodic reporting and anti-fraud provisions of the Exchange Act and the Securities Act of 1933 (the "Securities Act").

40.    Iconix's brand management business model is premised on the purchase of intellectual property rights to certain brands and licensing them to third party licensees, who are responsible for designing, producing, distributing, and managing inventory of products bearing the licensed brands (for example, Candie's footwear, Bongo jeans, Ed Hardy t-shirts, merchandise depicting Peanuts comic strip characters, Starter athletic apparel, Royal Velvet bedding sets, and many other products).  Iconix is responsible for managing, advertising, and marketing the brands. The Company's brands are currently subject to over 1,700 licenses with third party licensees.

41.    Iconix's brand licensing agreements require the third party licensee to pay royalties from net sales to the Company.  Iconix typically receives guaranteed minimum royalties even if the brands' net sales do not reach minimum sales targets set forth in the licensing agreements.

42.    Iconix maintains two licensing strategies:  direct-to-retail licenses and wholesale licenses.  Under a direct-to-retail licensing agreement, Iconix grants exclusive rights to one of its brands to a single retailer.  For example, the brand Candie's is licensed exclusively to Kohl's department store chain in the United States.  In the wholesale licensing scenario, Iconix will typically grant the rights to a single or small group of related products to a wholesale supplier who then sells the licensed products in multiple stores in a given geographic area.  For example, Iconix

licenses the Umbro brand to numerous wholesale suppliers for sale and distribution in department and athletic stores.

43.     According to Iconix, its brand management business model shelters it from the high costs and risks associated with traditional production because the Company simply manages the brands themselves, and has no brand-related production, distribution, or inventory costs.  As such, this model enables the Company to report high earnings before interest, taxes, depreciation, and amortization ("EBITDA") margins (*i.e.*, high operating profit) without the risks associated with production, distribution, or inventory.

44.     Key to the success of Iconix's business model is the Company's ability to sustain the value of brands over time in a world where consumer whims are constantly changing, and to acquire additional desirable brands to offset brands with declining popularity.  As detailed herein, by the start of the Class Period, Iconix's business was struggling on both fronts – many of the Company's brands were in steep decline and it was becoming increasingly harder and more expensive to acquire new brands as competition for suitable acquisition targets intensified.

**Iconix Struggles to Maintain Its Growth and
Engages in Accounting Fraud to Mask the Decline in Its Business**

45.     From 2005 to 2008, Iconix acquired over $1.09 billion in new brands.  In 2008 however, the onset of the financial crisis slowed the brand acquisition market, as potential sellers waited for the economy to improve.  As the economy began to recover in 2010, a number of well-funded competitors emerged – Galaxy Brands, Cherokee, Authentic Brand Group, and Sequential Brands (led by Iconix's former COO) – which made Iconix's acquisition of highly sought-after brands much more difficult and expensive.

46.     At the same time that the brand acquisition market was tightening, the popularity of Iconix's overall brand portfolio was deteriorating.  In particular, Iconix experienced problems with

its fashion apparel brands, which suffered from declining consumer appeal and plummeting royalty revenues.  Most notably, Iconix was hurt by four men's apparel brands that were major components of its portfolio:  Ecko (including Ecko Unltd., Ecko Red, and Marc Ecko Cut & Sew), Zoo York, Rocawear, and Ed Hardy.  Iconix spent a massive total of $508 million acquiring these brands between 2007 and 2013, which represented approximately 18% of the Company's total consolidated assets as of December 31, 2013 ($2.83 billion).

47.      Ecko and Zoo York, which specialize in urban fashion and skateboarding apparel, were acquired by Iconix in a series of transactions from 2009 through 2013 for $224 million. Following Iconix's acquisition, Ecko sales became progressively worse, causing severe credit problems at the Company's core U.S. licensee for the brand, MEE Apparel LLC ("MEE"), which had operated more than 100 Ecko Unltd. stand-alone stores in the U.S. in 2012, along with an Ecko wholesale business.  Iconix attempted to save MEE from bankruptcy by injecting an additional $97.7 million into the Ecko brand in May 2013 ($45 million to acquire an MEE affiliate's 49% interest in IPH Unltd., the joint venture formed in connection with Iconix's acquisition of Ecko and Zoo York, and $52.7 million to extinguish a note from IPH Unltd. to a creditor).  Nonetheless, MEE was forced to close 70 stores from the end of 2013 through early 2014, liquidate inventory through closeout sales, and file for Chapter 11 bankruptcy in April 2014.  One of MEE's bankruptcy filings described its sales problems as follows:

> Since the beginning of 2009, the Debtors [MEE] have suffered declining sales and reduced profitability. Like many of their competitors, a shift in market trends to a cleaner more main stream look available at mass-market retailers negatively impacted the Debtor's sales . . . [T]he Debtor's targeted young consumers, which tend to have fickle tastes generally, have moved away from expensive labels in favor of lower priced brands. . . .

*      *      *

> After 2009, the Debtors' sales continued to drastically decline as their brands remained less desirable to the targeted urban youth customer. The market shift in

trends caused Macy's and TJ Maxx, two of the Debtors' largest wholesale customers, to slowly reduce purchases and ultimately cease doing business with the Debtors altogether in 2013.

48.      In March 2007, Iconix acquired a $204 million interest in Rocawear, an urban fashion brand founded by Shawn "Jay-Z" Carter and his partners.  Like Ecko and Zoo York, Rocawear sales have been in steady decline since the Company's acquisition.  In connection with these declines, Roc Apparel Group LLC ("RAG"), a core U.S. licensee of Rocawear, ran into severe credit problems, announcing in January 2012 that it laid off 28 employees, half of its 56 total employees.   In order to stave off RAG's creditors, Iconix was forced to pledge a total of $7.1 million in cash collateral in support of RAG from 2009 through 2014.

49.      The Company acquired an $18 million stake in the Ed Hardy brand in May 2009.  Ed Hardy specializes in tattoo artwork on apparel (most notably printed t-shirts) created by French fashion designer Christian Audigier.  Ed Hardy apparel was highly popular in the mid-to-late 2000s, carried by high-end retailers such as Saks Fifth Avenue and Macy's.  But, the brand's sales fell precipitously in 2010, just a year after the Iconix acquisition.  The brand became overexposed and unpopular, forcing Ed Hardy to close retail stores and liquidate one of its major franchises in Australia.  Despite this collapse, Iconix invested another $62 million in the Ed Hardy brand in April 2011, acquiring an additional 35% stake in the brand (increasing its interest from 50% to 85%).

50.      Faced with declining cash flows from its aging brand portfolio, Iconix was forced to take on a large amount of debt to finance badly needed acquisitions.  From 2010 to 2015, the Company nearly tripled its long-term debt, from approximately $548 million to $1.46 billion. Iconix's ballooning debt, in turn, further limited its ability to borrow the additional funds needed to acquire expensive, in-demand brands to offset the decline of its older brands.

51.      Saddled with a heavy debt load and a declining brand portfolio, Iconix started to sell its brands through the formation of joint ventures.  This strategy consisted of Iconix forming a joint

venture and contributing certain of its brand rights to the joint venture (such as the rights to sell the brands in a particular region), selling a portion of the joint venture to a local partner, and then collecting a portion of the licensing revenue received by the joint venture (with the remaining portion going to the Company's joint venture partner).

52.     Iconix ostensibly formed joint ventures to bring its brands to market more quickly and efficiently than it could if it were to build out wholly owned operations across the world.  The joint ventures also enabled Iconix to divest itself of declining brands while receiving a much needed cash infusion.

53.     By the start of the Class Period, Defendants were engaging in a multiplicity of improper accounting practices, thereby materially overstating the Company's financial results and masking the true operating performance of Iconix's business.  In violation of GAAP, Defendants, among other things, improperly recognized revenue, inflated the Company's cash flows, misclassified expenses, inflated gains on sales of trademarks, failed to consolidate certain joint ventures, and failed to timely write down uncollectible account receivables.  As detailed herein, Iconix has now restated its financial statements for fiscal years 2011, 2012, 2013, 2014, and the first two quarters of 2015 thereby admitting that its financial statements were materially false and misleading and not prepared in accordance with GAAP.

**Iconix's Admissions that the Financial Statements
It Issued During the Class Period Were Materially False and Misleading**

54.     The Company's admissions that the financial statements it issued during the Class Period were materially false and misleading came in a series of announcements.  As detailed below, these admissions were in response to comments issued by the staff of the SEC, as well as public media reports, questioning the propriety of Iconix's financial reporting.

55.     The details associated with the Company's financial improprieties are, in part, set forth in Iconix's second amended Form 10-K for the year ended December 31, 2014 (the "Second Amended 2014 10-K"), its Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K"), its Amended Forms 10-Q for the quarters ended March 31, 2015 and June 30, 2015, and its Forms 8-K filed with the SEC on November 5, 2015 (the "November 5, 2015 8-K") and February 18, 2016 (the "February 18, 2016 8-K").

56.     On December 14, 2014, Off Wall Street Consulting Group, Inc. ("Off Wall Street") released a detailed report calling into question the propriety of Iconix's financial reporting.  Among other things, Off Wall Street reported that, over the past several years, Iconix had used numerous, questionable accounting practices and approaches to mask a decline in its core business and boost its reported results.  The Off Wall Street report described these practices, in pertinent part:

1.     Reclassifying aged Accounts Receivable as "Long-Term Accounts Receivable" included in "Other Assets - Current" and "Other Assets."  The impact is in the Operating Income line and reduces bad debt expense included within "Selling, general and administrative expenses."

2.     Gain-on-sale of trademarks in JVs [Joint Ventures].  The impact is at the revenue line and increases "Licensing and other revenue."

3.     Gains on re-measurement of JV stakes based on ICON buying out its JV partner or making a further investment in the JV.  The impact is below the operating income line and boosts "Interest and other income."

4.     Structuring JVs with preferred payouts in order to accelerate earnings.  The impact is below the Operating Income line and increases "Equity earnings on joint ventures" by pulling forward future earnings.

5.     Using consolidated JVs in order to report revenue attributable to the minority interest, thereby boosting the headline revenue number.  The impact is at the revenue line and increases "Licensing and other revenue."

6.     Hedging transactions with investment banks on ICON's two convertible bond issues ($700 mm in principal total) allowed ICON to undertake accretive stock buybacks, but exposes ICON to uncapped dilution, if ICON stock is above $35.52 and $40.62, that won't show up in earnings until maturity.  The net effect of these hedging transactions is that ICON loses $12.96 mm for every $1 its stock is above

$35.56 (from the $400mm convert hedging transaction) and also loses $9.76 mm for every $1 its stock is above $40.62 (from the $300 mm convert hedging transaction). The impact, when settled at maturity of the converts, will be below the Operating Income line and will likely show up as an offset to "Interest and other income" and will also increase the share count if settled in stock.

57.     Thus, in its analysis, the Off Wall Street report claimed, among other things, that Iconix used "questionable" practices associated with the accounting for its trademarks and joint ventures to artificially inflate its reported results.  Based on this analysis, Off Wall Street cut its rating on Iconix stock from "buy" to "sell."

58.     In response to the views expressed in the Off Wall Street report, the price of Iconix common stock declined by more than 6% on December 15, 2014, on very heavy trading volume.

59.     During the week of April 13, 2015, *Seeking Alpha*, a public website featuring crowd-sourced financial commentary and analysis, posted several research reports on Iconix.  The first report, "*Iconix Brand Group Part 1: The Growth In Revenue And Earnings Was Driven By Increasing Sales of Assets And Non-Cash Gains*," also called into question the propriety of the Company's accounting for its trademarks and joint ventures and concluded, in pertinent part:

- The growth in revenue and earnings in the past years was driven by increasing sale of asset and "non-cash gain" from book value adjustment.

- The amount of "gain" from brand sale is determined by the cost basis assignment, which was under-reported with questionable accounting practices, especially when [a] joint venture was formed.

60.     As the market digested the *Seeking Alpha* articles, the Company's stock price experienced a series of declines from April 10 to April 17, 2015 totaling 8.31% ($2.65) on unusually high trading volume.

61.     On August 10, 2015, Iconix issued a press release announcing its financial results for the second quarter ended June 30, 2015.  The press release noted, for the first time, that the staff of the SEC had been conducting an "ongoing" review of Iconix's financial reporting, particularly with

respect to its accounting for international joint ventures. The press release further disclosed that the Company's Board of Directors had formed a Special Committee to review such accounting and that, if the consolidation of joint ventures was deemed to be appropriate, previously reported gains may be reversed. The press release stated, in pertinent part:

> Iconix also announced today that it is currently in a comment letter process with the Staff of the Securities and Exchange Commission relating to an ongoing periodic review of the Company's Form 10-K for the year ended December 31, 2014. The current correspondence relates to the accounting treatment for the formation of the Company's international joint ventures under U.S. Generally Accepted Accounting Principles and whether such joint ventures should potentially have been consolidated in the Company's historical results. The Company's Board of Directors also formed a Special Committee consisting of independent directors to review the accounting treatment related to certain of the Company's international joint venture transactions.

> The material terms of the joint venture agreements have been fully disclosed in the Company's prior filings, and the Company's independent auditors have audited and reviewed such filings. In the past three years, the gains that the Company recognized related to the formation of joint ventures were approximately $46.5 million in 2014, $24.6 million in 2013, and $5.6 million in 2012. If consolidation of the joint ventures is required, these gains would be reversed and treated as non-controlling interests. We continue to believe that the structure of our joint venture transactions should not result in consolidation and have presented our views and supporting accounting literature to the Staff.

> While the ultimate outcome of the Staff's comment letter process is unknown and may have a material effect on the Company's historical financial statements, the Company believes that the results of the comment letter process will not have a material impact on historical free cash flow, will not impact the Company's reported results for the first half of 2015, and will not impact the Company's overall business strategy of forming joint ventures with large, well-capitalized partners that have local market expertise to organically grow the existing portfolio of brands globally. The Company will continue to work closely with the Staff to resolve any remaining open comments.

> The Company does not expect to comment further on the Special Committee's review until it deems disclosure necessary or appropriate.

62.     That day, August 10, 2015, the price of Iconix common stock declined by more than 2%, on very heavy trading volume.

63.     After the market closed on November 5, 2015, Iconix filed with the SEC the November 5, 2015 8-K disclosing that, as a result of the review by its Special Committee, Iconix's financial statements for the years ended December 31, 2013 and 2014, and its financial statements for each of the interim periods ended March 31, 2014, June 30, 2014, September 30, 2014, March 31, 2015, and June 30, 2015 would have to be restated and should no longer be relied upon.

64.     According to the November 5, 2015 8-K, Iconix admitted that the First Restatement was necessary to correct material financial misstatements it had made during the Class Period associated with: (i) improperly reported revenue on licensing agreements without "adequate support"; (ii) improperly reported accrued expenses on license agreements; and (iii) expenses improperly classified and not reported as a reduction of revenue.  The November 5, 2015 8-K further noted that the review by staff of the SEC into the Company's financial reporting remained "ongoing" and that its ultimate outcome was then unknown.

65.     In addition, the November 5, 2015 8-K stated, in pertinent part, that "[a]s a part of a comprehensive review of the Company's license agreements and relationships with its licensees, it was determined that additional [bad debt] reserves of approximately $12.2 million should be taken with respect to certain of the Company's accounts receivable," and that the resulting $12.2 million charge would negatively impact the Company's 2015 third quarter diluted earnings per share ("EPS") by approximately $0.16.

66.     In response to these revelations, the price of Iconix common stock declined by more than **57%**, on very heavy trading volume.

67.     On November 25, 2015, Iconix filed the Second Amended 2014 10-K with the SEC. The Second Amended 2014 10-K restated Iconix's financial statements for the years ended December 31, 2013 and 2014 and the quarters ended March 31, 2013 and 2014; June 30, 2013 and

2014; and September 30, 2013 and 2014 to correct the Company's admittedly improper accounting and reporting of revenue, accrued expenses, and misclassified expenses, as noted in ¶¶74-77, 280-287 below.

68.     The Second Amended 2014 10-K falsely and misleading represented that the Company had no unresolved comments with the staff of the SEC.

69.     On November 27, 2015, Iconix filed with the SEC amended Forms 10-Q for the quarters ended March 31, 2014 and 2015 and the quarters and six month periods ended June 30, 2014 and 2015 (the "Amended 2015 Forms 10-Q").  The Amended 2015 Forms 10-Q restated Iconix's financial statements for the quarters ended March 31, 2013 and 2014 and the quarters and six month periods ended June 30, 2013 and 2014 to correct the Company's admittedly improper accounting and reporting of revenue, accrued expenses, and misclassified expenses, as noted in ¶¶74-77, 280-287 below.

70.     The Amended 2015 Forms 10-Q also disclosed that the review by staff of the SEC into the Company's financial reporting was ongoing and that the current correspondence related thereto concerned Iconix's accounting for its international joint ventures.

71.     On December 28, 2015, Iconix filed with the SEC a Form 8-K announcing that the SEC had commenced a formal investigation into the Company.

72.     After the market closed on February 18, 2016, Iconix filed with the SEC the February 18, 2016 8-K announcing – *once again* – that it was  necessary to restate its previously issued financial statements.  The February 18, 2016 8-K explained that the Second Restatement was necessary to correct the Company's improper: (i) failure to consolidate certain international joint ventures; (ii) accounting for trademarks; and (iii) mischaracterization of reported gains.

73.     On March 30, 2016, when Iconix filed the 2015 10-K with the SEC, it further revealed that the financial statements it issued during the Class Period also improperly failed to disclose certain related party transactions.  Accordingly, the 2015 10-K disclosed that Iconix's previously issued financial statements – ***including those it re-issued in connection with the First Restatement*** – for the years ended December 31, 2011, 2012, 2013, and 2014; the interim periods during such years; and the interim 2015 periods were each materially false and misleading and violated GAAP.

### Iconix Restates Its Financial Statements Twice

74.     **First Restatement**: On November 5, 2015, Iconix filed a Form 8-K with the SEC, that disclosed that as a result of the review by its Special Committee, the Company's financial statements for the years ended December 31, 2013, and 2014, and its financial statements for each of the interim periods ended March 31, 2014, June 30, 2014, September 30, 2014, March 31, 2015 and June 30, 2015 would have to be restated and should no longer be relied upon.

75.     Iconix admitted that the First Restatement was necessary to correct material financial misstatements made by the Company during the Class Period.  According to Iconix, these misstatements resulted from the following accounting improprieties:

    (a)     the improper recognition and reporting of revenue on licensing agreements;

    (b)     the improper reporting of accrued expenses on license agreements; and

    (c)     the improper classification of expenses.

76.     The quantitative impact of Defendants' financial misrepresentations on certain of the Company's reported operating metrics during the Class Period, based upon the First Restatement is, demonstrated in part, as follows:

2014 Annual Results

• originally reported 2014 annual revenues were overstated by 4.83%;

- 23 -

- originally reported 2014 annual selling, general, and administrative ("SG&A") expenses were overstated by 8.02%;

- originally reported 2014 annual pre-tax income was overstated by 2.68%; and

- originally reported 2014 annual net income was overstated by 2.38%.

June 2014 Quarterly Results

- originally reported June 2014 quarterly revenues were overstated by 6.10%;

- originally reported June 2014 quarterly operating income was overstated by 9.37%;

- originally reported June 2014 quarterly pre-tax income was overstated by 12.03%; and

- originally reported June 2014 quarterly net income was overstated by 12.01%.

September 2014 Quarterly Results

- originally reported September 2014 quarterly revenues were overstated by 3.14%; and

- originally reported September 2014 quarterly SG&A expenses were overstated by 7.07%.

December 2014 Quarterly Results

- originally reported December 2014 quarterly revenues were overstated by 10.24%; and

- originally reported December 2014 quarterly SG&A expenses were overstated by 21.43%.

March 2015 Quarterly Results

- originally reported March 2015 quarterly SG&A expenses were overstated by 7.15%; and

- originally reported March 2015 quarterly operating income was understated by 2.58%.

June 2015 Quarterly Results

- originally reported June 2015 quarterly revenues were overstated by 2.33%; and

- originally reported June 2015 quarterly SG&A expenses were overstated by 5.21%.

77.     The November 5, 2015 8-K further noted that the review by staff of the SEC into the Company's financial reporting remained "ongoing" and that its ultimate outcome was then unknown.

78.     **Second Restatement**:  On February 18, 2016, Iconix announced that it was again restating its financial statements.  On that date, Iconix filed a Form 8-K with the SEC announcing that it was, once again, necessary to restate its previously issued financial statements.  Iconix stated that the Second Restatement was necessary to correct the Company's improper: (i) failure to consolidate certain international joint ventures; (ii) accounting for trademarks; and (iii) mischaracterization of reported gains.

79.     On March 30, 2016, when Iconix filed its 2015 10-K with the SEC, it further revealed that the financial statements it issued during the Class Period also improperly failed to disclose certain related party transactions.  Accordingly, the 2015 10-K disclosed that Iconix's previously issued financial statements – including those it re-issued in connection with the First Restatement – for the years ended December 31, 2011, 2012, 2013, and 2014; the interim periods during such years; and the interim 2015 periods were each materially false and misleading and violated GAAP, as a result of:

    (a)     the improper recognition and reporting of revenue on licensing agreements;

    (b)     the improper reporting of accrued expenses on license agreements;

    (c)     the improper classification of expenses;

    (d)     the improper failure to consolidate certain joint ventures;

    (e)     the improper accounting for trademarks, including the improper reporting of gains of the sale of trademarks;

    (f)     the improper characterization of reported gains; and

    (g)     the improper failure to disclose related party transactions.

- 25 -

80.     The 2015 10-K revealed the true extent to which Defendants' accounting improprieties materially misstated the Company's originally reported operating results during the Class Period.  The material misstatements of the Company's originally reported annual results based on the Second Restatement are illustrated, in part, in the following charts:[3]

## 2013 Annual Results

|  | Originally Reported | Second Restatement | % Overstated |
|---|---|---|---|
| Revenue | $432,626 | $390,574 | 10.77% |
| Operating Expenses | $175,215 | $155,596 | 12.61% |
| Operating Income | $257,411 | $234,978 | 9.55% |
| Pre-tax Income | $200,662 | $166,887 | 20.24% |
| Net Income | $142,587 | $117,292 | 21.57% |
| Net Income – Iconix Brand Grp | $128,048 | $104,989 | 21.96% |

## 2014 Annual Results

|  | Originally Reported | Second Restatement | % Overstated |
|---|---|---|---|
| Revenue | $461,243 | $391,490 | 17.82% |
| Operating Expenses | $205,410 | $171,062 | 20.08% |
| Operating Income | $255,833 | $220,428 | 16.06% |
| Pre-tax Income | $229,166 | $167,110 | 37.13% |
| Net Income | $167,429 | $118,822 | 40.91% |
| Net Income – Iconix Brand Grp | $152,736 | $103,723 | 47.25% |

---

[3]     While Iconix has admitted that its originally reported financial results prior to 2013 were also materially misstated, it has not published a complete set of restated financial statements for periods prior to 2013.  The Company has disclosed, however, that its originally reported 2012 operating income was understated by approximately 5.5% and its originally reported 2011 net income was overstated by approximately 7.9%.

81.    The Second Restatement also revealed that the Company's originally reported quarterly operating results were material misstated, in part, as follows:[4]

% Overstated / (Understated) as orginally reported

|  | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 |
|---|---|---|---|---|---|---|---|
| Licensing Revenue | 1.60% | 2.55% | 5.67% | 6.41% | (0.45%) | 1.09% | (2.62%) |
| Operating Income | 5.31% | 20.68% | 38.85% | 2.91% | (8.48%) | (4.73%) | (16.58%) |
| Pre-tax Income | 21.04% | 44.70% | 86.62% | 23.21% | (4.67%) | 3.49% | (49.26%) |
| Net Income | 18.50% | 43.91% | 127.15% | 27.31% | (4.54%) | 2.19% | (1) |
| Net Income - Iconix Brand Grp | 19.74% | 50.76% | 162.77% | 36.20% | (3.85%) | 7.49% | (2) |

(1) - Iconix orginally reported a Net Loss for Q3 2015 that was overstated by 212%.
(2) - Iconix orgininally reported a Net Loss - Iconix Brand Group for Q3 2015 that was overstated by 18%.

82.    The Company's restatements acknowledge that Defendants' accounting improprieties also materially misstated the Company's originally reported assets, liabilities, stockholders' equity, segment reporting, cash flows, and related financial disclosures during the Class Period.

**Iconix's Financial Misstatements
Were the Result of Intentional Conduct**

83.    Evidencing the Defendants' intent to misstate the Company's financial reporting during the Class Period, Iconix has now admitted that:

- its Board of Directors formed a Special Committee that hired a team of legal and accounting advisors to review Iconix's financial reporting;

- based on the reviews made by its Special Committee, Audit Committee, and Board of Directors, the Company now *twice* restated the financial statements it issued during the Class Period to correct a myriad of accounting improprieties dating back to, at least, 2011;

- at least five of its senior executives directly responsible for the Company's public disclosures and financial accounting, including its CEO, *two* CFOs, its COO, and its General Counsel, "resigned" during an approximate *two year* period;

---

[4]    Although Iconix has admitted that its originally reported 2013 quarterly results were also materially misstated, it has not published restated 2013 quarterly financial statements.

- its disclosure controls and internal control over financial reporting were riddled with material weaknesses that contributed to the material misstatements of its historical financial statements; and

- it is now subject to a formal order of investigation by the SEC.

84. Indeed, the multiplicity of the Company's GAAP violations; the duration and magnitude of Iconix's financial misstatements; two financial restatements; the formation of a Special Committee by the Board of Directors (to conduct an internal investigation into the Company's financial reporting with the assistance of a team of legal and accounting advisors); the rash of "resignations" of key members of executive management during a short two-year period; the numerous, material disclosure and internal control deficiencies; and the ongoing formal investigation launched by the SEC, collectively, evidence fraudulent financial reporting, rather than mere innocent recordkeeping mistakes.

**Iconix Lacked Effective
Internal Controls During the Class Period**

85. Defendants' admissions that they failed to maintain effective internal controls began on August 12, 2015, when Iconix belatedly filed its quarterly report for the period ended June 30, 2015 with the SEC on Form 10-Q (the "2Q15 10-Q") and revealed a "***material weakness***" in Iconix's disclosure controls and procedures.  The 2Q15 10-Q stated, in pertinent part:

> In connection with the auditors' review of our quarterly financial statements included in this filing, certain adjustments were noted related to Company acquisitions and certain other matters that were subsequently recorded by the Company.  These adjustments were subsequently identified and ***determined to be the result of a lapse in the efficiency of review controls at the Company*** which was attributable to the recent transition of key executives.  ***As a result of this, the interim principal executive officer and principal financial officer concluded that the Company's disclosure controls and procedures were not effective in timely alerting them to material information required to be included in our periodic SEC filings and ensuring that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms***.

86.     However, the 2Q15 10-Q falsely represented that "[n]otwithstanding the material weakness" in Iconix's disclosure controls and procedures, Defendants had "concluded that the financial statements included in [the 2Q15 10-Q] present fairly, in all material respects, [Iconix's] financial position, results of operations and cash flows for the periods presented in conformity with [U.S. GAAP]."

87.     The 2Q15 10-Q further stated that Defendants had "also conducted an evaluation of internal control over financial reporting," and determined that "there ha[d] been no change in the Company's internal control during the three months ended June 30, 2015 that has materially affected, or is reasonably likely to materially affect, the Company's internal control."

88.     As Defendants have now admitted, by virtue of their decision to restate Iconix's 2Q15 financial results, these representations were false.

89.     Then, on November 25, 2015, when Iconix filed its amended 2014 10-K, Defendants revealed that, in light of the First Restatement, Iconix had "reassessed its evaluation of the effectiveness of its internal control over financial reporting as of December 31, 2014," "identified a material weakness," and "concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2014" and that the Company's "disclosure controls and procedures were not effective . . . as of December 31, 2014."

90.     Finally, on March 30, 2016, when Iconix filed its 2015 10-K setting forth the Second Restatement, Defendants revealed the existence of widespread material weaknesses in Iconix's internal controls, including:

- ineffective controls over financial reporting to support the accurate reporting of revenue and deferred revenue as of December 31, 2015, which led to errors being identified in revenue and deferred revenue;

- ineffective controls to formally identify related parties and ensure that proper measures were taken to analyze transactions with these parties before they were entered into and that they were properly disclosed in the financial statements;

- ineffective controls over financial reporting to appropriately document evidence that journal entries were sufficiently reviewed;

- ineffective controls over financial reporting with regard to: (i) certain revenue recognition; (ii) the classification of contractually obligated expenses as selling expenses (as opposed to netting such expenses with revenue); and (iii) the estimation of accruals related to retail support for certain license agreements;

- ineffective controls over financial reporting to appropriately document review of supporting schedules within Forms 10-K and 10-Q; and

- ineffective controls over financial reporting that were not appropriately designed, adequately documented, or operating effectively related to complex accounting transactions, as a result of which the Company recorded adjustments to: (i) reduce licensing revenue and remeasurement gains associated with the review of various historical accounting transactions; and (ii) record a liability for a royalty credit earned by a specific licensee in accordance with its license agreement.

91.    The 2015 10-K disclosed that "[a]s a result of these material weaknesses," Defendants had "concluded that [Iconix's] internal control over financial reporting was not effective as of December 31, 2015."

92.    While the 2015 10-K described the material weaknesses in Iconix's internal controls as existing "as of December 31, 2015," in light of the fact that Iconix has restated its financial results for fiscal years 2011, 2012, 2013, 2014, and the first two quarters of 2015, Defendants have essentially admitted that Iconix lacked effective internal controls throughout the entirety of the Class Period.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

**Full Year 2011 Financial Results**

93.    The Class Period begins on February 22, 2012.  On that date, Iconix issued a press release announcing its financial results for the fourth quarter and full year 2011, ended December 31,

2011, and reporting "[r]ecord [r]evenue and [e]arnings." For the quarter, the Company reported that total revenue had increased 9% year-over-year, to approximately $95.5 million, and free cash flow was approximately $44.9 million. In addition, for the quarter, Iconix reported: licensing and other revenue of $95.513 million; SG&A expenses of $43.589 million; operating income of $51.922 million; income before taxes of $46.215 million; provision for income taxes of $15.973 million; net income of $30.242 million; net income attributable to Iconix of $27.162 million; and basic and diluted EPS of $0.37 and $0.36, respectively.

94.    For the full year 2011, the Company reported that total revenue had increased 11% year-over-year, to approximately $369.8 million, and free cash flow had increased 8% year-over-year, to approximately $179.2 million. In addition, for the full year 2011, Iconix reported: licensing and other revenue of $369.845 million; SG&A expenses of $140.985 million; operating income of $228.766 million; income before taxes of $212.527 million; provision for income taxes of $71.286 million; net income of $141.241 million; net income attributable to Iconix of $126.105 million; basic and diluted EPS of $1.72 and $1.67, respectively; total assets of $2.161 billion; total liabilities of $867.727 million; and total stockholders' equity of $1.294 billion. Commenting on the results, Defendant Cole stated, in pertinent part:

> We are pleased to report that ***2011 was another record year for our Company***. We continued to successfully execute our growth strategy through organic initiatives and acquisitions and look forward to continuing to build global businesses for our diverse portfolio of iconic brands. ***We see international expansion as the next big phase of growth for our Company and through our partnerships in China, Latin America, Europe and our newly announced joint venture in India we are well positioned to maximize the value of our brands around the world.*** In 2012, we remain committed to creating shareholder value by executing our growth initiatives and will continue to evaluate share repurchases as an additional way to deliver value.

95.    Also on February 22, 2012, Defendants held a conference call with analysts and investors, during which Defendant Cole stated, in pertinent part:

*In looking at our performance for 2011 in which we reported another record year for our Company, our business model continues to prove its long-term sustainability and profitability. With our diversified portfolio, growing international presence, acquisition activity, scalable platform we were able to deliver strong sales growth and profits* despite challenges in some of our men's businesses.

96.     On February 29, 2012, Iconix filed its annual report for the year ended December 31, 2011 with the SEC on Form 10-K (the "2011 10-K"), which was signed by Defendants Cole and Clamen and reiterated the Company's previously announced financial results.  The 2011 10-K included signed certifications by Defendants Cole and Clamen representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

97.     With respect to Iconix's accounts receivable, the 2011 10-K stated, in pertinent part:

*Accounts receivable are reported at amounts the Company expects to be collected, net of allowance for doubtful accounts, based on the Company's ongoing discussions with its licensees, and evaluation of each licensee's payment history and account aging.  As of December 31, 2011 and 2010, the Company's allowance for doubtful accounts was $6.6 million and $6.2 million, respectively*.

98.     The statements referenced above in ¶¶93-97 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following adverse facts that were known to Defendants or recklessly disregarded by them:

(a)     that Iconix's reported financial results materially overstated the Company's financial performance, as detailed herein;

(b)     that Iconix materially misstated the cost basis of, and gains on, certain trademarks sold or contributed to joint ventures, and improperly reported gains on sales of trademarks as revenue, as detailed in ¶¶294-299;

(c)     that Iconix failed to timely write off uncollectible accounts receivable, as detailed in ¶¶305-307;

(d)     that Iconix's free cash flow was materially misstated, as detailed in ¶¶308-313;

(e)     that Iconix's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶147, 150.  Accordingly, Iconix's financial statements were materially false and misleading when issued;

(f)     that the Company's internal and disclosure controls were materially deficient and not operating effectively, as detailed in ¶¶266-267, 314-319; and

(g)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business and its prospects.

**First Quarter 2012 Financial Results**

99.     On April 25, 2012, Iconix issued a press release announcing its financial results for the first quarter, ended March 31, 2012.  For the quarter, the Company reported total revenue of approximately $88.5 million, and reported that free cash flow had increased 3% year-over-year, to approximately $47.4 million.  In addition, Iconix reported: licensing and other revenue of $88.451 million; SG&A expenses of $30.899 million; operating income of $57.552 million; income before taxes of $45.722 million; provision for income taxes of $14.843 million; net income of $30.879 million; net income attributable to Iconix of $27.599 million; basic and diluted EPS of $0.38 and $0.37, respectively; total assets of $2.161 billion; total liabilities of $869.339 million; and total stockholders' equity of $1.292 billion.  Commenting on the results, Defendant Cole stated, in pertinent part:

> With the majority of our portfolio performing well in the U.S. and our continued expansion into new geographies, we believe *our Company remains strong and is well positioned for growth in 2013 and beyond*.  Although we see some challenges in the short term, we remain positive on the long-term as *we continue to execute an exciting and extremely profitable business model with a diversified portfolio and strong foundation. With our strong balance sheet and significant cash flow* we

plan to continue to execute on our share repurchase program as well as remain focused on acquisitions to deliver additional value to our shareholders.

100. Also on April 25, 2012, Defendants held a conference call with analysts and investors, during which Defendant Cole stated that, "we believe *our Company remains strong and is well-positioned for growth in 2013 and beyond. While we have encountered some near-term challenges they are not truly reflective of the big picture and the overall trends we are seeing*."

101. On May 7, 2012, Iconix filed its quarterly report for the period ended March 31, 2012 with the SEC on Form 10-Q (the "1Q12 10-Q"), which was signed by Defendants Cole and Clamen and reiterated the Company's previously announced financial results. The 1Q12 10-Q included signed certifications by Defendants Cole and Clamen representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

102. The statements referenced above in ¶¶99-100 were materially false and misleading at the time they were made for the reasons set forth in ¶98.

**Second Quarter 2012 Financial Results**

103. On July 25, 2012, Iconix issued a press release announcing its financial results for the second quarter, ended June 30, 2012. For the quarter, the Company reported that total revenue had increased 5% year-over-year, to approximately $93.6 million, and free cash flow had increased 11% year-over-year, to approximately $51.9 million. In addition, Iconix reported: licensing and other revenue of $93.646 million; SG&A expenses of $34.641 million; operating income of $59.005 million; income before taxes of $48.151 million; provision for income taxes of $16.178 million; net income of $31.973 million; net income attributable to Iconix of $28.585 million; basic and diluted EPS of $0.41 and $0.40, respectively; total assets of $2.003 billion; total liabilities of $730.042

million; and total stockholders' equity of $1.273 billion.  Commenting on the results, Defendant

Cole stated, in pertinent part:

> We are pleased with our overall performance in the second quarter. ***Our strategy of building our brands globally is gaining momentum with the launch of our India joint venture with Reliance*** and our first two direct-to-retail licenses in Europe. Looking ahead, we see continued opportunities to grow the portfolio both in the U.S. and around the world. In addition, ***with our significant free cash flow and strong balance sheet we plan to continue to deliver increased shareholder value*** through acquisitions and share repurchase.

104.    Also on July 25, 2012, Defendants held a conference call with analysts and investors,

during which Defendant Clamen stated that "***the completion of [Iconix's] new joint venture in***

***India*** . . . ***contributed approximately $5.6 million to the top line***."

105.    On August 6, 2012, Iconix filed its quarterly report for the period ended June 30,

2012 with the SEC on Form 10-Q (the "2Q12 10-Q"), which was signed by Defendants Cole and

Clamen and reiterated the Company's previously announced financial results.  The 2Q12 10-Q

included signed certifications by Defendants Cole and Clamen representing that the financial

information contained therein was accurate and that the Company's internal and disclosure controls

were effective.

106.    The 2Q12 10-Q also represented that Iconix had recorded a gain of $5.6 million

during the quarter related to the sale of a 50% interest in the Company's brands in India:

> In May 2012, the Company contributed substantially all rights to its wholly-owned and controlled brands in India to Imaginative Brand Developers Private Limited ("IBD"), a then newly formed subsidiary of the Company.   Shortly thereafter, Reliance Brands Limited ("Reliance"), an affiliate of the Reliance Group, purchased a 50% interest in IBD for $6.0 million.  Reliance paid $2.0 million upon the closing of the transaction and committed to pay an additional $4.0 million over the 48-month period following closing.  ***As a result of this transaction, the Company recorded a gain of $5.6 million, which is included in licensing and other revenue in the Current Quarter***.  As of June 30, 2012, of the $4.0 million remaining due to the Company from Reliance, $1.0 million is included in other assets – current and $3.0 million is included in other assets on the unaudited condensed consolidated balance sheet.

- 35 -

107.    The statements referenced above in ¶¶103-106 were materially false and misleading at the time they were made for the reasons set forth in ¶98.

**Third Quarter 2012 Financial Results**

108.    On November 1, 2012, Iconix issued a press release announcing its financial results for the third quarter, ended September 30, 2012.  For the quarter, the Company reported total revenue of approximately $86.6 million and free cash flow of approximately $43.2 million.  In addition, Iconix reported: licensing and other revenue of $86.59 million; SG&A expenses of $33.026 million; operating income of $53.564 million; income before taxes of $47.71 million; provision for income taxes of $16.073 million; net income of $31.637 million; net income attributable to Iconix of $27.131 million; basic and diluted EPS of $0.40 and $0.38, respectively; total assets of $2.029 billion; total liabilities of $727.098 million; and total stockholders' equity of $1.302 billion.

109.    In addition, Iconix initiated guidance for the full year 2013, consisting of: full year 2013 revenue guidance of a range of $395-$405 million; full year 2013 GAAP diluted EPS guidance of a range of $1.75-$1.85; and full year 2013 free cash flow guidance of a range of $196-$203 million.  Commenting on the results, Defendant Cole stated, in pertinent part:

> ***Over the past few weeks we have announced several exciting initiatives including the acquisition of Umbro*** and the launch of a new Peanuts movie that we believe position our Company for long term growth. ***We also remain focused on international expansion***, which we now believe can grow to approximately 40% of our business. In addition, we have a strong acquisition pipeline and continue to evaluate a number of opportunities that could be actionable in the near-term. ***With 29 brands in our portfolio, inclusive of Umbro, that represent over $13 billion in annual retail sales, we believe our Company is stronger than ever*** and we look forward to continuing to grow our business and deliver value to our shareholders.

110.    Also on November 1, 2012, Iconix filed its quarterly report for the period ended September 30, 2012 with the SEC on Form 10-Q (the "3Q12 10-Q"), which was signed by Defendants Cole and Clamen and reiterated the Company's previously announced financial results. The 3Q12 10-Q included signed certifications by Defendants Cole and Clamen representing that the

- 36 -

financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

111.    The 3Q12 10-Q also reiterated that Iconix had recorded a gain of $5.6 million related to the sale of a 50% interest in the Company's brands in India, and stated that the gain was "included in licensing and other revenue in the Current Nine Months."

112.    The statements referenced above in ¶¶108-111 were materially false and misleading at the time they were made for the reasons set forth in ¶98.

**Full Year 2012 Financial Results**

113.    On February 20, 2013, Iconix issued a press release announcing its financial results for the fourth quarter and full year 2012, ended December 31, 2012. For the quarter, the Company reported that total revenue was approximately $85.1 million, and free cash flow was approximately $37.9 million. In addition, for the quarter, Iconix reported: licensing and other revenue of $85.131 million; SG&A expenses of $39.802 million; operating income of $45.329 million; income before taxes of $40.889 million; provision for income taxes of $11.869 million; net income of $29.02 million; net income attributable to Iconix of $26.093 million; and basic and diluted EPS of $0.38 and $0.37, respectively.

114.    For the full year 2012, the Company reported that total revenue was approximately $353.8 million, and free cash flow was approximately $180.5 million. In addition, for the full year 2012, Iconix reported: licensing and other revenue of $353.818 million; SG&A expenses of $138.368 million; operating income of $215.45 million; income before taxes of $182.472 million; provision for income taxes of $58.963 million; net income of $123.509 million; net income attributable to Iconix of $109.408 million; basic and diluted EPS of $1.57 and $1.52, respectively; total assets of $2.482 billion; total liabilities of $1.182 billion; and total stockholders' equity of $1.30 billion.

115.    In addition, Iconix announced that it was raising its full year 2013 revenue guidance to a range of $425-$435 million; raising its full year 2013 GAAP diluted EPS guidance to a range of $2.05-$2.15; and raising its full year 2013 free cash flow guidance to a range of $203-$210 million. Commenting on the results, Defendant Cole stated, in pertinent part:

> *Over the past year we have executed on several exciting initiatives that position our company for significant growth. We acquired three iconic brands, continued to expand our global footprint*, signed a Peanuts movie deal and launched a new $1.1 billion securitization facility. Looking to 2013 and beyond, *with our powerful portfolio of over 30 brands* that are well diversified across numerous industries and geographies *along with our strong balance sheet* and financial flexibility, we look forward to delivering continued growth and value to our shareholders.

116.    Also on February 20, 2013, Defendants held a conference call with analysts and investors, during which Defendant Clamen stated: "*With . . . a strong balance sheet and strong free cash flow, we believe we are well positioned to grow our business* through additional acquisitions."

117.    On February 28, 2013, Iconix filed its annual report for the year ended December 31, 2012 with the SEC on Form 10-K (the "2012 10-K"), which was signed by Defendants Cole and Clamen and reiterated the Company's previously announced financial results.  The 2012 10-K included signed certifications by Defendants Cole and Clamen representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

118.    The 2012 10-K also reiterated that Iconix had recorded a gain of $5.6 million during 2012 related to the sale of a 50% interest in the Company's brands in India, and stated that the gain was "*included in licensing and other revenue in FY 2012*."

119.    The 2012 10-K contained an identical representation concerning Iconix's accounting policy for accounts receivable to that contained in the 2011 10-K, as referenced above, and represented that: "*As of December 31, 2012 and 2011, the Company's allowance for doubtful accounts was $12.0 million and $6.6 million, respectively*."

120.    The statements referenced above in ¶¶113-119 were materially false and misleading at the time they were made for the reasons set forth in ¶98.

**First Quarter 2013 Financial Results**

121.    On April 24, 2013, Iconix issued a press release announcing its financial results for the first quarter, ended March 31, 2013 and reporting "[r]ecord [r]evenue and [e]arnings."  For the quarter, the Company reported that total revenue had increased 19% year-over-year, to approximately $105.1 million, and free cash flow had increased 9% year-over-year, to approximately $51.8 million.  In addition, Iconix reported: licensing and other revenue of $105.062 million; SG&A expenses of $38.826 million; operating income of $66.236 million; income before taxes of $54.305 million; provision for income taxes of $15.031 million; net income of $39.274 million; net income attributable to Iconix of $34.189 million; basic and diluted EPS of $0.53 and $0.51, respectively; total assets of $2.828 billion; total liabilities of $1.533 billion; and total stockholders' equity of $1.295 billion.

122.    In addition, Iconix reaffirmed its full year 2013 revenue guidance of a range of $425-$435 million; revised its full year 2013 GAAP diluted EPS guidance to a range of $1.87-$1.97; and reaffirmed its full year 2013 free cash flow guidance of a range of $203-$210 million.  Commenting on the results, Defendant Cole stated, in pertinent part:

> ***With record results in the first quarter***, 2013 is off to a strong start and we are on track to deliver over 20% revenue and EPS growth for the full year. We successfully completed three acquisitions in the past five months and with our current pipeline we believe there are additional opportunities, which would continue to enhance our portfolio. As we look ahead, we are also focused on continuing to build our portfolio of brands organically through our global platform, and we believe that ***with our free cash flow and strong balance sheet we will continue to create increased shareholder value***.

123.    On May 7, 2013, Iconix filed its quarterly report for the period ended March 31, 2013 with the SEC on Form 10-Q (the "1Q13 10-Q"), which was signed by Defendants Cole and Clamen

and reiterated the Company's previously announced financial results.  The 1Q13 10-Q included signed certifications by Defendants Cole and Clamen representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

124.    The statements referenced above in ¶¶121-123 were materially false and misleading at the time they were made for the reasons set forth in ¶98.

**Second Quarter 2013 Financial Results**

125.    On July 24, 2013, Iconix issued a press release announcing its financial results for the second quarter, ended June 30, 2013 and again reporting "[r]ecord [r]evenue and [e]arnings."  For the quarter, the Company reported that total revenue had increased 23% year-over-year, to approximately $115.1 million, and free cash flow had increased 17% year-over-year, to approximately $60.8 million.  In addition, Iconix reported: licensing and other revenue of $115.125 million; SG&A expenses of $43.611 million; operating income of $71.514 million; income before taxes of $60.676 million; provision for income taxes of $18.661 million; net income of $42.015 million; net income attributable to Iconix of $38.716 million; basic and diluted EPS of $0.69 and $0.66, respectively; total assets of $2.896 billion; total liabilities of $1.744 billion; and total stockholders' equity of $1.153 billion.

126.    In addition, Iconix reaffirmed its full year 2013 revenue guidance of a range of $425-$435 million; raised its full year 2013 GAAP diluted EPS guidance to a range of $1.97-$2.07; and reaffirmed its full year 2013 free cash flow guidance of a range of $203-$210 million.

127.    According to the press release, Iconix's second quarter results included "the formation of a new joint venture in Canada, which ***contributed approximately $9.8 million to revenue***."  Commenting on the results, Defendant Cole stated, in pertinent part:

With *record performance in the second quarter*, we made progress on our growth initiatives driving over 20% revenue growth and 60% EPS growth.  We believe *the performance we have achieved year-to-date and over the past several years demonstrates the power of our business model, and over the next few years we expect to see additional growth as we continue to build our existing brands around the world and further leverage our strong balance sheet and free cash flow* to add iconic brands to our portfolio and continue to enhance shareholder value through opportunistic share repurchases.

128.    Also on July 24, 2013, Defendants held a conference call with analysts and investors, during which Defendant Clamen stated, in pertinent part:

*Our strong top line reflects healthy trends across the majority of our portfolio, our recent acquisitions, and continued focus on international expansion, including the formation of a new joint venture in Canada.*

\*       \*       \*

In addition, *in the second quarter, the formation of our new joint venture in Canada contributed approximately $9.8 million to our revenue.  Similarly, the second quarter of 2012 included the formation of our joint venture in India, which contributed approximately $5.6 million to revenue in the prior-year quarter.*"

129.    On August 9, 2013, Iconix filed its quarterly report for the period ended June 30, 2013 with the SEC on Form 10-Q (the "2Q13 10-Q"), which was signed by Defendants Cole and Clamen and reiterated the Company's previously announced financial results.  The 2Q13 10-Q included signed certifications by Defendants Cole and Clamen representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

130.    With respect to Iconix's Joint Venture in Canada, formed during the quarter, the 2Q13 10-Q represented that it was "*not a variable interest entity and not subject to consolidation*" and stated, in pertinent part:

*Iconix Canada Joint Venture*

In June 2013, the Company contributed substantially all economic rights to its brands in Canada to Iconix Canada L.P., ICO Brands L.P., and 8560854 Canada, Inc. (together, "Iconix Canada"), all then newly formed joint ventures with BII and its

- 41 -

subsidiaries. In consideration for its aggregate 50% interest in Iconix Canada, BII agreed to pay $17.7 million in cash to the Company, of which approximately $8.8 million was paid upon closing of this transaction in June 2013, the remaining $8.8 million of which is a note payable to the Company to be paid over three years, with final payment in June 2016. *Of the $8.8 million note receivable, $2.9 million is included in other assets – current, the remaining $5.9 of which is included in other assets on the unaudited condensed consolidated balance sheet at June 30, 2013. As a result of this transaction, the Company recognized a gain of approximately $9.8 million which is included in licensing and other revenue on the unaudited condensed consolidated income statement for the Current Quarter and Current Six Months*.

*     *     *

*At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and BII, that Iconix Canada is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting*.

131.    The statements referenced above in ¶¶125-130 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following adverse facts that were known to Defendants or recklessly disregarded by them:

(a)    that Iconix's reported financial results materially overstated the Company's financial performance, as detailed herein;

(b)    that Iconix's financial results were materially misstated as a result of the Company's failure to consolidate certain joint ventures, as detailed in ¶¶288-293;

(c)    that Iconix materially misstated the cost basis of, and gains on, certain trademarks sold or contributed to joint ventures, and improperly reported gains on sales of trademarks as revenue, as detailed in ¶¶294-299;

(d)    that Iconix failed to timely write off uncollectible accounts receivable, as detailed in ¶¶305-307;

(e)    that Iconix's free cash flow was materially misstated, as detailed in ¶¶308-313;

- 42 -

(f)      that Iconix's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶147, 150.  Accordingly, Iconix's financial statements were materially false and misleading when issued;

(g)      that the Company's internal and disclosure controls were materially deficient and not operating effectively, as detailed in ¶¶266-267, 314-319; and

(h)      as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business and its prospects.

**Third Quarter 2013 Financial Results**

132.      On October 29, 2013, Iconix issued a press release announcing its financial results for the third quarter, ended September 30, 2013 and again reporting "[r]ecord [r]evenue and [e]arnings." For the quarter, the Company reported that total revenue had increased 24% year-over-year, to approximately $107.2 million, and free cash flow had increased 26% year-over-year, to approximately $54.3 million.  In addition, Iconix reported: licensing and other revenue of $107.175 million; SG&A expenses of $45.705 million; operating income of $61.47 million; income before taxes of $44.244 million; provision for income taxes of $13.74 million; net income of $30.504 million; net income attributable to Iconix of $28.997 million; basic and diluted EPS of $0.54 and $0.50, respectively; total assets of $2.852 billion; total liabilities of $1.756 billion; and total stockholders' equity of $1.096 billion.

133.      In addition, Iconix reaffirmed its full year 2013 revenue guidance of a range of $425-$435 million; raised its full year 2013 GAAP diluted EPS guidance to a range of $2.06-$2.16; and reaffirmed its full year 2013 free cash flow guidance of a range of $203-$210 million.  The Company also initiated guidance for the full year 2014, consisting of: full year 2014 revenue guidance of a range of $440-$455 million; full year 2014 GAAP diluted EPS guidance of a range of $2.19-$2.29; and full year 2014 free cash flow guidance of a range of $210-$217 million.

- 43 -

134.     According to the press release, Iconix's third quarter results included "the formation of a new joint venture in Australia, which *contributed approximately $5 million to revenue*." Commenting on the results, Defendant Cole stated, in pertinent part:

> We believe the performance we have achieved year to date, with over 20% revenue growth and over 40% EPS growth, *demonstrates the power of our business model and the strength of our portfolio*. Looking ahead into 2014 and beyond, we expect to continue to deliver strong growth through both organic initiatives as well as acquisitions, as *we continue to build our global footprint and further leverage our strong balance sheet*. In addition, we plan to continue to balance acquisitions with share repurchases, as we have successfully done over the past two years, in which we bought back 32% of our shares outstanding.

135.     Also on October 29, 2013, Defendants held a conference call with analysts and investors, during which Defendant Cole stated, in pertinent part:

> *[W]e believe the performance we have achieved year-to-date with double-digit revenue and earnings growth, demonstrates the power of our business model and the strength of our portfolio.  Looking ahead into 2014 and beyond, we expect to continue to deliver strong growth* in both organic initiatives as well as acquisitions, as we continue to build our global footprint and further leverage our strong balance sheet to add Iconix brands to our portfolio.

136.     On November 6, 2013, Iconix filed its quarterly report for the period ended September 30, 2013 with the SEC on Form 10-Q (the "3Q13 10-Q"), which was signed by Defendants Cole and Clamen and reiterated the Company's previously announced financial results. The 3Q13 10-Q included signed certifications by Defendants Cole and Clamen representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

137.     The 3Q13 10-Q contained a substantially similar discussion of the Iconix Canada Joint Venture to that contained in the Company's 2Q13 10-Q, as referenced above, including reiterating that it was "*not a variable interest entity and not subject to consolidation*."

138.     The 3Q13 10-Q also disclosed that Iconix had recorded a gain of $5.1 million during the quarter related to the sale of a 50% interest in Iconix Australia:

*Iconix Australia Joint Venture*

In September 2013, the Company formed Iconix Australia, LLC ("Iconix Australia"), a Delaware limited liability company and a wholly-owned subsidiary of the Company, and contributed substantially all rights to its wholly-owned and controlled brands in Australia and New Zealand (the "Australia territory") through an exclusive, royalty-free perpetual master license agreement with Iconix Australia. Shortly thereafter Pac Brands USA, Inc. ("Pac Brands") purchased a 50% interest in Iconix Australia for $7.2 million in cash, all of which was received upon closing of this transaction in September 2013. *As a result of this transaction, the Company recorded a gain of $5.1 million, which was included in licensing and other revenue in the Current Quarter*.

139.    The statements referenced above in ¶¶132-138 were materially false and misleading at the time they were made for the reasons set forth in ¶131.

**Full Year 2013 Financial Results**

140.    On February 20, 2014, Iconix issued a press release announcing its financial results for the fourth quarter and full year 2013, ended December 31, 2013 and again reporting "[r]ecord [r]evenue and [e]arnings."  For the quarter, the Company reported that total revenue had increased 24% year-over-year, to approximately $105.3 million, and free cash flow had increased 66% year-over-year, to approximately $62.9 million.  In addition, for the quarter, Iconix reported: licensing and other revenue of $105.264 million; SG&A expenses of $47.073 million; operating income of $58.191 million; income before taxes of $41.437 million; provision for income taxes of $10.643 million; net income of $30.794 million; net income attributable to Iconix of $26.146 million; and basic and diluted EPS of $0.51 and $0.44, respectively.

141.    For the full year 2013, the Company reported that total revenue had increased 22% year-over-year, to approximately $432.6 million, and free cash flow had increased 27% year-over-year, to approximately $229.9 million.  In addition, for the full year 2013, Iconix reported: operating cash flow of $232.798 million; licensing and other revenue of $432.626 million; SG&A expenses of $175.215 million; operating income of $257.411 million; income before taxes of $200.662 million;

provision for income taxes of $58.075 million; net income of $142.587 million; net income attributable to Iconix of $128.048 million; basic and diluted EPS of $2.28 and $2.11, respectively; total assets of $2.86 billion; total liabilities of $1.758 billion; and total stockholders' equity of $1.102 billion.

142.     In addition, Iconix reaffirmed its full year 2014 revenue guidance of a range of $440-$455 million; reaffirmed its full year 2014 GAAP diluted EPS guidance of a range of $2.19-$2.29; and reaffirmed its full year 2014 free cash flow guidance of a range of $210-$217 million. Commenting on the results, Defendant Cole stated, in pertinent part:

> *Since converting to a licensing model in 2005, we have built a powerful global platform, delivering compounded annual growth of around 40% for both revenue and EPS.  In 2013, we had another record year and continued to drive growth through the expansion of our worldwide footprint*, our acquisition strategy of asset light businesses and global brands, and our ongoing commitment to share repurchases. Looking ahead, as we continue to focus on international markets and additional acquisitions, *I believe we can build on our success and continue to deliver increased value to our shareholders*.

143.     Also on February 20, 2014, Defendants held a conference call with analysts and investors, during which Defendant Clamen stated that: "*Our strong top line primarily reflects our . . . continued focus on international expansion, including the formation of two new international joint ventures in Southeast Asia and Israel, which together contributed approximately $7 million to revenue*."

144.     During the call, Defendant Cole stated, in pertinent part:

> *2013 was a strong year for our company, with over 20% top line growth and over 40% non-GAAP EPS growth.*

> \*          \*          \*

> *Starting with our international strategy, we continue to make great progress in building our worldwide platform. And in 2013, we formed four new international joint ventures in Canada, Australia, Southeast Asia, and Israel.* We have structured these partnerships similar to our other previous signed deals in Latin America, China, Europe, and India, in which we have 50% ownership, and our

- 46 -

strategy has been to identify partners in each territory that have the relationships and networks similar to what we have in the United States, and leverage their expertise to expand our portfolio of brands into new geographies.

145.    On February 27, 2014, Iconix filed its annual report for the year ended December 31, 2013 with the SEC on Form 10-K (the "2013 10-K"), which was signed by Defendants Cole and Clamen and reiterated the Company's previously announced financial results.  The 2013 10-K included signed certifications by Defendants Cole and Clamen representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

146.    The 2013 10-K contained a substantially similar discussion of the Iconix Canada Joint Venture to that contained in the Company's 2Q13 10-Q, as referenced above, including reiterating that it was "*not a variable interest entity and not subject to consolidation*."  With respect to Iconix's Joint Ventures in Israel and Southeast Asia, formed during the fourth quarter, the 2013 10-K stated, in pertinent part:

*Iconix Israel Joint Venture*

    In November 2013, the Company contributed substantially all rights to its wholly-owned and controlled brands in the State of Israel and the geographical regions of the West Bank and the Gaza Strip (together, the "Israel Territory") to Iconix Israel LLC ("Iconix Israel"), a then newly formed subsidiary of the Company through an exclusive, royalty-free perpetual master license agreement with Iconix Israel[.] Shortly thereafter, M.G.S.  Sports Trading Limited ("MGS") purchased a 50% interest in Iconix Israel for approximately $3.3 million. MGS paid $1.0 million upon the closing of the transaction and committed to pay an additional $2.3 million over the 36-month period following closing. *As a result of this transaction, the Company recorded a gain of $2.3 million, which was included in licensing and other revenue in FY 2013*. As of December 31, 2013, of the $2.3 million remaining due to the Company from MGS, approximately $0.8 million is included in other assets – current and $1.5 million is included in other assets on the consolidated balance sheet.

*                *                *

    *At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and*

- 47 -

*MGS, that Iconix Israel is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting.*

\*      \*      \*

### Iconix Southeast Asia Joint Venture

In October 2013, the Company contributed substantially all rights to its wholly-owned and controlled brands in Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor (together, the "Southeast Asia Territory") to Lion Network Limited ("Iconix SE Asia"), a then newly formed subsidiary of the Company through an exclusive, royalty-free perpetual master license agreement with Iconix SE Asia. Shortly thereafter, LF Asia Limited ("LF Asia"), an affiliate of Li & Fung Limited, purchased a 50% interest in Iconix SE Asia for $12.0 million. LF Asia paid $7.5 million upon the closing of the transaction and committed to pay an additional $4.5 million over the 24-month period following closing. The Company may earn an additional $2.0 million based on certain criteria relating to the achievement of Iconix SE Asia revenue targets through the year ending December 31, 2014.

*As a result of this transaction, the Company recorded a gain of $4.7 million, which was included in licensing and other revenue in FY 2013. As of December 31, 2013, of the $4.5 million remaining due to the Company from LF Asia, $3.5 million is included in other assets - current and $1.0 million is included in other assets on the consolidated balance sheet.*

\*      \*      \*

*At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and LF Asia, that Iconix SE Asia is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting.*

147.    In addition, the 2013 10-K represented that Iconix's accounting policies with respect to VIEs were consistent with GAAP and stated, in pertinent part:

### Principles of Consolidation

The consolidated financial statements include the accounts of the Company, its wholly-owned subsidiaries, and, in accordance with U.S. GAAP and accounting for variable interest entities and majority owned subsidiaries, the Company consolidates five joint ventures (Scion, Peanuts Holdings, Hardy Way, Icon Modern Amusement, and Alberta ULC; see Note 3 for explanation). All significant intercompany transactions and balances have been eliminated in consolidation. The Company uses either the equity method or the cost method of accounting, depending on a variety of

- 48 -

factors as set forth in Accounting Standards Codification ("ASC") 323 - Investments ("ASC 323") and ASC 810 - Consolidation ("ASC 810"), to account for those investments and joint ventures which are not required to be consolidated under U.S. GAAP.

148.    The 2013 10-K also reiterated that Iconix had recorded a gain of $5.1 million related

to the sale of a 50% interest in Iconix Australia in September 2013, and stated that the gain was

"included in licensing and other revenue in the [full year] 2013."

149.    The 2013 10-K further stated that Iconix had recorded a gain of $10.0 million related

to the sale of Umbro trademarks in South Korea:

> In December 2013, the Company sold its Umbro trademarks in South Korea to a licensee for $10.0 million. *As a result of this transaction, the Company recorded a gain of $10.0 million*, which is included in licensing and other revenue on the consolidated income statement in FY 2013[.]

150.    With respect to Iconix's revenue recognition policies, the 2013 10-K stated, in

pertinent part:

> The Company has entered into various trademark license agreements that provide revenues based on minimum royalties and additional revenues based on a percentage of defined sales. Minimum royalty revenue is recognized on a straight-line basis over each period, as defined, in each license agreement.  Royalties exceeding the defined minimum amounts are recognized as revenue during the period corresponding to the licensee's sales. *Revenue is not recognized unless collectability is reasonably assured*.

151.    The 2013 10-K contained an identical representation concerning Iconix's accounting

policy for accounts receivable to that contained in the 2011 10-K, as referenced above, and

represented that: "*As of December 31, 2013 and 2012, the Company's provision for doubtful*

*accounts was $12.1 million and $12.0 million, respectively*."

152.    The statements referenced above in ¶¶140-151 were materially false and misleading

at the time they were made because they misrepresented and failed to disclose the following adverse

facts that were known to Defendants or recklessly disregarded by them:

(a)     that Iconix's reported financial results materially overstated the Company's financial performance, as detailed herein;

(b)     that Iconix's financial results were materially misstated as a result of the Company's failure to consolidate certain joint ventures, as detailed in ¶¶288-293;

(c)     that Iconix materially misstated the cost basis of, and gains on, certain trademarks sold or contributed to joint ventures, and improperly reported gains on sales of trademarks as revenue, as detailed in ¶¶294-299;

(d)     that Iconix improperly recognized revenue relating to certain license agreements without the requisite support for doing so, as detailed in ¶¶280-284;

(e)     that Iconix misclassified contractually obligated expenses, retail support, and other costs as SG&A expenses, instead of netting such expenses against licensing and other revenue, as detailed in ¶¶287;

(f)     that Iconix improperly accounted for accrued expenses related to retail support for certain licensing agreements, as detailed in ¶¶285-286;

(g)     that Iconix failed to timely write off uncollectible accounts receivable, as detailed in ¶¶305-307;

(h)     that Iconix's free cash flow was materially misstated, as detailed in ¶¶308-313;

(i)     that Iconix's operating cash flow was materially misstated, as detailed in ¶¶308-313;

(j)     that Iconix's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶147-150.  Accordingly, Iconix's financial statements were materially false and misleading when issued;

(k)      that the Company's internal and disclosure controls were materially deficient and not operating effectively, as detailed in ¶¶266-267, 314-319; and

(l)      as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business and its prospects.

**First Quarter 2014 Financial Results**

153.    On April 30, 2014, Iconix issued a press release announcing its financial results for the first quarter, ended March 31, 2014 and again reporting "[r]ecord [r]evenue and [e]arnings." For the quarter, the Company reported that total revenue had increased 11% year-over-year, to approximately $116.1 million, and free cash flow had increased 12% year-over-year, to approximately $58.0 million.  In addition, Iconix reported: licensing and other revenue of $116.138 million; SG&A expenses of $48.202 million; operating income of $67.936 million; income before taxes of $88.396 million; provision for income taxes of $25.554 million; net income of $62.842 million; net income attributable to Iconix of $59.768 million; basic and diluted EPS of $1.21 and $1.03, respectively; total assets of $2.846 billion; total liabilities of $1.790 billion; and total stockholders' equity of $1.056 billion.

154.    In addition, Iconix announced that it was raising its full year 2014 revenue guidance to a range of $450-$460 million; raising its full year 2014 GAAP diluted EPS guidance to a range of $2.50-$2.60; and raising its full year 2014 free cash flow guidance to a range of $213-$220 million. Commenting on the results, Defendant Cole stated, in pertinent part:

> ***With record results in the first quarter, 2014 is off to a strong start.*** Through our diversified portfolio of brands and expanding global footprint ***we continued to achieve strong growth***. As we look ahead, ***we believe we can continue to deliver significant value to our Company and shareholders*** through a combination of organic growth driven by international expansion and Peanuts initiatives, as well as, additional acquisitions of global iconic brands.

- 51 -

155.    Also on April 30, 2014, Defendants held a conference call with analysts and investors, during which Defendant Cole stated that: "***Through our diversified portfolio of brands and expanding global footprint we continue to achieve strong growth and generate significant free cash flow.***"

156.    During the call, Defendant Lupinacci stated, in pertinent part:

I am excited to be here today and to be part of this dynamic company with its ***outstanding financial track record. Reviewing results for the first quarter ended March 31, 2014 it was a record quarter for our company*** with revenue approximately $116.1 million an 11% increase as compared to $105.1 million in the first quarter 2013.

157.    On May 9, 2014, Iconix filed its quarterly report for the period ended March 31, 2014 with the SEC on Form 10-Q (the "1Q14 10-Q"), which was signed by Defendants Cole and Lupinacci and reiterated the Company's previously announced financial results.  The 1Q14 10-Q included signed certifications by Defendants Cole and Lupinacci representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

158.    The 1Q14 10-Q contained a substantially similar discussion of Iconix's Joint Ventures in Canada, Southeast Asia, and Israel to those contained in the Company's 2Q13 10-Q and 2013 10-K, as referenced above, including reiterating that each was "***not a variable interest entity and not subject to consolidation***."  With respect to Iconix's Joint Venture LC Partners U.S., formed during the quarter, the 1Q14 10-Q stated, in pertinent part:

*LC Partners U.S.*

In March 2014, the Company, through its wholly-owned subsidiary domiciled in Luxembourg, contributed its rights to the Lee Cooper trademarks in the U.S. through a royalty-free perpetual master license agreement to LC Partners U.S. LLC ("LCP"), a then newly formed wholly-owned Delaware limited liability company. Subsequent to this contribution, the Company sold 50% of the equity interests in LCP to Rise Partners LLC ("Rise Partners") for $4.0 million, of which $0.4 million was received during the Current Quarter and $0.4 million was paid shortly after

closing subsequent to the Current Quarter, the remaining $3.2 million to be paid in four equal annual installments on the first through[] the fourth anniversaries of the closing date. *As of March 31, 2014, $1.2 million of the $3.6 million is included in other assets – current, with the remaining $2.4 million included in other assets in the unaudited condensed consolidated balance sheet. As a result of this transaction the Company recorded a $4.0 million gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement in the Current Quarter*.

> *At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and Rise Partners, that LCP is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting*.

159.     The statements referenced above in ¶¶153-158 were materially false and misleading at the time they were made for the reasons set forth in ¶152.

**Second Quarter 2014 Financial Results**

160.     On July 29, 2014, Iconix issued a press release announcing its financial results for the second quarter, ended June 30, 2014 and again reporting "[r]ecord [r]evenue and [e]arnings."  For the quarter, the Company reported that total revenue had increased 3% year-over-year, to approximately $118.9 million, and free cash flow was approximately $60.0 million.  In addition, Iconix reported: licensing and other revenue of $118.943 million; SG&A expenses of $44.293 million; operating income of $74.650 million; income before taxes of $59.56 million; provision for income taxes of $20.778 million; net income of $38.782 million; net income attributable to Iconix of $35.319 million; basic and diluted EPS of $0.73 and $0.60, respectively; total assets of $2.845 billion; total liabilities of $1.784 billion; and total stockholders' equity of $1.061 billion.

161.     In addition, Iconix raised its full year 2014 revenue guidance to a range of $455-$465 million; reaffirmed its full year 2014 GAAP diluted EPS guidance of a range of $2.50-$2.60; and raised its full year 2014 free cash flow guidance to a range of $215-$222 million.  Commenting on the results, Defendant Cole stated, in pertinent part:

*With record results in the second quarter, we continue to demonstrate the power of our business model with our diversified revenue stream and strong free cash flow.* As we look to the future we believe *we can continue to deliver significant growth and increased value for our Company and shareholders* through our global expansion plans, worldwide Peanuts business and additional acquisitions of global iconic brands.

162.    Also on July 29, 2014, Defendants held a conference call with analysts and investors, during which Defendant Horowitz discussed Iconix's sale of the Sharper Image domain name and trademark, stating, in pertinent part:

> *In the second quarter, we sold the rights to the sharper image eCommerce and US catalog businesses for $10 million to our licensee Camelot, at a 10 times revenue multiple, resulting in $7.8 million of revenue in the second quarter*. Going forward, we will continue to receive a royalty on Sharper Image product sold by our licensees to both Camelot and all global retailers and Camelot will own and manage the catalog eCommerce and catalog business which is more of a curated specialty shop that sells multiple brands.

163.    During the call, the following exchange took place:

Jim Chartier – Monness, Crespi, Hardt & Co. – Analyst:

Just along the revenue line, I just wanted to be clear, there is $7.8 million of revenue from selling Sharper Image e-commerce business, and then another $14 million related to the sales from brands through international joint venture?

Defendant Cole:

Correct. Roughly.

                              *      *      *

And also, just to clarify, on the Sharper Image, we are going to continue to get royalty by product that is being sold to the eCommerce site. And we also have a joint venture with [] Camelot to take the catalog around the world.

164.    On August 6, 2014, Iconix filed its quarterly report for the period ended June 30, 2014 with the SEC on Form 10-Q (the "2Q14 10-Q"), which was signed by Defendants Cole and Lupinacci and reiterated the Company's previously announced financial results.  The 2Q14 10-Q included signed certifications by Defendants Cole and Lupinacci representing that the financial

- 54 -

information contained therein was accurate and that the Company's internal and disclosure controls were effective.

165.    The 2Q14 10-Q contained a substantially similar discussion of Iconix's Joint Ventures in Canada, Southeast Asia, and Israel, and with LC Partners U.S., to those contained in the Company's 2Q13 10-Q, 2013 10-K, and 1Q14 10-Q, as referenced above, including reiterating that each was "***not a variable interest entity and not subject to consolidation***." With respect to Iconix's subsequent transaction with the Southeast Asia Joint Venture during the quarter, the 2Q14 10-Q stated, in pertinent part:

> In June 2014, the Company contributed substantially all rights to its wholly-owned and controlled brands in the Republic of Korea, and its Ecko, Zoo York, Ed Hardy and Sharper Image Brands in the European Uniton, and Tutkery, in each case, to Iconix SE Asia. In return, LF Asia agreed to pay the Company $15.9 million, of which $4.0 million was paid at closing. ***As a result of this transaction, the Company recorded a gain of $13.6 million in the Current Quarter, which is included in licensing and other revenue in the unaudited condensed consolidated income statement***.
>
> ***As of June 30, 2014, of the $15.9 million remaining due to the Company from LF Asia, $7.5 million is included in other assets—current and $8.4 million is included in other assets on the unaudited condensed consolidated balance sheet***.
>
> *            *            *
>
> ***At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and LF Asia, that Iconix SE Asia is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting***.

166.    The 2Q14 10-Q also disclosed the following concerning the sale of the Sharper Image domain name and trademark during the quarter:

> [I]n June 2014, the Company sold the exclusive right to use the "sharperimage.com" domain name and Sharper Image trademark in connection with the operation of a branded website and catalog distribution in specified jurisdictions, thereby decreasing indefinite-lived trademarks by approximately $2.2 million.

167.     The 2Q14 10-Q further stated that Iconix had realized a ***net gain of $7.8 million*** related to "the sale of the 'sharperimage.com' domain name and certain categories under the Sharper Image trademark[.]"

168.     The statements referenced above in ¶¶160-167 were materially false and misleading at the time they were made for the reasons set forth in ¶152.

**Third Quarter 2014 Financial Results**

169.     On October 28, 2014, Iconix issued a press release announcing its financial results for the third quarter, ended September 30, 2014 and again reporting "[r]ecord [r]evenue and [e]arnings." For the quarter, the Company reported that total revenue had increased 6% year-over-year, to approximately $113.8 million, and free cash flow had increased 14% year-over-year, to approximately $61.8 million.  In addition, Iconix reported: licensing and other revenue of $113.75 million; SG&A expenses of $50.19 million; operating income of $63.56 million; income before taxes of $47.119 million; provision for income taxes of $9.907 million; net income of $37.212 million; net income attributable to Iconix of $33.779 million; basic and diluted EPS of $0.70 and $0.58, respectively; total assets of $2.848 billion; total liabilities of $1.799 billion; and total stockholders' equity of $1.049 billion.

170.     In addition, Iconix reaffirmed its full year 2014 revenue guidance of a range of $455-$465 million; raised its full year 2014 GAAP diluted EPS guidance to a range of $2.61-$265; and reaffirmed its full year 2014 free cash flow guidance of a range of $215-$222 million.  The Company also initiated guidance for the full year 2015, consisting of: full year 2015 revenue guidance of a range of $485-$500 million; full year 2015 GAAP diluted EPS guidance of a range of $2.82-$3.00; and full year 2015 free cash flow guidance of a range of $220-$230 million. Commenting on the results, Defendant Cole stated, in pertinent part:

> *Our strong third quarter and year to date results reflect the continued strength of our overall portfolio and the power of our business model. With solid brand performance domestically supported by large direct-to-retail licenses, and double digit growth around the world driven by our global brands and joint ventures, we continue to execute in line with our successful track record.* As we look to 2015, we expect to continue to drive positive organic growth, and with our strong balance sheet we plan to deliver additional value as we execute on our acquisition strategy and continue to opportunistically repurchase stock.

171. Also on October 28, 2014, Defendants held a conference call with analysts and investors, during which Lupinacci highlighted Iconix's "***record third quarter***."

172. During the call, Defendant Cole highlighted Iconix's "***strong balance sheet***" and stated that the Company's "***business model remains attractive with its low-risk profile, strong consistent free cash flows***."

173. On November 7, 2014, Iconix filed its quarterly report for the period ended September 30, 2014 with the SEC on Form 10-Q (the "3Q14 10-Q"), which was signed by Defendants Cole and Lupinacci and reiterated the Company's previously announced financial results. The 3Q14 10-Q included signed certifications by Defendants Cole and Lupinacci representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

174. The 3Q14 10-Q contained a substantially similar discussion of Iconix's Joint Ventures in Canada, Southeast Asia, and Israel, and with LC Partners U.S., to those contained in the Company's 2Q13 10-Q, 2013 10-K, 1Q14 10-Q, and 2Q14 10-Q, as referenced above, including reiterating that each was "***not a variable interest entity and not subject to consolidation***." With respect to Iconix's subsequent transaction with the Southeast Asia Joint Venture during the quarter, the 3Q14 10-Q stated, in pertinent part:

> In September 2014, the Company contributed substantially all rights to its Lee Cooper and Umbro brands in the People's Republic of China, Hong Kong, Macau and Taiwan (together, the "Greater China Territory"), to Iconix SE Asia. In return, LF Asia agreed to pay the Company $21.5 million, of which $4.3 million was

paid at closing. *As a result of this transaction the Company recorded an $18.7 million gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement for the Current Quarter*.

*As of September 30, 2014, of the $35.6 million remaining due to the Company from LF Asia, $15.3 million is included in other assets—current and $20.3 million is included in other assets on the unaudited condensed consolidated balance sheet*.

\*       \*       \*

*At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and LF Asia, that Iconix SE Asia is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting*.

175.   The 3Q14 10-Q also reiterated that "in June 2014, the Company sold the exclusive right to use the 'sharperimage.com' domain name and Sharper Image trademark in connection with the operation of a branded website and catalog distribution in specified jurisdictions, thereby decreasing indefinite-lived trademarks by approximately $2.2 million" and that Iconix had realized "*a $7.8 million gain*" as a result of the transaction.

176.   The statements referenced above in ¶¶169-175 were materially false and misleading at the time they were made for the reasons set forth in ¶152.

**Full Year 2014 Financial Results**

177.   On February 26, 2015, Iconix issued a press release announcing its financial results for the fourth quarter and full year 2014, ended December 31, 2014.  For the quarter, the Company reported that total revenue had increased 7% year-over-year, to approximately $112.4 million.  For the first time, Iconix disclosed that approximately $102.2 million of that amount was comprised of licensing revenue and $10.3 million was comprised of other revenue.  In addition, for the quarter, Iconix reported: free cash flow of approximately $46.3 million; SG&A expenses of $62.725 million; operating income of $49.687 million; income before taxes of $34.091 million; provision for income

taxes of $5.498 million; net income of $28.593 million; net income attributable to Iconix of $23.87 million; and basic and diluted EPS of $0.50 and $0.44, respectively.

178.    For the full year 2014, the Company reported that total revenue had increased 7% year-over-year, to approximately $461.2 million.  Of that amount, approximately $406.9 million was comprised of licensing revenue and approximately $54.3 million was comprised of other revenue.  In addition, for the full year 2014, Iconix reported: free cash flow of approximately $174.3 million; SG&A expenses of $205.41 million; operating income of $255.833 million; income before taxes of $229.166 million; provision for income taxes of $61.737 million; net income of $167.429 million; net income attributable to Iconix of $152.736 million; basic and diluted EPS of $3.15 and $2.66, respectively; total assets of $2.873 billion; total liabilities of $1.805 billion; and total stockholders' equity of $1.069 billion.

179.    In addition, Iconix raised its full year 2015 revenue guidance to a range of $490-$510 million; raised its full year 2015 GAAP diluted EPS guidance to a range of $3.06-$3.20; and established new full year 2015 free cash flow guidance of a range of $208-$218 million. Commenting on the results, Defendant Cole stated, in pertinent part:

> *We are pleased with our performance in 2014 and are enthusiastic about our growing global brand management platform*, which today includes a diversified portfolio of over 35 brands across women's, men's, home and entertainment. *In 2015, we expect to achieve strong top and bottom line growth* driven by steady expansion in our domestic licensing business, rapid growth in our international business both inside our joint ventures and across the territories that we control, the excitement surrounding our upcoming Peanuts movie and the benefits of our recently announced Strawberry Shortcake and PONY transactions.

180.    Also on February 26, 2015, Defendants held a conference call with analysts and investors, during which Defendant Horowitz stated, in pertinent part:

> *2014 was another strong year for our Company. Our growth was driven by* the ongoing success of our direct to retail business with market leading retailers around the world, increasing momentum for our Peanuts brand, *global market expansion for our portfolio and the extension of our international joint venture platform*.

181.    During the call, Defendant Lupinacci stated that:  "*Other revenue in the quarter resulted from a revenue gain related to the formation of a new joint venture with [G]lobal [B]rands [G]roup to grow our international footprint in the Middle East*."

182.    In addition, Defendant Cole represented during the call that: "*our Company is stronger than ever* . . . ."

183.    On March 2, 2015, Iconix filed its annual report for the year ended December 31, 2014 with the SEC on Form 10-K (the "2014 10-K"), which was signed by Defendants Cole and Lupinacci and reiterated the Company's previously announced financial results.  The 2014 10-K included signed certifications by Defendants Cole and Lupinacci representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

184.    The 2014 10-K contained a substantially similar discussion of Iconix's Joint Ventures in Canada, Southeast Asia, and Israel, and with LC Partners U.S., to those contained in the Company's 2Q13 10-Q, 2013 10-K, 1Q14 10-Q, 2Q14 10-Q, and 3Q14 10-Q, as referenced above, including reiterating that each was "*not a variable interest entity and not subject to consolidation*." With respect to Iconix's Joint Venture in the Middle East, formed during the fourth quarter, the 2013 10-K stated, in pertinent part:

*Iconix Middle East Joint Venture*

In December 2014, the Company and certain of its subsidiaries contributed substantially all rights to their wholly-owned and controlled brands in the United Arab Emirates, Qatar, Kuwait, Bahrain, Saudi Arabia, Oman, Jordan, Egypt, Pakistan, Uganda, Yemen, Iraq, Azerbaijan, Kyrgyzstan, Uzbekistan, Lebanon, Tunisia, Libya, Algeria, Morocco, Cameroon, Gabon, Mauritania, Ivory Coast, Nigeria and Senegal to Iconix MENA LLC ("Iconix Middle East"), a then newly formed subsidiary of the Company through agreement with Iconix Middle East. Shortly thereafter, Global Brands Group Asia Limited ("GBG"), formerly Li & Fung, purchased a 50% interest in Iconix Middle East for approximately $18.8 million. GBG paid $6.3 million upon the closing of the transaction and committed to pay an additional $12.5 million over the 24-month period following closing. *As a result of*

*this transaction, the Company recorded a gain of $10.3 million for the difference between the consideration (cash and notes receivable) received by the Company and the book value of the brands contributed to the joint venture, which was included in other revenue in FY 2014 (see Note 4). As of December 31, 2014, of the $12.5 million remaining due to the Company from GBG, approximately $6.3 million is included in other assets - current and $6.2 million is included in other assets on the consolidated balance sheet.*

*   *   *

*At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and GBG, that Iconix Middle East is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting.*

185.     Under the heading "Principles of Consolidation," the 2014 10-K contained a substantially similar representation concerning Iconix's accounting policies with respect to VIEs to that contained in the 2013 10-K, as referenced above, and further stated, in pertinent part:

**Variable Interest Entities**

*In accordance with the variable interest entities ("VIE") sub-section of ASC 810, Consolidation, we perform a formal assessment at each reporting period regarding whether any consolidated entity is considered the primary beneficiary of a VIE based on the power to direct activities that most significantly impact the economic performance of the entity and the obligation to absorb losses or rights to receive benefits that could be significant to us.*

186.     The 2014 10-K again reiterated that "in June 2014, the Company sold the exclusive right to use the sharperimage.com domain name and Sharper Image trademark in connection with the operation of a branded website and catalog distribution in specified jurisdictions, thereby decreasing indefinite-lived trademarks by approximately $2.2 million" and that Iconix had realized "***a net gain of $7.8 million***" as a result of the transaction.

187.     With respect to Iconix's revenue recognition policies, the 2014 10-K represented, in pertinent part:

We have entered into various trade name license agreements that provide revenues based on minimum royalties and advertising/marketing fees and additional

revenues based on a percentage of defined sales. ***Minimum royalty and advertising/marketing revenue is recognized on a straight-line basis over the term of each contract year, as defined, in each license agreement. Royalties exceeding the defined minimum amounts are recognized as income during the period corresponding to the licensee's sales. Payments received as consideration for the grant of a license or advanced royalty payments are recognized ratably as revenue over the term of the license agreement and are reflected on the Company's consolidated balance sheets as deferred license revenue at the time payment is received and recognized ratably as revenue over the term of the license agreement. Revenue is not recognized unless collectability is reasonably assured***. If licensing arrangements are terminated prior to the original licensing period, we will recognize revenue for any contractual termination fees, unless such amounts are deemed non-recoverable.

In addition, we sell a brand's territories and/or categories through joint venture transactions which is a central and ongoing part of our business. . . . The Company considers, among others, the following guidance in determining the appropriate accounting and gains recognized from the initial sale of our brands/trademarks to our joint ventures: ASC 323, *Investments - Equity Method and Joint Venture,* ASC 605, *Revenue Recognition*, ASC 810, *Consolidations*, and ASC 845, *Nonmonetary Transactions - Exchanges Involving Monetary Consideration*.

188.    The 2014 10-K contained an identical representation concerning Iconix's accounting policy for accounts receivable to that contained in the 2011 10-K, as referenced above, and represented that:  "***As of December 31, 2014 and 2013, the Company's provision for doubtful accounts was $10.2 million and $12.1 million, respectively***."

189.    The statements referenced above in ¶¶177-188 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following adverse facts that were known to Defendants or recklessly disregarded by them:

(a)    that Iconix's reported financial results materially overstated the Company's financial performance, as detailed herein;

(b)    that Iconix's financial results were materially misstated as a result of the Company's failure to consolidate certain joint ventures, as detailed in ¶¶288-293;

(c)      that Iconix materially misstated the cost basis of, and gains on, certain trademarks sold or contributed to joint ventures, and improperly reported gains on sales of trademarks as revenue, as detailed in ¶¶294-299;

(d)      that Iconix improperly recognized revenue relating to certain license agreements without the requisite support for doing so, as detailed in ¶¶280-284;

(e)      that Iconix misclassified contractually obligated expenses, retail support, and other costs as SG&A expenses, instead of netting such expenses against licensing and other revenue, as detailed in ¶287;

(f)      that Iconix improperly accounted for accrued expenses related to retail support for certain licensing agreements, as detailed in ¶¶285-286;

(g)      that Iconix failed to timely write off uncollectible accounts receivable, as detailed in ¶¶305-307;

(h)      that Iconix's free cash flow was materially misstated, as detailed in ¶¶308-313;

(i)      that Iconix's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶147-150.  Accordingly, Iconix's financial statements were materially false and misleading when issued;

(j)      that the Company's internal and disclosure controls were materially deficient and not operating effectively, as detailed in ¶¶266-267, 314-319; and

(k)      as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business and its prospects.

**First Quarter 2015 Financial Results**

190.      On April 29, 2015, Iconix issued a press release announcing its financial results for the first quarter, ended March 31, 2015.  For the quarter, the Company reported that licensing

revenue had decreased 15% year-over-year, to approximately $95.4 million, and reported other revenue of $0.  In addition, Iconix reported: free cash flow of approximately $30.1 million; SG&A expenses of $44.155 million; operating income of $51.232 million; income before taxes of $91.817 million; provision for income taxes of $25.91 million;  net income of $65.907 million; net income attributable to Iconix of $62.84 million; basic and diluted EPS of $1.30 and $1.21, respectively; total assets of $3.022 billion; total liabilities of $1.915 billion; and total stockholders' equity of $1.107 billion.

191.    In addition, Iconix reaffirmed its full year 2015 revenue guidance of a range of $490-$510 million; raised its full year 2015 GAAP diluted EPS guidance to a range of $3.65-$3.79; and reaffirmed its 2015 free cash flow guidance of a range of $208-$218 million.  Commenting on the results, Defendant Cole assured investors that Iconix's "*core licensing business remains healthy*," and stated, in pertinent part:

> In the first quarter we continued to execute on our global strategy and remain focused on international, entertainment and sports as key drivers of our growth.   Our international business continued to grow in the first quarter *with our joint ventures in Australia, India, Southeast Asia and the Middle East, as well as our Latin America business, each delivering double-digit gains*.

192.    Also on April 29, 2015, Defendants held a conference call with analysts and investors, during which Defendant Cole stated that:  "*we are confident in the health of our overall business and believe our Company is positioned for continued success*."

193.    During the call, Defendant Cole also remarked upon Seeking Alpha's scrutiny of the Company's accounting for joint ventures, stating, in pertinent part:

> [I]n reading some of the things out there over the last month or two and being frustrated in somewhat of a quiet period couldn't really talk to it, *our total joint venture strategy is a little misunderstood in my opinion*.
>
> *We find best in class partners who will probably only be our partner if they got equity and we make these joint ventures not to realize short term gain when they buy the IP, but because they are so connected in the markets that we build a pretty*

- 64 -

*big footprint*.  And if you look at what happened in both China and in Latin America, we have had phenomenal success where in Latin America our royalty has more than tripled since we started and then we rebought back the JV's.

*     *     *

*I do believe our strategy is working both long-term and short term* and we have been able to build this pretty strong footprint going forward.

194.    On May 8, 2015, Iconix filed its quarterly report for the period ended March 31, 2015 with the SEC on Form 10-Q (the "1Q15 10-Q"), which was signed by Defendants Cole and Blumberg and reiterated the Company's previously announced financial results.  The 1Q15 10-Q included signed certifications by Defendants Cole and Blumberg representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

195.    The 1Q15 10-Q contained a substantially similar discussion of Iconix's Joint Ventures in Canada, Southeast Asia, Israel, and the Middle East, and with LC Partners U.S., to those contained in the Company's 2Q13 10-Q, 2013 10-K, 1Q14 10-Q, 2Q14 10-Q, 3Q14 10-Q, and 2014 10-K, as referenced above, including reiterating that each was "*not a variable interest entity and not subject to consolidation*."

196.    The statements referenced above in ¶¶190-195 were materially false and misleading at the time they were made for the reasons set forth in ¶189.

**Second Quarter 2015 Financial Results**

197.    On August 10, 2015, Iconix issued a press release announcing its financial results for the second quarter, ended June 30, 2015.  For the quarter, the Company reported that licensing revenue had increased 1% year-over-year, to approximately $98.5 million, and reported other revenue of $0.  In addition, Iconix reported: free cash flow of approximately $75.4 million; SG&A expenses of $49.087 million; operating income of $49.372 million; income before taxes of $31.555

million; provision for income taxes of $12.184 million;  net income of $19.371 million; net income attributable to Iconix of $14.768 million; basic and diluted EPS of $0.31 and $0.30, respectively; total assets of $3.068 billion; total liabilities of $1.942 billion; and total stockholders' equity of $1.126 billion.

198.    In addition, Iconix revised its full year 2015 revenue guidance to reflect its new classification of "licensing revenue" and "other revenue," forecasting licensing revenue of $410-$425 million and other revenue of $5-$15 million.  Iconix also revised its full year 2015 GAAP diluted EPS guidance to a range of $2.24-$2.39; and revised its 2015 free cash flow guidance to a range of $170-$190 million.   Commenting on the results, Defendant Cuneo stated, in pertinent part:

> In looking at today's results I believe the most important take-away is that ***Iconix' core underlying licensing business remains healthy and continues to generate significant free cash flow***. I am genuinely optimistic about the future of our Company and believe that ***Iconix has significant strengths upon which to build, including its global portfolio of over 35 diversified consumer brands and its profitable business model. I believe the Company is well positioned to resume its growth trajectory*** both organically and through new acquisitions.

199.    On August 12, 2015, Iconix belatedly filed its 2Q15 10-Q, which was signed by Defendants Jones and Cuneo and reiterated the Company's previously announced financial results. The 2Q15 10-Q represented that "[n]otwithstanding the material weakness" in Iconix's disclosure controls and procedures, Defendants had "concluded that the financial statements included in [the 2Q15 10-Q] present fairly, in all material respects, [Iconix's] financial position, results of operations and cash flows for the periods presented in conformity with [U.S. GAAP,]" and included signed certifications by Defendants Jones and Cuneo representing that the financial information contained therein was accurate.  The 2Q15 10-Q further stated that Defendants had "conducted an evaluation of internal control over financial reporting," and determined that "there ha[d] been no change in the Company's internal control during the three months ended June 30, 2015 that has materially affected, or is reasonably likely to materially affect, the Company's internal control."

200.    The 2Q15 10-Q contained a substantially similar discussion of Iconix's Joint Ventures in Canada, Southeast Asia, Israel, and the Middle East, and with LC Partners U.S., to those contained in the Company's 2Q13 10-Q, 2013 10-K, 1Q14 10-Q, 2Q14 10-Q, 3Q14 10-Q, and 2014 10-K, as referenced above, including reiterating that each was "***not a variable interest entity and not subject to consolidation***."

201.    The statements referenced above in ¶¶197-200 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following adverse facts that were known to Defendants or recklessly disregarded by them:

(a)    that Iconix's reported financial results materially overstated the Company's financial performance, as detailed herein;

(b)    that Iconix's financial results were materially misstated as a result of the Company's failure to consolidate certain joint ventures, as detailed in ¶¶288-293;

(c)    that Iconix materially misstated the cost basis of, and gains on, certain trademarks sold or contributed to joint ventures, and improperly reported gains on sales of trademarks as revenue, as detailed in ¶¶294-299;

(d)    that Iconix improperly recognized revenue relating to certain license agreements without the requisite support for doing so, as detailed in ¶¶280-284;

(e)    that Iconix misclassified contractually obligated expenses, retail support, and other costs as SG&A expenses, instead of netting such expenses against licensing and other revenue, as detailed in ¶287;

(f)    that Iconix improperly accounted for accrued expenses related to retail support for certain licensing agreements, as detailed in ¶¶285-286;

(g)      that Iconix failed to timely write off uncollectible accounts receivable, as detailed in ¶¶305-307;

(h)      that Iconix's free cash flow was materially misstated, as detailed in ¶¶308-313;

(i)      that Iconix's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶147, 150.  Accordingly, Iconix's financial statements were materially false and misleading when issued;

(j)      that the Company's internal controls over financial reporting were materially deficient and not operating effectively, as detailed in ¶¶266-267, 314-319; and

(k)      as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business and its prospects.

### Iconix's Accounting Fraud Was Slowly Exposed, Forcing It to Restate a Wide Range of Financial Results, Alter Its Accounting Practices, and Admit Severe Financial Problems

202.      Beginning in December 2014, events began to unfold that slowly exposed the illicit practices running rampant throughout Iconix and forced the Company to restate nearly five years of its financials.  These revelations surprised investors because the Company reported record earnings and growth for years, and projected such results would continue.  However, each revelation chipped away at the façade and exposed more pieces of the fraudulent scheme that resulted in massive declines in the Company's securities prices, analyst downgrades, and a formal investigation by the SEC.  Even as the truth leaked out, Defendants continued to mislead investors as to the Company's true financial condition, while they scrambled to replace a series of high-level executives abandoning their posts, and to issue patched-up financial reports restating nearly five years of fraudulent accounting "errors."

**The SEC Begins to Ask Questions and Defendant Clamen Jumps Ship**

203.    On November 25, 2013, Iconix received a comment letter addressed to Defendant Cole from the SEC regarding the accounting and presentation of its cash flows in its 2012 10-K.  As part of the comment letter process, Defendants analyzed the Company's financial statements and provided substantive responses about Iconix's accounting practices.  The Company finally agreed to revise its disclosures regarding certain cash flow metrics.  Defendant Clamen also undertook a certification that the Company was responsible for the truthfulness and accuracy of its statements.

204.    In the wake of the comment letter process, and the Company's detailed analysis of its financial reporting, on March 18, 2014, Defendant Clamen, who had signed and certified the Company's responses to the SEC's comment letters, resigned after serving as CFO for nine years. Although Defendants' carefully orchestrated fraud kept the market from realizing the true import of Clamen's resignation, it was only a matter of months until investors began to learn of the Company's improper accounting and true financial condition.

205.    On October 30 and 31, 2014, Defendants Cole and Blumberg sold substantial quantities of Company stock for massive proceeds.  The timing and amount of these sales were not random but rather intentional and suspiciously out of line with previous trading patterns.  These Defendants, while in possession of material non-public information about the Company's true financial condition and upcoming filing, sold more than $40 million, liquidating significant portions of their holdings while the stock was trading near its Class Period high.

206.    As detailed below, these sales were well-timed to maximize their benefit from the artificial inflation in the Company's stock because, as they knew but failed to disclose, the Company was going to change its financial reporting in its 3Q14 10-Q to be filed one week later on November 7, 2014 – a change that provided analysts with information that they previously lacked that enabled them to review and analyze the Company's accounting and uncover a massive accounting fraud.

**Analysts Began to Question the Company's Accounting Practices**

207.    On December 14, 2014, Off Wall Street released a detailed retail report into Iconix's financial reporting, including the Company's recently released third quarter 2014 financial results. The report noted that Iconix's September 30, 2014 quarterly report included a questionable one-time gain of $62.7 million, and a new line item on the cash-flow statement with a negative $44.9 million classified as "gains on sale of trademarks," even though that amount was allegedly not subtracted from the $179 million free cash-flow total.  As a result, Off Wall Street questioned the Company's financial reporting by citing to organic sales declines in core portfolio brands and unusual accounting practices, concluding the Company had "questionable" one-time gains, and was booking revenue gains on joint venture transactions as income and reclassifying old account receivables into "other assets," which in turn allowed Iconix to avoid bad debt expense and reflect higher earnings.

208.    Based on its research, Off Wall Street changed its recommendation for Iconix stock from "buy" to "sell."  Reflecting investors' concerns, news sources such as Bloomberg echoed the Off Wall Street findings regarding Iconix's "questionable" accounting practices and organic sales declines.

209.    As a result of this news, the price of Iconix stock fell a total of 8.9% ($3.44 per share) on December 15 and 16, 2014.  Specifically, the stock initially dropped from a closing price of $39.25 per share on Friday, December 12, 2014, to a closing price of $36.86 per share on Monday, December 15, 2014, on unusually heavy trading volume of 2.1 million shares traded.  As the market continued to digest the news, the price of Iconix stock continued to fall to a closing price of $35.84 per share on December 16, 2014, on unusually heavy trading volume of 1.5 million shares traded.

210.    Faced with this scrutiny, Defendants were forced to provide more visibility regarding the Company's joint venture practices.  On February 26, 2015, just two months after the Off Wall Street report was released, Iconix issued a press release announcing changes to its financial reporting

that illuminated certain aspects of the Company's "questionable" accounting methods.  For the first time since 2011, Iconix's financial results for the fourth quarter and fiscal year 2014 broke out "other revenue" from total revenue, revealing the portion of the Company's revenue that was generated from non-growth-oriented activities.  For the past two years, those categories of revenue had been consolidated, concealing the lack of licensing revenue growth by combining it with non-growth "other revenue" generated from one-time sales to joint venture partners and the re-measurement of investments.  This tactic had the effect of artificially inflating the Company's recurring, organic revenue growth.

211.    Additionally, the Company announced on February 26, 2015 that it misrepresented its previously reported operating cash flow and reported free cash flow.

212.    In its 2013 10-K, Iconix reported that its operations generated cash flows of $232.8 million during the year ended December 31, 2013.  On February 26, 2015, however, Iconix revealed that it had restated the amount of cash flow generated by its operations during 2013.  Indeed, Iconix acknowledged that amount of cash flow it previously reported as being from its operations during the year ended December 31, 2013 was overstated by $29.6 million, or approximately 15%.

213.    In its 2014 10-K, Iconix revealed that this restatement was due to its improper characterization of gains on the sale of trademarks as being cash flow from operations.

214.    When the market learned that one of the Company's most important financial metrics had been grossly overstated, the price of Iconix stock immediately dropped approximately 3% – from a close of $35.24 per share on February 25, 2015, to a closing price of $34.18 per share on February 26, 2015, on unusually heavy trading volume of 2.6 million shares traded.

215.     On February 27, 2015, citing the Company's "redefinition of [free cash flow]" and constrained guidance, Cowen and Company ("Cowen") cut its Iconix stock price target from $52 to $40.

216.     On the heels of the Off Wall Street report and accounting changes, on March 30, 2015, Iconix stunned investors by announcing the immediate departure of newly hired CFO, Defendant Lupinacci.  Lupinacci had been with Iconix for less than a year after replacing the Company's former CFO, Defendant Clamen.  Defendant Blumberg replaced Lupinacci as Interim CFO.

217.     Investors were stunned to learn that Iconix was losing yet another CFO after filing year-end financial results.  Adding insult to injury, Iconix's top-level financial executive was jumping ship right after two disclosures stirring market speculation about the Company's "questionable" accounting practices, and indicating to investors that there were undisclosed problems at the Company.

218.     The market immediately reacted to the news, causing the price of Iconix stock to drop 7.47% ($2.72 per share), falling from a closing price of $36.39 per share on March 30, 2015, to a closing of $33.67 per share on March 31, 2015, on unusually heavy trading volume of over 3.5 million shares traded.

219.     On April 2, 2015, analysts at Cowen downgraded Iconix from "Outperform" to "Market Perform" and cut their price target to $36 from $40, expressing concern over the departure of CFO Lupinacci and warning that "the instability in the CFO position adds additional risk to the story," in addition to an uncertain cash flow profile and difficulty projecting earnings.

220.     Shortly after the departure of Lupinacci – the Company's second CFO departure in a year – Seeking Alpha posted a series of three articles during the week of April 13, 2015 that deeply

analyzed Iconix's financial statements and revealed particularized details about the Company's accounting practices and joint venture structure.  The articles were able to glean additional detail from the Company's recent disclosures, including changes to revenue and free cash flow reporting announced on February 26, 2015, and alleged other problems with the Company's financials.  In particular, the articles discussed in detail the Company's faulty accounting (such as under-reporting the cost basis of assets transferred to joint ventures), declining and under-marketed brands, diminishing real earnings from business operations, and increasing reliance on brand sales and non-cash gains to boost revenue and earnings.

221.    The first article in the series, released on April 13, 2015 ("Iconix Brand Group Part 1: The Growth in Revenue and Earnings Was Driven by Increasing Sales of Assets and Non-Cash Gains"), stated:

> In the [Company's] most recent 10-K (p. 69), the past three years of operating cash flow were $206.9M, $203.2M, and $162.5M, for year[s] 2012-2014.  The operating [cash flows] were declining, yet both revenue and EPS were presented with an ever-growing story.  So what happened? It is not a hidden secret that with lax accounting rules and standard[s], a company has much flexibility in decisions and assumptions that could substantially inflate reported earnings using accounting practices. We can observe several such practices in Iconix financial statements that substantially affect [the] company's reported earnings.

222.    The second Seeking Alpha article, released on April 15, 2015 ("Iconix Brand Group Part 2:  The Diminishing Earnings Power of Iconix Brands"), discussed Iconix's declining brands and organic revenue growth.  The article compared Iconix's business to a rental property, given that it buys property (brands) and makes money by collecting rent (royalties from brand licensees).  When the Company sells the property, it earns a quick infusion of cash into the business, but in the long run it has less property on which to collect rent.  The article also emphasized the Company's inability to compensate for declining brands by acquiring new brands.

> The overall observed flattened revenue growth (shown in Table 2.1 and Figure 2.4), is the result of a[n] overall negative organic growth, offset by positive effect from

new acquisitions.  The two effects are always at play, however, a[s] time goes by, the weight of older brands becomes heavier and the new entrants have proportionally less impact. This especially becomes apparent in 2014, when new acquisitions waned with limited financing ability at debt equity ratio over 150%. Without new acquisitions, the growth rate would gravitate towards organic growth rate, and there would be no growth, with natural decline of older brands. This is also why, when Iconix CEO Neil Cole was asked during a presentation in 2013, what keep him up at night, his answer was direct to the point, a long dry period with no acquisitions.

223.    The third article in the Seeking Alpha series, released on April 17, 2015 ("Iconix Brand Group Part 3:  The Inevitability of Diminishing Brands Value at Iconix"), continued to analyze the Company's declining brand value and its declining earnings as a result.  According to the article, these problems were hastened by the Company's failure to properly market the brands: "Without sufficient investment in ads/marketing in an integrated operational process, a brand value would naturally decline. . . . Contract theory explained ads/marketing behavior of Iconix.  Neither licensor nor licensee has financial incentive to invest sufficient ads expenditure that is necessary to maintain the brands value."

224.    As the market digested the Seeking Alpha articles, the price of Iconix stock experienced a series of declines from April 10 to April 17, 2015 totaling 8.31% ($2.65 per share) on unusually heavy trading volume.  Specifically, the price of Iconix stock fell from a closing price of $34.68 per share on Friday, April 10, 2015, to closing prices of:  (i) $34.27 per share on Monday, April 13, 2015 (the release date of the first Seeking Alpha article); (ii) $33.90 per share on April 14, 2015; (iii) $33.30 per share on April 15, 2015 (the release date of the second Seeking Alpha article); (iv) $32.97 per share on April 16, 2015; and (v) $32.03 per share on April 17, 2015 (the release date of the third Seeking Alpha article).

225.    On the heels of these articles, amidst market speculation about its accounting and business model problems, Iconix announced, after the market closed on Friday, April 17, 2015, that Defendant Horowitz, yet another high-level Company executive (COO), had resigned.  This

resignation came less than two weeks after the resignation of Iconix's CFO (Defendant Lupinacci), and only one year after Horowitz was promoted to the COO position in March 2014.

226.    Investors and analysts were shocked.  Less than a month earlier they had learned that two CFOs had departed in the span of a year.  Now a third C-level executive was leaving the Company amidst the Seeking Alpha reports and market speculation regarding the Company's irregular accounting, inflated free cash flow, and questionable joint venture transactions.  Defendant Horowitz's resignation, the second within a month, served to confirm the recent allegations and speculation.

227.    On the next trading day, Monday, April 20, 2015, securities analyst Roth Capital Partners ("Roth") issued a report stating that "[n]ews of the COO's resignation is likely to weigh on shares near-term, particularly following the CFO's recent departure as well as uncertainties surrounding the company's prior reporting of free cash flow and practice of booking joint venture gains as revenue."  Roth also lowered its price target for Iconix's stock (from $42 to $36), noting concerns of "accounting irregularities" and "increasing uncertainty after recent management changes that followed questions surrounding the company's reporting practices."

228.    The market reacted sharply to the news with the stock price dropping 20.67% in a single trading day, from a closing price of $32.03 per share on Friday, April 17, 2015 to a closing price of $25.41 per share on Monday, April 20, 2015, on unusually heavy trading volume of over 17 million shares traded.

229.    On April 21, 2015, Brean Capital, LLC ("Brean")  also cut its target price for Iconix from $42 to $34 citing similar reasons, prophetically stating that "[w]hile we believe Mr. Horowitz's resignation was independent of the resignation of CFO Jeff Lupinacci, it is the second departure at

the C-Suite level in less than a month and as evidenced by the stock being off ~21% yesterday, it raises a lot of questions about earnings, possible restatements and the alleged accounting issues."

230.   On April 29, 2015, Iconix announced disappointing results for key metrics reported during the first quarter of 2015.  For the first time, the Company was forced to reveal the declining nature of its growth, contrary to its prior representations that growth was occurring at a record pace. The Company lacked new joint venture opportunities to sell-off brands that would prop up their revenue and disclosed that "[o]ther revenue was $0 in the first quarter of 2015."  The Company press release reported unexpected decreases in its key metrics of licensing revenue, EBITDA, and free cash flow. Iconix's press release specifically stated, in pertinent part:

> Licensing revenue for the first quarter of 2015 was approximately $95.4 million, a 15% decrease as compared to approximately $112.2 million in the first quarter of 2014. . . . EBITDA attributable to Iconix for the first quarter of 2015 was approximately $52.4 million, a 25% decrease as compared to $69.8 million in the prior year quarter. On a non-GAAP basis, as described in the tables below, net income attributable to Iconix was $26.7 million, a 32% decrease as compared to the prior year quarter of approximately $39.3 million.  Non-GAAP diluted EPS for the first quarter of 2015 was $0.54, a 27% decrease as compared to $0.74 in the prior year quarter. … Free cash flow attributable to Iconix for the first quarter of 2015 was approximately $30.1 million, a 39% decrease as compared to the prior year quarter of approximately $49.4 million.

231.   In an attempt to quiet the market's growing concerns, Defendants also repeatedly and emphatically denied any financial or managerial problems within the Company, assuring investors that "our core licensing business remains healthy" and instead highlighted the "double-digit gains" from the international joint venture non-cash gains.

232.   Later that day, Defendants Cole and Blumberg took part in a conference call and for the first time addressed analysts' questions regarding the escalating issues that had taken place over the last month.  First, addressing the departure of Defendants Lupinacci (CFO) and Horowitz (COO), Cole stated that "as a matter of policy we do not comment on personnel matters" and denied any

internal problems, stating that "these departures were completely unrelated to one another and while they took place in close proximity each executive left the organization for their own reasons."

233.     Then, during the question-and-answer session with securities analysts, Blumberg continued to tout the Company's growth, chalking up the significant decrease in free cash flow to a mere "timing issue":

Bob Drbul - Nomura Securities Intl (America) - Analyst

Hi, good morning, this is Karen O'Brien filling in for Bob. You mentioned you touched upon the free cash flow with it being down this quarter around 40% according to you calculations, can you just walk us through how you continue to plan for over $200 million for 2015? Is it just the $19 million that you commented on for April or what else goes into that? Thanks?

David Blumberg - Iconix Brand Group, Inc. - EVP, Head of Strategic Development, Interim CFO

Sure, Karen. There is a few things. One is that the year-over-year, in our mind, is a timing issue and so we think we are going to see, we know we are going to see the positive impact in Q2. In the first week of April we received $19 million and when you also compare March of this year to March of last year there was some DTR payments made last year early that were for Q2 through Q4.

234.     The Company remained quiet and kept denying any problems until August 6, 2015, when Iconix announced after the market closed that the Company would be taking another blow to the C-suite.  The Company's founder and alleged trailblazing leader, Defendant Cole, was stepping down from his position as CEO, Chairman, and President.  Cole was at the helm of Iconix, and had been leading the Company since it went by the name of Candie's and sold shoes.  Iconix had always emphasized that Cole was the Company's most important factor for growth and success which justified his disproportionately high salary, bonus, and performance-based compensation. Specifically, the announcement stated:

Neil Cole is stepping down from his positions as Chief Executive Officer, Chairman and President and as a member of the Board of Directors. Mr. Cole has agreed to serve as a special advisor to the Company through September 30, 2015 to assist with the transition. He thereafter intends to pursue other business opportunities. Iconix

- 77 -

board member Peter Cuneo has been appointed Chairman of the Board and Interim CEO.

235.    Defendant Cole's resignation was the fourth unexpected exodus from a senior Iconix executive within a year-and-a-half, following the resignations of Defendants Clamen (CFO, March 18, 2014), Lupinacci (CFO, March 30, 2015), and Horowitz (COO, April 13, 2015).  Defendant Cuneo, an Iconix Board member since 2006, was appointed Chairman of the Board and Interim CEO in place of Defendant Cole, who agreed to serve as special advisor to the Company through September 30, 2015.

236.    On Friday, August 7, 2015, in the aftermath of the Company's late Thursday announcement, analysts indicated that Cole's abrupt departure was confirmation of larger problems within the Company, which had been speculated upon by analysts but had not yet been fully disclosed.  For example, Wunderlich Securities ("Wunderlich") issued a report "*Cutting to Hold and PT of $16 - Old King Cole Dethroned; Giving Up on ICON*" stating that given the timing just before second quarter earnings, "we believe the board asked for Mr. Cole to resign" and Wunderlich was "'throwing in the towel' on ICON."  The report went on to state:

> We believe the company's ability, especially with a new CFO, to offset organic revenue declines with material one-time items and joint venture gains has become basically impossible and that the board was forced to take action . . . .

> *        *        *

> Lack of realism and organic growth declines doomed Mr. Cole. In 2012, Iconix experienced organic revenue declines driven by maturing brands. Instead of shifting the business model to a cash flow focus, which would have entailed debt and share repurchases and the initiation of a dividend program, management resorted to one-time items, joint ventures and asset sales to provide an illusion of organic growth; we estimate one-time items accounted for 16% of 2014 revenue. The model has become increasingly unsustainable and the architect is now gone.

237.    The report continued that "we have been gluttons for punishment, but have had enough" and cut their rating from "buy" to "hold."  The Wunderlich report explained that "with no

- 78 -

visibility, management in turmoil and Street expectations continuing not to fully incorporate the impact from one-time items, we are stopping the beating and moving to the sidelines until visibility and, frankly, hope, returns to the company."

238.    Multiple news sources, including Bloomberg Business and Benzinga, repeated the findings in the Wunderlich report as, they too, were "giving up on Iconix."

239.    On August 7, 2015, Brean Capital likewise cut their Iconix stock price target 31%, from $34 to $24, speculating that Cole's departure could be attributable, in part, to "accounting concerns[.]"

240.    By the end of the day, Iconix's stock plummeted on the biggest one-day slide since September 2002.  Specifically, the price of Iconix stock dropped 23.88% – falling from a closing price of $19.60 per share on August 6, 2015, to a closing price of $14.92 per share on August 7, 2015, on unusually heavy trading volume of over 10 million shares traded.

**In Response to SEC Inquiries, the Company Announced a Litany of Accounting Restatements**

241.    The Company's material accounting changes and intense analyst scrutiny did not go unnoticed by the SEC.  On August 10, 2015, less than a week after Cole had abruptly resigned, Iconix issued a press release revealing that the SEC was reviewing its accounting with respect to the Company's 2014 10-K.  In particular, Iconix disclosed that, through a comment letter process, the SEC was looking into its "accounting treatment for the formation of the Company's international joint ventures under [GAAP] and whether such joint ventures should potentially have been consolidated in the Company's historical results."  The Company warned that such consolidation would result in the reversal of gains it had recognized from the formation of the joint ventures (approximately $46.5 million in 2014, $24.6 million in 2013, and $5.6 million in 2012).  The

Company also announced that its Board had formed a Special Committee of independent directors to review the Company's accounting.

242.    The Company acknowledged that certain gains realized in 2012, 2013, and 2014 would need to be reversed if consolidation of the joint ventures was required.  The announcement stated, in relevant part:

> Iconix also announced today that it is currently in a comment letter process with the Staff of the Securities and Exchange Commission relating to an ongoing periodic review of the Company's Form 10-K for the year ended December 31, 2014. The current correspondence relates to the accounting treatment for the formation of the Company's international joint ventures under U.S. Generally Accepted Accounting Principles and whether such joint ventures should potentially have been consolidated in the Company's historical results.  The Company's Board of Directors also formed a Special Committee consisting of independent directors to review the accounting treatment related to certain of the Company's international joint venture transactions.
>
> The material terms of the joint venture agreements have been fully disclosed in the Company's prior filings, and the Company's independent auditors have audited and reviewed such filings. In the past three years, the gains that the Company recognized related to the formation of joint ventures were approximately $46.5 million in 2014, $24.6 million in 2013, and $5.6 million in 2012. If consolidation of the joint ventures is required, these gains would be reversed and treated as non-controlling interests. We continue to believe that the structure of our joint venture transactions should not result in consolidation and have presented our views and supporting accounting literature to the Staff.

243.    Nonetheless, the Company attempted to downplay any impact of the SEC inquiry on the Company's financial results or joint venture strategy:

> While the ultimate outcome of the Staff's comment letter process is unknown and may have a material effect on the Company's historical financial statements, the Company believes that the results of the comment letter process will not have a material impact on historical free cash flow, will not impact the Company's reported results for the first half of 2015, and will not impact the Company's overall business strategy of forming joint ventures with large, well-capitalized partners that have local market expertise to organically grow the existing portfolio of brands globally. The Company will continue to work closely with the Staff to resolve any remaining open comments.

244.    Further, the Company announced disappointing financial results for the second quarter of 2015, missing consensus quarterly earnings and revenue expectations by 13% and 14%, respectively.  The Company also dramatically cut its full-year sales guidance for 2015.

245.    In response to this news, on August 10, 2015, Cowen cut its Iconix stock price target in half, from $30 to $15, opining that "accounting concerns could cause EPS restatements" and cautioning that "[Iconix] disclosed that they are in discussions with the SEC in regards to the accounting treatment for the formation of their International JV's."

246.    As the market learned of this news, the price of Iconix stock declined even further by the end of the day.  Specifically, the price dropped 2.35%, falling from a closing price of $14.92 per share on Friday, August 7, 2015, to a closing price of $14.57 per share on Monday, August 10, 2015, on unusually heavy trading volume of 6.8 million shares traded.  The stock decline would have been even greater had the Company not downplayed the SEC inquiry.

247.    Finally, on November 5, 2015, the last day of the Class Period, Iconix announced that the Special Committee (along with a team of independent legal and accounting advisors) and the Company's management had completed its internal review of Iconix's accounting treatment related to its joint venture transactions.  The Company disclosed that, as a result of such review, it would restate certain financial statements from 2013 through 2015 (specifically, the fourth quarter and fiscal year 2013; the first, second, third, and fourth quarters of 2014; and the first and second quarters of 2015) to "correct certain errors in accounting," which impacted a host of metrics including revenue and operating income.  The restatements would reclassify "contractually obligated expenses, retail support and other costs as selling, general and administrative expenses, as opposed to netting such expenses against licensing or other revenue, as applicable" and correct "inadequate

support for revenue recognition relating to certain license agreements" and "inadequate estimation of accruals related to retail support for certain license agreements."

248.     Moreover, the Company revealed that it had reduced "revenue assumptions for the fourth quarter of 2015 related to the accounting adjustments recorded as a result of the Special Committee and current management team's reviews."  As a result, Iconix dramatically cut its 2015 guidance for earnings (from $2.00-$2.15 per share to $1.35-$1.40 per share), licensing revenue (from $410-$425 million to $370-$380 million), and other revenue (from $5-$15 million to zero). The Company also revealed the dire state of its declining brands, signaling to the market that certain intangible assets related to men's fashion brands may be impaired.

249.     These results were a far cry from the record-setting free cash flow, revenue, and earnings the Company had previously attributed to its increasingly high rates of organic growth.  The market learned for the first time that numerous improper accounting tricks were used throughout the Company's financial reports, and were propping up the organic growth illusion.

250.     In response to the Company's devastating announcements, on November 6, 2015, Brean downgraded their rating of Iconix from "Buy" to "Hold," citing the "accounting errors" and "disappointing pre-announcement and restatements" as the primary drivers for their pessimism.

251.     The same day, Wunderlich slashed Iconix stock price targets from $16 to $10 with a report "*Aaugh! Restatements Guidance Cuts Signal More Pain for ICON; Reiterate Hold*." Wunderlich dubbed the "materially lower guidance [] a stunner" and opined that "[c]oming on the recent earnings and revenue guidance cuts in August, it is blatantly obvious that visibility for Iconix is nearing historically low levels and that current management will have their work cut out, cleaning up the accounting morass that the prior team left behind."  Wunderlich concluded by noting that "we believe the company, with no full time CEO, two major top and bottom line cuts in four months, and

increasing worries over debt paydowns, has to rebuild credibility from probably the lowest depths of any licensing company in recent history."

252.    As a result of these stunning new facts revealed to the market, the price of Iconix stock plummeted **57.2%**, falling from a closing price of $16.14 per share on November 5, 2015 (the last day of the Class Period) to a closing price of $6.90 per share on November 6, 2015, on unusually high trading volume of 23.8 million shares traded.

**Post-Class Period Events**

253.    The fallout from Defendants' accounting fraud continued to unfold after the end of the Class Period.  On December 28, 2015, Iconix announced that the SEC had upgraded its previous review of Iconix's accounting for the formation of certain joint ventures to a formal investigation:

> [Iconix] today announced that the Company received a formal order of investigation from the Staff of the SEC.  The Company intends to fully cooperate with the SEC. As previously disclosed, the Company is currently in a comment letter process with the Staff of the SEC related to the accounting treatment for the formation of certain joint ventures.  Additionally, the Company formed a Special Committee of the Board of Directors to conduct a review of the accounting treatment related to certain of the Company's transactions.
>
> As announced in a Form 8-K filed on November 5, 2015, the Company's current management team determined, based in part on the Special Committee's review, that the Company would restate its historical financial statements in respect of (i) the 2013 fiscal year and the fourth quarter thereof, (ii) the 2014 fiscal year and each quarterly period thereof and (iii) the first and second quarters of 2015, to correct certain errors in accounting. The Company completed these restatements, which were filed at the end of November 2015.

254.    As a result of its discussions with the SEC, Iconix announced on February 18, 2016 that it would issue **another** set of restatements to correct its accounting treatment for certain joint venture transactions, which would delay its 2015 10-K until March 15, 2016:

> . . . . After discussions with the [SEC] Staff, the Company has concluded that with respect to its Iconix Canada, Iconix Israel, Iconix Southeast Asia, Iconix MENA and LC Partners US joint ventures, the Company will revise its historical accounting treatment to consolidate the financial statements of these entities with the Company's financial statements and will eliminate the previously reported gains on sale which

- 83 -

were recorded at the time these transactions were consummated (including the subsequent June 2014 and September 2014 transactions with respect to Iconix Southeast Asia).

255.    Iconix further revealed that the restatements would affect multiple aspects of the Company's financial reporting for fiscal years 2013 and 2014, including: (i) "recalculat[ing] the cost basis of the trademarks contributed to the respective joint ventures to determine the amount of the gain that should have been recorded at the time of the consummation of these transactions"; (ii) with respect to Iconix's recent sales of Umbro and Sharper Images trademarks, "recalculat[ing] the cost basis of the trademarks sold to determine the amount of the gain that should have been recorded at the time of sale"; (iii) "reclassify[ing] the presentation of its income statement to reflect gains on sale of trademarks as a separate line item above the Operating Income line, and not as revenue, as previously reflected"; and (iv) "reclassify[ing] the Equity Earnings on Joint Ventures line to above the Operating Income line, from its previous location within the Other Expenses section."

256.    On March 14, 2016, Iconix announced that it would further delay the filing of its 2015 10-K to an anticipated date of March 30, 2016 because it was unable to complete its accounting restatements.  On March 18, 2016, the Company announced that, as a result of this delay, it had "received a customary deficiency notice from the NASDAQ Listing Qualifications Staff" stating that it was not currently in compliance with NASDAQ Marketplace Rule 5250(c)(1).

257.    On March 28, 2016, the Company missed consensus earnings estimates for the fourth quarter of 2015 and reduced its full-year 2016 earnings guidance to $1.15-$1.30 per share (from $1.35-$1.40 per share).  The Company confirmed that the financial results incorporated the previously announced accounting restatements in connection with the ongoing SEC investigation:

> The results that the Company reported today reflect the historical restatement that the Company previously announced on February 18, 2016, and relates to consolidation of certain joint ventures that were previously accounted for as equity method investments, the elimination of the gains associated with those joint venture transactions, the recalculation of the cost basis of trademarks contributed to other

joint ventures that continue to be accounted for on the equity method, and certain other non-cash adjustments primarily to historical licensing revenue. With this restatement, the Company believes that all significant historical transactions have been reviewed and will be properly accounted for. As previously disclosed, the Company has responded to the Staff of the SEC with a Confirming Letter on all of the questions the Staff has raised.

258.    The Company also disclosed a material financial impact directly resulting from the SEC investigation and senior management turnover, in the form of "[s]pecial charges of approximately $11.1 million for the full year of 2015 and $1.6 million for the fourth quarter of 2015 related to professional fees associated with the previously disclosed correspondence with the Staff of the SEC and the Special Committee review, as well as costs related to the transition of Iconix management."

259.    In addition, the Company finally quantified its severe brand portfolio declines, announcing a "non-cash impairment charge of approximately $437.5 million in the fourth quarter of 2015 related to certain of the Company's trademarks and goodwill."  The Company stated that "[o]ver 90% of the impairment is related to the Company's men's business including Rocawear, Ecko and Ed Hardy, with the balance primarily related to the Company's Royal Velvet brand."  The total write-down ($437.5 million) represented approximately 17% of the Company's total consolidated assets as of December 31, 2015 ($2.52 billion).

## ICONIX'S FALSE FINANCIAL STATEMENTS

260.    SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  17 C.F.R. §210.4-01(a)(1).  Regulation S-X also requires that interim financial statements comply with GAAP. 17 C.F.R. §210.10-01(a).

261.    As detailed herein, Iconix has admitted that its previously issued financial statements were materially misstated over a multi-year period and "should no longer be relied upon."

262.     Specifically, the Company has now admitted that its financial statements for each of the years ended December 31, 2011, 2012, 2013, and 2014 and each of the interim financial statements it issued during the period 2011 through 2015 were materially misstated.   These misstatements, which Iconix acknowledged in two separate financial restatements, were the result of numerous and varied accounting improprieties and violations of GAAP, which are generally summarized as follows:

(a)     the improper recognition and reporting of revenue on licensing agreements;

(b)     the improper reporting of accrued expenses on license agreements;

(c)     the improper classification of expenses;

(d)     the improper failure to consolidate certain joint ventures;

(e)     the improper accounting for trademarks, including the improper reporting of gains of the sale of trademarks;

(f)     the improper characterization of reported gains; and

(g)     the improper failure to disclose related party transactions.

263.     Thus, there is no dispute that Iconix issued materially misstated financial statements and financial disclosures in violation of  GAAP and SEC regulations governing financial reporting prior to and during the Class Period.

264.     In addition to the admitted violations of GAAP, during the quarter ended September 30, 2015, Iconix recorded a $12.2 million charge associated with accounts receivable reserves and write-offs.  As alleged herein, Defendants caused Iconix to violate GAAP during the Class Period by falsely and misleadingly delaying the recognition of such charge.

265.     Iconix also supplemented its GAAP financial statements with certain "non-GAAP" financial measures during the Class Period that, admittedly, were materially false and misleading.  In

particular, the Company provided investors with materially false and misleading "free cash flow" data, a non-GAAP financial metric that Iconix represented during the Class Period to be "useful in evaluating its financial condition because it is representative of cash flow from operations that is available for repaying debt, investing and capital expenditures."

266.    Further, Iconix has admitted that, despite repeated representations to the contrary during the Class Period, its system of internal control over financial reporting was riddled with "material weaknesses."  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in an entity's financial statements will not be prevented or detected on a timely basis.

267.    As set forth in Section 13 of the Exchange Act, 15. U.S.C. §78m, Defendants were responsible for presenting Iconix's business activities in a manner that accurately and fairly reflected its transactions and maintaining a system of internal accounting controls sufficient to provide reasonable assurances that Iconix's financial statements conformed to GAAP:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -
>
>> A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>>
>> B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -
>>
>>> i.    transactions are executed in accordance with management's general or specific authorization;
>>>
>>> ii.    transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;
>>>
>>> iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

### Iconix's Admission that Its Financial Misstatements Were Material

268.    As noted herein, Iconix has now *twice* restated the financial statements it issued to investors during the Class Period due to a myriad of financial reporting improprieties.  These financial restatements establish that *Iconix itself* has concluded the financial statements it issued to investors during the Class Period were materially misstated, as only materially misstated financial statements are to be corrected and re-reported on a retroactive basis.[5]

269.    When Iconix issued the restatements, it revealed the true extent to which Defendants' accounting improprieties materially misstated the operating results that were originally reported by the Company during the Class Period.  The restatements revealed, for example, that Defendants fraudulently overstated the Company's annual revenues by 10.77% (FY 2013) and 17.82% (FY 2014) and its annual net income by 21.57% (FY 2013) and 40.91% (FY 2014).  *See* ¶¶74-82.

270.    These misstatements of Iconix's income-related financial measures materially distorted the Company's operating performance during the Class Period.  In addition, Defendants' accounting improprieties materially misstated the Company's originally reported assets, liabilities, stockholders' equity, segment reporting, cash flows, and related financial disclosures during the Class Period.

271.    Thus, there can be no dispute that the reported operating performance of Iconix, and Defendants' statements related thereto, during the Class Period were materially false and misleading.

---

[5]    *See, e.g.*, Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC")Topic 250, *Accounting Changes and Error Corrections*, SEC Codification of Staff Accounting Bulletins ("CSAB") Topic 1M *Financial Statements, Materiality* and Topic 1-N, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*.

In fact, the financial improprieties resulting in the two restatements were sufficient to overstate the Company's accumulated earnings, that is, the **cumulative** amount of net income Iconix reported from its **inception through December 31, 2014**, by more than **13%**.

272.    Moreover, the SEC, in CSAB 1M *Financial Statements, Materiality*, notes, in pertinent part:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

273.    Indeed, the number and magnitude of the financial metrics, now **twice** restated by Iconix, depict a Company whose finances bear little resemblance to those Defendants portrayed to investors during the Class Period.

274.    In addition, CSAB 1M provides that materiality in the context of a financial misstatement requires not only an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial misstatement (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

275.    Thus, CSAB 1M provides: "there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material."  In this regard, CSAB 1M notes that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."

276.    When the Company disclosed that the First Restatement was necessary to correct material misstatements in the financial statements it previously issued during the Class Period, the

price of its common stock declined **more than 57%** and its market capitalization collapsed by more than **$430 million**, further evidencing the materiality of the Company's financial misstatements.

### Iconix's Violations of GAAP

277.     In the First Restatement, Iconix admitted that the financial statements it issued during the Class Period violated GAAP in the following respects: (i) revenue was improperly recognized and reported; (ii) accrued expenses were improperly recognized and reported; and (iii) reported expenses were misclassified.

278.     Thereafter, Iconix disclosed that the Second Restatement was necessary to correct the Company's improper: (i) failure to consolidate certain joint ventures; (ii) accounting for trademarks; (iii) mischaracterization of reported gains; and (iv) failure to disclose related party transactions.

279.     In addition to these admitted violations of GAAP, during the quarter ended September 30, 2015, Iconix recorded a $12.2 million charge associated with accounts receivable reserves and write-offs.  As alleged below, Defendants caused Iconix to violate GAAP during the Class Period by falsely and misleadingly delaying the recognition of such charge.

**First Restatement – Improper Recognition and Reporting of Revenue**

280.     GAAP, as set forth in ASC No. 605, *Revenue Recognition*, provides that revenue is to be recognized when it is both earned and realized or realizable.  Revenue on a licensing arrangement is considered earned and realized or realizable only if all of the following criteria are met: (i) **persuasive evidence of an arrangement exists**; (ii) delivery has occurred; (iii) the seller's price to the buyer is fixed or determinable; and (iv) collectability of the revenue is reasonably assured.

281.     As explicitly noted in the SEC's CSAB 13A, *Revenue Recognition, Selected Revenue Recognition Issues*, when an entity's business practice requires that sale transactions be supported by a written agreement, a final sales agreement, executed by the appropriately authorized personnel of

the customer, is necessary to satisfy the persuasive evidence of an arrangement criterion of revenue recognition.

282.    The Company's publicly stated accounting policy for revenue recognition was falsely represented by Defendants to be consistent with GAAP.  For example, the Company's 2012 10-K, signed by Defendants Cole and Clamen, represented the following:

### Revenue Recognition

The Company has entered into various trademark license agreements that provide revenues based on minimum royalties and additional revenues based on a percentage of defined sales.  Minimum royalty revenue is recognized on a straight-line basis over each period, as defined, in each license agreement.  Royalties exceeding the defined minimum amounts are recognized as income during the period corresponding to the licensee's sales.  Revenue is not recognized unless collectability is reasonably assured.

283.    Iconix's 2014 10-K, signed by Defendants Cole and Lupinacci, contained a revised revenue recognition disclosure, acknowledging Defendants' knowledge of GAAP's revenue recognition requirements, stating, in pertinent part:

### Revenue Recognition

The Company enters into various trade name license agreements that provide revenues based on minimum royalties and advertising/marketing fees and additional revenues based on a percentage of defined sales.   Minimum royalty and advertising/marketing revenue is recognized on a straight-line basis over the term of each contract year, as defined, in each license agreement.  Royalties exceeding the defined minimum amounts are recognized as income during the period corresponding to the licensee's sales.  Payments received as consideration of the grant of a license or advanced royalty payments are recognized ratably as revenue over the term of the license agreement and are reflected on the Company's consolidated balance sheets as deferred license revenue at the time payment is received and recognized ratably as revenue over the term of the license agreement.  Revenue is not recognized unless collectability is reasonably assured.  If licensing arrangements are terminated prior to the original licensing period, we will recognize revenue for any contractual termination fees, unless such amounts are deemed non-recoverable.

In addition, from time to time, we sell a brand's territories and/or categories through joint venture transactions which is a central and ongoing part of our business. Since our goal is to maximize the value of the IP, we evaluate sale opportunities by comparing whether the offer is more valuable than the current and potential revenue

stream in the Company's traditional licensing model. Further, as part of the Company's evaluation process, it will also look at whether or not the buyer's future development of the brand could help expand the brands global recognition and revenue.

The Company considers, among others, the following guidance in determining the appropriate accounting for gains recognized from the initial sale of our brands/trademarks to our joint ventures: ASC 323, *Investments- Equity Method and Joint Venture*, ASC 605, *Revenue Recognition*, ASC 810, *Consolidations*, ASC 845, *Nonmonetary Transactions - Exchanges Involving Monetary Consideration* and Staff Accounting Bulletin No. 104.

284.    As part of the First Restatement, the Company admitted that it violated GAAP by improperly reporting revenue on licensing agreements when Iconix did not possess the requite support necessary to evidence their existence.

**First Restatement – Improper Recognition and Reporting of Accrued Expenses**

285.    GAAP requires expenses to be recorded in the period they are incurred.  *See* FASB ASC 450-20, *Loss Contingencies*, and Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶¶85-87.  The notion that expenses must be recorded in the same period in which the corresponding benefit is realized is one of the, if not the most, basic tenets underlying accrual accounting.

286.    As part of the First Restatement, Iconix admitted that it overstated its reported income by improperly delaying the recognition of retail support related expenses on certain license agreements.

**First Restatement – Mischaracterization of Expenses**

287.    In violation of the GAAP provisions set forth in ASC 605-45, *Revenue Recognition*, Defendants improperly overstate the Company's reported revenue by mischaracterizing contractually obligated, retail support, and other costs as SG&A expenses, when they were required to instead be netted against licensing or other revenue, as applicable.

**Second Restatement – Improper Failure to Consolidate Certain Joint Ventures**

288.   GAAP, as set forth in SEC Regulation S-X, provides that SEC registrants are generally required to consolidate majority owned entities.  17 C.F.R. §210.3A-02(a).  In certain situations, however, the consolidation of an entity is necessary, notwithstanding the lack of majority ownership, to present fairly the financial position and results of operations of the SEC registrant due to the existence of a parent-subsidiary relationship by means other than ownership of voting stock. *Id*.

289.   GAAP, in ASC 810, *Consolidation*, further provides that a reporting entity must consolidate any entity, including joint ventures, in which it has a controlling financial interest.  In making this assessment, the reporting entity must first determine whether the entity is a voting interest entity or a VIE.  Under the voting interest model, generally the investor that has voting control (usually more than 50% of an entity's voting interest) consolidates the entity.  Under the VIE model, the party that has the power to direct the entity's most significant economic activities and has the ability to participate in the entity's economics consolidates the entity.  This party could be an equity investor, some other capital provider, or a party with a contractual arrangement.

290.   During the Class Period, Defendants falsely represented that the Company's accounting policies and reporting of VIEs were consistent with GAAP.  For example, in the 2014 10-K, signed by Defendants Cole and Lupinacci, Iconix represented the following:

> ***Variable Interest Entities***
>
> In accordance with the variable interest entities ("VIE") sub-section of ASC 810, Consolidation, we perform a formal assessment at each reporting period regarding whether any consolidated entity is considered the primary beneficiary of a VIE based on the power to direct activities that most significantly impact the economic performance of the entity and the obligation to absorb losses or rights to receive benefits that could be significant to us.

*     *     *

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company, its wholly-owned subsidiaries, and, in accordance with U.S. GAAP and accounting for variable interest entities and majority owned subsidiaries, the Company consolidates eight joint ventures (Scion, Peanuts Holdings, Hardy Way, Icon Modern Amusement, Alberta ULC, Iconix Europe, Hydraulic IP Holdings and NGX, LLC; see Note 3 for explanation). All significant intercompany transactions and balances have been eliminated in consolidation. The Company uses either the equity method or the cost method of accounting, depending on a variety of factors as set forth in Accounting Standards Codification ("ASC") 323 - Investments ("ASC 323") and ASC 810 - Consolidation ("ASC 810"), to account for those investments and joint ventures which are not required to be consolidated under U.S. GAAP.

291.   Iconix has now admitted that the financial statements it issued during the Class Period, in violation of GAAP and the publicly disclosed accounting policies therein, improperly failed to consolidate certain international joint ventures in which it had a controlling financial interest.

292.   Defendants' improprieties, associated with Iconix's failure to consolidate its Iconix Canada, Iconix Israel, Iconix Southeast Asia, Iconix MENA, and with LC Partners US joint ventures, enabled the Company to, among other things, falsely and misleadingly overstate reported gains on sale associated with such joint ventures.

293.   As disclosed, in pertinent part, in the 2015 10-K, the Second Restatement was necessary to:

> consolidate the financial statements of the Iconix Canada, Iconix Israel, Iconix Southeast Asia, Iconix MENA and LC Partners US joint ventures with the Company's financial statements, and eliminate the previously reported gains on sale which were recorded at the time these transactions were consummated (including subsequent June 2014 and September 2014 transactions with respect to Iconix Southeast Asia).

**Second Restatement – Improper Accounting for Trademarks**

294.   Defendants have also admitted that the financial statements Iconix issued to investors during the Class Period violated GAAP by improperly accounting for intangible trademark assets.

As noted in ASC 810, *Intangibles—Goodwill and Other*, intangible assets acquired, individually or within a group of assets, in a transaction other than a business combination are commonly conducted at arm's length, which provides reliable evidence about the existence and fair value of those assets at the time they are acquired.  ASC 810 also notes that the costs of internally developing, maintaining, or restoring intangible assets that are not specifically identifiable, that have indeterminate lives, or that are inherent in a continuing business or nonprofit activity and related to an entity as a whole, are to expensed when incurred.

295.    In the February 18, 2016 8-K, Iconix disclosed, in pertinent part:

. . . the Company will recalculate the cost basis of the trademarks contributed to [Iconix China, Iconix Latin America, Iconix Europe, Iconix India and Iconix Australia joint ventures] to determine the amount of the gain that should have been recorded at the time of consummation of these transactions.

With respect to the Company's sale of the trademarks relating to the Umbro brand in the territory of Korea (which closed in December 2013) and the e-commerce and U.S. catalog rights in respect of the Sharper Image brand (which closed in June 2014), the Company will recalculate the cost basis of the trademarks sold to determine the amount of the gain that should have been recorded at the time of the sale.

296.    Thus, Defendants' improprieties associated with the Company's improper accounting for trademarks resulted in, among other things, materially overstated gains on the sale of trademarks. During 2013, the actual $7.4 million gain on the sale of trademarks was falsely and misleadingly represented to be $34.6 million, or an overstatement of ***370%.***  Similarly, in 2014, the actual $6.4 million gain on the sale of trademarks was falsely and misleadingly represented to be $54.3 million, or an overstatement of ***749%.***

297.    For example, in 2013, Iconix reported $5.1 million on the sale of a 50% interest in Iconix Australia.  As part of the Second Restatement, Iconix admitted in its 2015 10-K that the amount of such gain was overstated by approximately 24%, stating, in pertinent part, "the Company recorded a gain of $4.1 million in FY 2013 for the difference between the cash consideration

received by the Company and the book value of the brands contributed to the joint venture [Iconix Australia]."

298.    Similarly during 2013, Iconix sold the rights of its Umbro trademark in Korea and reported a $10.0 million gain on the sale.  As part of the Second Restatement, Iconix revealed in 2015 10-K that the amount of such gain was overstated by nearly *18 times*, admitting the true gain on such sale totaled only $556,000.

299.    During 2014, Iconix reported a "$7.8 million gain on the sale of the 'sharperimage.com' domain name and certain categories under the Sharper Image trademark."  As part of the Second Restatement, Iconix admitted in 2015 10-K that the amount of such gain was overstated by approximately 21%, stating, in pertinent part, "[i]n FY 2014 (restated) we realized a $6.4 million gain on the sale of the 'sharperimage.com' domain name and certain categories under the Sharper Image trademark."

**Second Restatement – Improper Characterization of One-Time Gains as Revenue**

300.    GAAP, in the SEC's CSAB 13B, *Revenue Recognition, Disclosures*, provides that gains from the sale of assets should not be reported as part of revenue pursuant to Regulation S-X, Article 5-03(6).  17 C.F.R. §210. 5-03(6).

301.    As part of the Second Restatement, Iconix admitted the financial statements it issued during the Class Period overstated the Company's reported revenues by mischaracterizing one-time gains as revenues from its ongoing operations.

**Second Restatement – Improper Failure to Disclose Related Party Transactions**

302.    Since transactions among related parties cannot be presumed to have been carried out at arm's length, GAAP, in ASC 850, *Related Party Disclosures*, requires that users of financial statements be provided with the following information about transactions involving related parties:

(a)    the nature of the relationship(s) involved;

(b)      a description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

(c)      the dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

(d)      amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

303.    Indeed, the disclosure of related party transactions is of such significance to an informed investment decision that Congress enacted Section 10A of the Exchange Act, 15 U.S.C. §78j-1,  mandating that auditors design procedures sufficient to identify related party transactions.

304.    As part of the Second Restatement, Iconix admitted the financial statements it issued during the Class Period improperly failed to disclose related party transactions.

**Improper Failure to Timely Expense Uncollectible Receivables**

305.    GAAP, in ASC 310, *Receivables* and 450, *Contingencies*, requires that financial statements recognize and report a charge to income when information indicates that it is probable (*i.e.*, likely) that receivables are uncollectible and the amount of the loss can be reasonably estimated.  ASC 310 also provides that receivables are impaired "[i]f, based on current information and events, it is probable that the entity will be unable to collect all amounts due according to the contractual terms of the receivable."

306.    Concerning the Company's accounting policy for accounts receivable, Iconix's 2014 10-K falsely represented, in pertinent part:

*Accounts Receivable*

Accounts receivable are reported at amounts the Company expects to be collected, net of provision for doubtful accounts, ***based on*** the Company's ongoing discussions with its licensees, and its evaluation of ***each licensee's payment history and account aging***. As of December 31, 2014 and 2013, the Company's provision for doubtful accounts was $10.2 million and $12.1 million, respectively.

307.     Defendants improperly delayed recognizing an impairment to the Company's uncollected receivables until after the resignations of Defendants Cole, Lupinacci and Horowitz. The impairment was finally recognized near the end of the Class Period, when Iconix announced its financial results for the quarter ended September 30, 2015. At that time, the Company reported a $12.2 million, or $0.16 per diluted share, charge associated with "accounts receivable reserves and write-offs" stemming from "a comprehensive review of the Company's license agreements and relationships with its licensees."

### Iconix's Material Cash Flow Misrepresentations

308.     During the Class Period, Defendants issued materially false and misleading information about the Company's cash flows. A key financial metric, cash flow from operations advises stakeholders about an entity's ability to meet its financial obligations from the cash it generates internally from day-to-day operations.

309.     As noted above, on February 26, 2015, Iconix revealed that the amount of cash flow generated by its operations during 2013 was overstated by approximately 15%. Later, when Iconix filed its 2015 10-K with the SEC, it revealed that the amount of cash flow generated by its operations during 2013 was actually overstated by approximately 22%.

310.     During the Class Period, Defendants also supplemented Iconix's GAAP financial statements with certain non-GAAP financial measures. The objective of non-GAAP measures, which are governed by Regulation G [17 C.F.R. §244.100], is to facilitate investor understanding and provide better insight into a company's operational performance, liquidity, or financial position by making various adjustments to the entity's reported GAAP results.

311.    As Iconix has now admitted, the non-GAAP measures it provided to investors during the Class Period were materially misstated.  In particular, Defendants presented investors with materially misstated "free cash flow" data that Iconix represented to be "useful in evaluating its financial condition because it is representative of cash flow from operations that is available for repaying debt, investing and capital expenditures."

312.    The extent to which such data was quantitatively misstated is illustrated in the following chart:

% Overstated / (Understated) as originally reported

|  | Q4 2013 | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 |
|---|---|---|---|---|---|---|
| **Free Cash Flow** | 9.57% | 17.41% | 72.89% | 58.08% | 9.80% | -4.96% |

313.    As a result, during the Class Period, investors were materially misled about the ability of the Company's operations to generate cash flow available for repaying debt, investing, and capital expenditures.

**Iconix's Ineffective Disclosure Controls
and Internal Control Over Financial Reporting**

314.    Disclosure controls and procedures are designed to ensure that information required to be disclosed pursuant to the rules mandated by the SEC rule is appropriately recorded, processed, and summarized.  Item 307 of Regulation S-K, *Disclosure Controls and Procedures*, required that Iconix's Forms 10-K and 10-Q during the Class Period disclose the conclusions of its principal executive and financial officers regarding the effectiveness of the Company's disclosure controls and procedures.  17 C.F.R. 229.307.

315.    Internal control over financial reporting is broadly defined as a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable

assurance that, among other things, the entity's financial reporting is reliable and accurate.  Item 308 of Regulation S-K, *Internal Control Over Financial Reporting*, required that Iconix's Forms 10-K and 10-Q during the Class Period disclose, among other things, the assessment made by its management concerning the effectiveness of Iconix's internal control over financial reporting.  17 C.F.R. 229.308.

316.    As detailed herein, from the beginning of the Class Period through the filing of Iconix's Form 10-Q for the quarter ended March 30, 2015, Defendants falsely and misleadingly represented that the Company's disclosure and internal controls were operating effectively when, as Iconix has now admitted, they were riddled with material weaknesses.

317.    Thereafter, when Iconix filed with the SEC its 2Q 2015 10-Q, the Company disclosed "a" material weakness in its disclosure controls and procedures.  The 2Q 2015 10-Q falsely represented that "[n]otwithstanding the material weakness" in Iconix's disclosure controls and procedures, Defendants had "concluded that the financial statements included in [the 2Q15 10-Q] present fairly, in all material respects, [Iconix's] financial position, results of operations and cash flows for the periods presented in conformity with [U.S. GAAP]."

318.    On November 25, 2015, when Iconix filed with the SEC the Second Amended 10-K, management falsely represented that the Company's disclosure controls and procedures were ineffective due to the following, single material weaknesses in its system of internal control – "management's failure to timely and adequately perform management review control functions."

319.    Later, in its 2015 10-K, Iconix revealed the true extent to which its disclosure and internal controls were infirm.  The 2015 10-K acknowledged that the Company's disclosure controls and procedures were ineffective and the Company's system of internal control over financial reporting was riddled with material weaknesses:

- The Company did not maintain internal controls over financial reporting that were operating effectively to support the accurate reporting of revenue and deferred revenue as of December 31, 2015, which led to errors being identified in revenue and deferred revenue;

- The Company did not implement effective internal controls to formally identify related parties and ensure that proper measures were taken to analyze transactions with these parties before they were entered into and that they were properly disclosed in the financial statements;

- The Company did not maintain internal controls over financial reporting that were appropriately documented to evidence that journal entries were sufficiently reviewed;

- The Company did not maintain internal controls over financial reporting that were operating effectively with regard to certain revenue recognition, the classification of contractually obligated expenses as selling expenses as opposed to netting such expenses with revenue and the inadequate estimation of accruals related to retail support for certain license agreements;

- The Company did not maintain internal controls over financial reporting that appropriately documented review of supporting schedules within Forms 10-K and 10-Q;

- The Company did not maintain internal controls over financial reporting that were appropriately designed, adequately documented and operating effectively related to complex accounting transactions. As a result, the Company recorded adjustments to (i) reduce licensing revenue and remeasurement gains associated with the review of various historical accounting transactions, (ii) record a liability for a royalty credit earned by a specific licensee in accordance with its license agreement; and

- During the course of our 2015 audit, [Iconix's] auditors identified errors in the calculation of the impairment charge for goodwill reducing the charge by $35 million.

## ADDITIONAL SCIENTER ALLEGATIONS

320. As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own names during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts

regarding Iconix, their control over, and/or receipt and/or modification of Iconix's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.  This scheme could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of personnel at the highest levels of the Company, including Defendants.

321.     Defendants, because of their positions with Iconix, controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of these Defendants is responsible for the accuracy of Iconix's corporate statements and is thus responsible and liable for the representations contained therein.

322.     As detailed below, numerous facts support a strong inference of Defendants' scienter during the Class Period, including:  (1) the magnitude of Defendants' GAAP violations and restatements; (2) Defendants' insider stock sales and performance-based compensation; (3) Defendants' admissions that their internal controls during the Class Period were ineffective, despite repeated assurances to the contrary; (4) the fact that Defendants' misstatements and accounting improprieties concerned the Company's core operations on which they repeatedly spoke; (5) intense scrutiny surrounding Defendants' accounting practices; (6) the suspiciously timed resignations of four of the Individual Defendants; (7) litigation filed against Defendants by their licensees, which

further supports their propensity to defraud in an effort to forestall the Company's decline; and (8) Defendants' efforts to deny, downplay and cover up their fraudulent conduct.

### 1. The Magnitude of the GAAP Violations and Restatements Supports the Individual Defendants' Scienter

323.    The Company's multiplicity of GAAP violations and the issuance of multiple successive restatements (and amended financial filings) correcting four-and-a-half years of financial statements support a strong inference of Defendants' scienter.  Defendants engaged in a host of accounting improprieties that had the combined effect of dramatically inflating the Company's financial results for nearly five years.  Critically, it was only following SEC scrutiny into the Company's accounting practices and financial reporting, the resignation of four executives, and the formation of a Special Committee by the Board of Directors to evaluate the Company's operations, that the Company announced two restatements coming only months apart.  This is not a matter of a single accounting error.  Rather, as detailed herein, these restatements impacted nearly every aspect of the Company's financial results including its revenues, EPS, cash flows from operations, free cash flows, accounts receivable, and net income, among others, and caused significant downward revisions to the Company's total revenue and diluted EPS.

324.    Moreover, when Defendants finally adjusted their financial reporting and accounting practices, the Company's true financial condition was revealed, including its deteriorating organic growth and the significant impairment of certain of its core brands, which it had improperly avoided writing down until the fourth quarter of 2015.  These facts support a strong inference that Defendants consciously engaged in accounting machinations and misled the market about the Company's declining financial health or, at a minimum, were severely reckless in overseeing the Company's financial reporting and internal controls and issuing misleading statements and omissions.

### 2. Defendants Were Financially Motivated to Defraud Investors

#### a. Defendants Cole, Blumberg, and Clamen Capitalized on the Stock's Artificial Inflation Through Massive, Suspiciously Timed Insider Stock Sales

325.    During the Class Period, Defendants took full advantage of the artificial inflation of Iconix's securities caused by their knowingly false financial reporting and accounting machinations. Collectively, Defendants Cole, Blumberg, and Clamen sold 1,219,122 shares of Iconix common stock at materially inflated prices for proceeds of ***more than $46 million***.

326.    In particular, on October 31, 2014, just three days after the Company raised its full-year 2014 earnings guidance and announced "record" revenue and earnings and a 14% increase in free cash flow during the third quarter of 2014, Defendant Cole sold 1 million shares on just one trading day at a high price of $39.51, resulting in proceeds of $39.5 million.  This was an unusually large and suspiciously timed sale designed to maximize his personal benefit from the artificial inflation in the Company's stock price right before it began to decline.  The sale represented a substantial 32% of Cole's holdings in the Company, was his first sale since January 2012 (nearly three years prior), and was approximately four times larger than his previous sale.  Moreover, Defendant Cole's sales were not made pursuant to an SEC Rule 10b5-1 executive trading plan (as his previous sales in January 2012 and late 2011 had been), so Cole was able to liquidate a large position quickly without the delay or restrictions that an executive trading plan would impose.

327.    Significantly, Defendant Cole dumped his stock just one week before the Company issued its third quarter 10-Q on November 7, 2014, changing its financial reporting.  As a result, only five weeks later, Off Wall Street issued a report evaluating the Company's financials in light of this change and questioned the Company's accounting and declining financial health, causing the Company's stock price to decline 8.7% and a partial revelation of the Company's accounting machinations.  As such, Cole was able to exit a substantial portion of his position in the stock at an

inflated price of $39.51 per share, nearly six times higher than the closing price of $6.90 per share on November 6, 2015.

328.    During the Class Period, Defendant Blumberg also engaged in unusually large and suspiciously timed sales of Company stock right before its price began to decline.   Indeed, Defendant Blumberg sold 209,122 shares of Iconix stock at an average price of $37.67 for proceeds totaling $7,357,997, as detailed in the chart below:

| | | | |
|---|---|---|---|
| 24- Feb. 2012 | 10,000 | $18.70 | $187,000 |
| 26- July 2012 | 3,800 | $18.00 | $68,400 |
| 26- July 2012 | 13,000 | $18.00 | $234,000 |
| 25- July 2013 | 7,815 | $31.25 | $244,219 |
| 25- Feb. 2014 | 61,350 | $31.53 | $1,934,366 |
| 05- May 2014 | 55,000 | $42.23 | $2,322,650 |
| 31- July 2014 | 15,000 | $42.14 | $632,100 |
| 31- July 2014 | 5,000 | $42.15 | $210,750 |
| 30- Oct. 2014 | 8,157 | $39.82 | $324,812 |
| 30- Oct. 2014 | 30,000 | $39.99 | $1,199,700 |
| | **209,122** | | **$7,357,997** |

329.    Such sales were unusual in amount as they represented over 51% of his total holdings in the Company.   They were also not made pursuant to an SEC Rule 10b5-1 executive trading plan and were designed to maximize Defendant Blumberg's personal benefit from the artificial inflation in the Company's stock price.   Indeed, his sales dramatically increased in 2014 as the fraud grew, yielding him artificially inflated proceeds of over $6.6 million as the stock traded near its Class Period high of $44.22.

330.    Defendant Clamen also benefitted from a suspiciously well-timed insider sale during the Class Period.   On February 20, 2013, the Company issued a press release reporting artificially inflated financial numbers for the fourth quarter and fiscal year 2012, engineered through the improper accounting practices discussed herein.   Just two days later, on February 22, 2013, Clamen sold 10,000 shares of Iconix common stock at an artificially inflated price of $23.91 per share, for

proceeds totaling $239,100.  This was Clamen's first insider sale in over two years (since October 29, 2010), and was not made pursuant to an SEC Rule 10b5-1 executive trading plan.  The price at which Clamen sold was over three times the closing price of $6.90 per share on November 6, 2015, following the close of the Class Period.

331.    In such a way, Defendants Cole, Blumberg, and Clamen were able to personally benefit from the artificial inflation in the Company's stock price, which Defendants had propped up through false and misleading statements and financial reporting throughout the Class Period.[6]

    **b.    Defendants Were Motivated to Engage in Fraud Because Their Compensation Was Heavily Tied to the Company's Financial Performance**

332.    Defendants were also motivated to engage in accounting fraud because it increased the amount of their performance-based compensation tied to the achievement of certain Iconix financial targets.  Iconix claimed that such compensation was "set to incentivize our executives to achieve the strategic goals of the Company."  However, it actually incentivized Defendants to fraudulently inflate the Company's accounting.  Defendants Cole and Blumberg were particularly motived to engage in such fraud because the ***majority*** of their total compensation was performance-based compensation.  In 2013, for instance, Cole's and Blumberg's performance-based compensation comprised 75% and 61% of their total compensation, respectively.  By inflating the Company's financials, Defendants increased both the amount and value of the Iconix shares they

---

[6]    Making matters worse, Iconix repurchased significant quantities of Iconix shares at inflated prices concomitantly while these insiders were selling.  During the Class Period, the Company bought back its common stock shares at a torrid pace and announced three separate share repurchase programs totaling $1.1 billion in only one year's time.  These massive share buybacks, using borrowed funds based on fraudulent numbers, helped prop up Iconix's share price while Defendants Cole, Blumberg, and Clamen sold.  For example, during fiscal year 2014, as insiders were dumping shares of Iconix, the Company simultaneously repurchased nearly 5 million shares for $193.4 million under the Company's July 2013 share repurchase plan.

received as performance-based compensation.  This enabled Defendants to cash in on millions of dollars' worth of Iconix shares at artificially inflated prices, as described above.

333.    Under Iconix's Amended and Restated 2009 Equity Incentive Plan, the Company offered Restricted Stock Units ("RSUs") and Performance Stock Units ("PSUs") to certain executives.  RSUs were granted to executives upon being hired, promoted, or retained under the terms of new or renewed employment agreements.  RSUs were ordinarily scheduled to vest in installments over a term of two-to-three years subject to continued employment.  PSUs were Company shares granted to executives that vested upon the achievement of pre-determined yearly performance goals, which were allegedly "set to incentivize" the executives.  The performance goals during a PSU's vesting period were determined at the grant date.  If performance goals were not met in a given year, any unvested PSUs were eligible to vest in the remaining years of the term under a "catch-up" provision.

334.    During the Class Period, the Company granted PSUs under three different tranches: 2011 PSUs, 2013 PSUs, and 2014 PSUs.[7]  The performance goals that determined the vesting of these PSUs were based on the Company's annual EBITDA, diluted EPS (excluding extraordinary items), and free cash flow.  Defendants Cole, Clamen, Blumberg, Horowitz, and Lupinacci received lucrative PSUs under at least one of these tranches:

- **2011 PSUs:**  Defendants Cole and Clamen were two of only three executives who received 2011 PSUs.  The Company granted Clamen 57,648 PSUs valued at $1,794,006 and granted Cole an exorbitant amount of 1,219,945 PSUs valued at ***nearly $27 million***.[8]

---

[7]    The year of each PSU tranche indicated the year it was created, not the year eligible for vesting. The Company did not grant PSU tranches in 2009, 2010, or 2012.

[8]    In addition to 2011 PSUs, Cole received other stock grants in 2011 that, along with the PSUs, collectively amounted to a whopping ***$31.6 million*** worth of Iconix stock.

- **2013 PSUs:**  In 2013, Iconix's Board approved a broad-based, executive PSU program, providing for PSU awards to senior executives who were not officers of the Company.  Under this 2013 tranche, Defendant Blumberg was granted 200,000 PSUs valued at $4,840,000 and Defendant Horowitz was granted 30,000 PSUs.

- **2014 PSUs:**  Defendants Horowitz and Lupinacci received grants under the 2014 PSU tranche.  Horowitz was awarded 69,279 PSUs valued at nearly $2.8 million and Lupinacci was awarded 47,322 PSUs valued at nearly $1.8 million.

335.    Defendants were able to manipulate the vesting of their PSUs through the fraudulent accounting practices detailed above.  For 2013, the Company announced that EPS growth and free cash flow targets were fully met, vesting thousands of 2011 PSUs under the catch-up provision (382,607 held by Cole and 24,233 held by Clamen).  Iconix originally reported diluted EPS of $2.11 per share, easily surpassing the target vesting amount ($1.80 per share).  However, as result of the Company's accounting restatements, the 2013 diluted EPS number dropped to $1.73 per share.  So, if not for the artificial inflation resulting from Defendants' accounting fraud, their PSUs would not have fully vested under the EPS standard.

336.    The same was true in 2014.  Iconix originally reported diluted EPS of $2.66 per share, easily surpassing the PSU vesting target ($2.32 per share).  As a result of the Company's accounting restatements, the 2014 diluted EPS number dropped to $1.81 per share.  Again, if not for the artificial inflation, management would have widely missed the vesting targets for EPS, instead of handily beating them as originally reported.

337.    In addition to stock grants, Defendants Cole and Blumberg were entitled to annual cash bonuses for reaching certain performance goals.  During the Class Period, Cole was eligible to make up to 200% of his base salary ($1.5 million) if the Company achieved targeted EBITDA amounts.  Cole was therefore heavily incentivized to manipulate the EBITDA numbers to dramatically increase his annual cash bonus.  Indeed, Cole received cash bonuses of $2.175 million

and $1.125 million in 2013 and 2014, respectively, by achieving performance targets based on the Company's inflated EBITDA.

338.    Defendant Blumberg also benefitted from Iconix's completion of acquisitions, including international joint ventures.  By inflating the value of such acquisitions through accounting fraud, Blumberg received higher cash bonuses, stock grants, and PSUs.  In 2013 alone, Defendant Blumberg earned $6 million in stock awards and a $500,000 cash bonus tied to his completion of deals.

### 3.    Defendants' Statements Regarding Internal Controls and Compliance with the Sarbanes-Oxley Act of 2002 Establish Scienter

339.    Defendants' scienter is underscored by the Sarbanes-Oxley mandated certifications of Defendants Cole, Clamen, Lupinacci, Blumberg, Horowitz, Jones and Cuneo, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Iconix was made known to them and that the Company's disclosure related controls were operating effectively.  Notwithstanding these certifications, Defendants have now admitted that the Company's disclosure controls were ineffective throughout the Class Period and that Iconix suffered from multiple material weaknesses in its internal controls over financial reporting.

340.    The fact that Defendants consistently assured the market and certified that they had undertaken an assessment and evaluation of the Company's financial reporting and internal controls leads to only one conclusion:  that they knowingly misled the market or were severely reckless in executing such certificates.

### 4.    Defendants' Misstatements and Accounting Improprieties Concerning the Company's Core Operations Support Scienter

341.    Iconix's various operating and financial problems involved the Company's core operations.  According to the Company, its central business strategy is to acquire and monetize consumer brands primarily through strategic licenses and joint venture partnerships around the world.  For example, Cole referred to the Company's "core licensing business" during the Class Period and acknowledged that the Company's joint venture formations were "core to our overall operating strategy."  The significance of these core business operations is clear from the Company's financial results.  For example, for the year-ended December 31, 2014, licensing revenue ($406.9 million) comprised nearly all of the Company's total revenue ($461.2 million).

342.    The core nature of these matters is also evidenced by Defendants' own public statements.  Defendants made numerous public statements throughout the Class Period in which they discussed the Company's brand licensing, brand acquisitions, and international expansion through joint ventures, while highlighting the Company's "record" revenue growth and earnings and strong and stable cash flow.

343.    Defendants were heavily involved in such core business operations, and knew of material problems affecting them and their impact on the Company's financial results and prospects.  This is supported by the fact that, during the Class Period, the Individual Defendants were the highest-ranking officers of the Company, and thus were responsible for managing, monitoring, overseeing, directing, and developing such core operations.  Specifically, Defendant Cole was CEO, Defendants Clamen, Lupinacci, and Blumberg were CFOs, and Defendant Horowitz was COO of Iconix.

344.    In addition, Defendants made numerous other statements during the Class Period supporting their direct knowledge of, and hands-on involvement with, the Company's core business operations and finances.  For instance:

- On February 22, 2012, Cole stated that "we're constantly looking for new brands and new revenue growth both through acquisition and expanding the brands we have today.";

- On the same date, February 22, 2012, Cole specifically rejected the notion that urban brands including Rocawear and Ecko would be written down, stating that "I think we can build them and they're not – they're still very large brands, a lot larger than most – a lot in our portfolio with incredible market share of hundreds and hundreds of millions of dollars.  So we don't see them being written off, they have great revenue flows . . . And actually over the last month or two we've started to stabilize . . . .";

- On July 24, 2013, Cole stated that "we have been extremely focused on building our portfolio of brands around the world and expect international to represent approximately 33% of our business this year. . . . [Buffalo] marks our fifth international joint venture as we continue to work on and explore opportunities to sign new joint venture partners in additional territories around the world.";

- On April 30, 2014, when asked about the specific revenue impact of an accounting change - consolidating the Latin America and European joint ventures - Cole responded, "I would say the two [joint ventures] based on a three-quarter basis could be anywhere between $10 million and $12 million," and proceeded to respond to a number of follow-up questions with additional accounting specifics; and

- On February 26, 2015, Cole confirmed that he had personal knowledge of the specific GAAP requirements related to the Company's joint venture transactions.  When asked to provide detail on non-cash gain related to the re-measurement of joint venture investments, he stated:  "I believe that's going to be non GAAP'd out. That's from a GAAP prospective as we gain a lot of our JVs have the option where we can get control of them, mostly in the back half, which will give us these gains that we will non-GAAP out."

345.    The fact that Iconix's problems were rooted in its core assets, business strategies and financial metrics, and Defendants' high-level positions and numerous statements regarding such matters (especially those statements reflecting their hands-on approach and close personal involvement with such matters), all support Defendants' knowledge of and reckless disregard of such operational and financial matters.

### 5.    Defendant Cole's and Iconix's Previous Settlements with the SEC for Accounting Fraud and SEC Scrutiny During the Class Period Further Support Their Scienter

346.    As detailed above, Iconix's precursor, Candie's, and Defendant Cole have previous experience in abusing accounting rules.  In July 1999, while Candie's was under the stewardship of CEO Cole, the SEC initiated a formal investigation into Candie's accounting practices.  Soon after, in September 1999, Candie's restated its financial statements for fiscal year 1998 and the first three quarters of fiscal year 1999.  The restatement led to the termination of its auditor, Ernst & Young LLP ("E&Y"), after uncovering insufficient evidence to verify certain transactions.

347.    Four years later, Candie's reached a settlement with the SEC pursuant to which Candie's consented to the entry of an administrative cease-and-desist order on April 30, 2003.  The order was based on findings of "fraudulent accounting practices designed to improve Candie's publicly reported financial condition" from August 1997 until the Spring of 1999, in violation of various provisions of the Securities Act and Exchange Act, including Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Specifically, the SEC found that the Company artificially inflated its revenue and income by engaging in improper "bill and hold" shipping practices, fraudulent barter transactions, improper use of credits with buying agents.  The SEC also found that, during the course of this fraud, the Company had inadequate internal accounting controls.

348.    Cole reached a separate settlement with the SEC based on his approval of SEC filings that overstated the Company's revenue.  Pursuant to the settlement, Cole consented to the entry of an administrative cease and desist order dated April 30, 2003 alleging that Cole had received "indications that Candie's was improperly recognizing revenue," including the Company's former CFO directly raising his concerns with Cole about the Company's improper bill and hold practices.  The SEC also alleged that, despite Defendant Cole's direct knowledge of an improper barter agreement, he failed to investigate whether Company was improperly recognizing revenue from its barter transactions, which enabled the Company "to continue to recognize improper revenue and

income from the barter transactions."  Further, the SEC alleged that Cole authorized a misleading press release that omitted material information about the Company's artificially inflated revenue and income, and failed to disclose that the Company's auditors would be unable to complete their audit because of the Company's accounting issues.  According to the SEC, Cole authorized this filing even after "Candie's auditors had raised questions with Cole about the barter company agreement and the credits with Candie's buying agent.  Moreover, the auditors had indicated that because of these concerns and Candie's inability to resolve questions they had raised, they would [] not be able to complete their audit."  Pursuant to the settlement, Defendant Cole also agreed to pay a civil penalty of $75,000.

349.    As a result of this scrutiny and resulting settlements with the SEC, Defendants Cole and Iconix, as well as the Company's officers and employees, should have had a heightened awareness of their obligations under GAAP in issuing Iconix's financial results during the Class Period.  This is particularly true where Defendant Cole and the Company had previously been found to engage in improper revenue recognition practices.

350.    Moreover, during the Class Period, Defendants were engaged in responding to SEC comment letters, which required significant analysis and explication of their accounting practices. Beginning on November 25, 2013, the SEC began sending comment letters to Defendants regarding Iconix's accounting for and disclosure of non-GAAP free cash flow.  Iconix's correspondence with the SEC on this matter continued through January 15, 2014 and resulted in Defendants altering certain financial reporting and disclosures and certifying the truth and accuracy of the Company's financial statements.  This analysis alone notified or should have notified them of the myriad GAAP violations and accounting errors present in the Company's financial statements.

### 6.    Suspiciously Timed Resignations of the Individual Defendants Support Scienter

351.   As Defendants' fraud was gradually revealed to the market, four of the seven Individual Defendants resigned during the Class Period. Within a year-and-a-half, the Company's founder and long-time CEO (Cole), two successive CFOs (Clamen and Lupinacci), and COO (Horowitz) were all gone from the Company. Their sudden, suspicious departures, under highly questionable circumstances, provide strong additional support that they knew of the Company's pervasive accounting fraud during their tenure with the Company.

### 7.   Litigation Filed Against Defendants by Their Licensees Further Demonstrates Their Scienter

352.   Defendants' knowledge of Iconix's declining brand portfolio, as well as their propensity to defraud in an effort to forestall the Company's decline, are further evidenced by lawsuits brought against the Company by licensees. The licensees allege that Defendants misled them into entering into contracts that provided Iconix with badly needed royalties, and then failed to live up to the contract terms.

- As alleged in the Verified Answer and Counterclaims in *IP Holdings Unltd LLC v. Marcraft Clothes, Inc.*, No. 651344/2015 (N.Y. Sup. Ct.), filed on August 26, 2015 [Dkt. No. 1], Iconix knew of severe damage to the Marc Ecko brand, including that it was on the verge of having no viability, but "deliberately and fraudulently concealed material, nonpublic information that it had a duty to disclose in order to induce Marcraft [a licensee] to extend – for an additional four year period – the terms of [its] license agreement" that Marcraft would have otherwise let expire. Iconix allegedly extracted an additional $2,950,000 in "guaranteed" payments over a five year term, in exchange for licensing an essentially worthless brand. By doing so, Defendants were able to guarantee a badly-needed revenue stream from its licensee.

- As alleged in the verified complaint in *Anthony L&S Athletics, LLC v. US Pony Holdings, LLC*, No. CA11867 (Del. Ch.), filed on January 4, 2016 [Dkt. No. 1], Anthony L&S Athletics, LLC ("Anthony L&S") gave up an exclusive license to its dormant brand Pony to Iconix, which received a 75% interest through the formation of US Pony Holdings, LLC ("Pony Holdings"), a company formed to obtain the license to the Pony brand and bring it back to prominence. In return, Anthony L&S would pay minimum royalty payments to Pony Holdings. According to the complaint, Iconix represented that it would develop and launch marketing campaigns and obtain endorsements

that would "jettison Pony back to prominence." Under the agreement, Iconix would receive minimum royalty payments of an initial $4,000,000 in the first year and $20,000,000 in the first five years. According to the complaint, Iconix (through Pony Holdings) was supposed to spend 20% of annual royalty payments on marketing each year, but instead "hoard[ed] Pony Holdings cash until such time as a distribution was required under the Agreement," and failed to market the Pony brand, which "destroyed all efforts to launch and jump start it."

### 8.     Defendants' Repeated Attempts to Deny, Downplay, and Cover Up Their Fraudulent Conduct Establish Scienter

353.     In addition to SEC scrutiny, beginning on December 14, 2014, the Company experienced analyst scrutiny into its accounting practices and true financial condition. Starting on this date, the investing public increasingly learned of Defendants' accounting improprieties and the Company's true financial condition through a series of partial disclosures including an Off Wall Street report, several articles posted on Seeking Alpha and a spate of executive resignations, among others. Yet, Defendants continued to conceal their true practices and engaged in a campaign of misinformation, assuring the market that they were confident in the Company's overall business and downplaying successive executive resignations as unrelated insignificant events.

354.     In the days following Defendant Cole's resignation, on August 10, 2015, Defendant Cuneo actively concealed the true reasons behind Cole's departure after 22 years at the helm of the Company, couching it as a resignation "to pursue other business opportunities." Defendant Cuneo emphasized that the Company was "well-positioned to resume its growth trajectory," stating that this is "based on our view of both organic revenue growth and new acquisitions." Likewise, Defendant Jones emphasized that the Company's "balance sheet is really strong." Additionally, Defendant Cuneo assured investors that he, along with Defendant Jones were in the process of implementing additional procedures and controls related to transactions and other business arrangements with licensees and the Company's joint ventures.

355.    These statements, stood in stark contrast to the true state of affairs at Iconix, as revealed just three months later on November 5, 2015, when Defendants announced the first restatement, and stated that they expected "organic growth to be flat." Defendants' efforts to conceal the true financial condition and the meaning behind successive executive resignations during the Class Period despite continued analyst and SEC scrutiny into the same, further support their scienter.

## LOSS CAUSATION/ECONOMIC LOSS

356.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Iconix securities and operated as a fraud or deceit on Class Period purchasers of Iconix securities by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Iconix securities fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Iconix securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

357.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Iconix's business and prospects. Defendants' false and misleading statements had the intended effect and caused Iconix's securities to trade at artificially inflated levels throughout the Class Period. Iconix's common stock reached an artificially inflated Class Period high of $44.22 per share on June 9, 2014, before suffering a series of declines in response to the partial revelations of Defendants' prior misrepresentations and fraudulent conduct alleged herein, plummeting to $6.90 per share on November 6, 2015. This represented a decline of *84%* from the Class Period high. The Company's debt securities also declined in response to such revelations.

358.    The precipitous declines in the prices of Iconix securities were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the declines in the prices of Iconix securities negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

359.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Iconix securities and the subsequent significant declines in the value of such securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance: Fraud on the Market Doctrine

360.    At all relevant times, the market for Iconix securities was an efficient market for the following reasons, among others:

(a)    Iconix common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Iconix filed periodic public reports with the SEC and the NASDAQ;

(c)    Iconix regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Iconix was followed by numerous securities analysts employed by major brokerage firms, including Zacks Investment Research, Brean Capital, Wunderlich, Monness, Crespi

& Hardt, and Roth, who wrote reports which were distributed to those brokerage firms' sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public market place.

361.     As a result of the foregoing, the market for Iconix securities promptly digested current information regarding Iconix from all publicly available sources and reflected such information in the price of such securities.  Under these circumstances, all purchasers of Iconix securities during the Class Period suffered similar injury through their purchase of Iconix securities at artificially inflated prices and a presumption of reliance applies.

362.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Iconix's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**No Safe Harbor**

363.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

- 118 -

364.     Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Iconix who knew that those statements were false when made.   Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

365.     Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

366.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

367.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

368.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Iconix securities.  Plaintiffs and the Class would

not have purchased Iconix securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

369.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Iconix securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

370.    Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

371.    The Individual Defendants acted as controlling persons of Iconix within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions as officers and/or directors of Iconix, and their ownership of Iconix securities, the Individual Defendants had the power and authority to, and did, cause Iconix to engage in the wrongful conduct alleged.

372.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Iconix securities during the Class Period.

373.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  May 13, 2016                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        ROBERT M. ROTHMAN


                                        _s/ Samuel H. Rudman_
                                        SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        rrothman@rgrdlaw.com

                                        ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                        JACK REISE (_pro hac vice_)
                                        120 East Palmetto Park Road, Suite 500
                                        Boca Raton, FL  33432
                                        Telephone:  561/750-3000
                                        561/750-3364 (fax)
                                        jreise@rgrdlaw.com

- 121 -

SAXENA WHITE P.A.
JOSEPH E. WHITE, III (*pro hac vice*)
LESTER R. HOOKER (*pro hac vice*)
JORGE A. AMADOR (*pro hac vice forthcoming*)
5200 Town Center Circle, Suite 601
Boca Raton, FL  33486
Telephone:  561/394-3399
561/394-3382 (fax)
jwhite@saxenawhite.com
lhooker@saxenawhite.com
jamador@saxenawhite.com

Co-Lead Counsel for Plaintiffs


<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on May 13, 2016, I authorized the electronically filed of the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.


*s/ Samuel H. Rudman*
SAMUEL H. RUDMAN