USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 10/25/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re ICONIX BRAND GROUP, INC., et al.

**ORDER**

15 Civ. 4860 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a securities class action brought against Defendant Iconix Brand Group, Inc. ("Iconix" or the "Company") and Defendants Neil Cole, Warren Clamen, Jeff Lupinacci, David Blumberg, Seth Horowitz, David K. Jones, and F. Peter Cuneo, pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5. Plaintiffs purchased shares of Iconix common stock and contend that Defendants knowingly engaged in "a multiplicity of improper accounting practices" in order to "materially overstat[e] [Iconix's] financial results and mask[] the true operating performance of Iconix's business." (Consolidated Amended Class Action Complaint (hereinafter "Amended Complaint") (Dkt. No. 62) ¶¶ 2, 6, 53, 83-84) As a result of this alleged "accounting fraud," Iconix announced two separate restatements of its financial reports for fiscal years 2011, 2012, 2013, 2014, and the first two quarters of 2015 – a period spanning 18 quarters – in order to correct the accounting errors. (See id. ¶ 2)

Pending before the Court is Defendants' motion to dismiss the Amended Complaint.[1] (Dkt. No. 102) For the reasons stated below, Defendants' motion will be granted.

---

[1] Iconix and Defendants Cole, Clamen, Lupinacci, Blumberg, Jones, and Cuneo jointly moved to dismiss. (Def. Notice of Motion (Dkt. No. 102)) Defendant Horowitz separately moved to

# BACKGROUND[2]

## I. FACTS

### A. The Parties

Plaintiffs are a class of individuals and entities that purchased Iconix securities between February 22, 2012 and November 5, 2015 (the "Class Period"). (Am. Cmplt. (Dkt. No. 62) ¶ 1) City of Atlanta Firefighters' Pension Fund and City of Atlanta Police Officers' Pension Fund serve as Lead Plaintiffs. (Id. ¶¶ 17-18)

Defendant Iconix is a brand management company that "owns a diversified portfolio of over 35 global consumer brands in the women's and men's apparel, entertainment, and home industry [sectors]." (Id. ¶ 19) Iconix "monetizes" the brands it owns "by licensing their intellectual property rights . . . to retailers and wholesalers, who are responsible for manufacturing and distributing the brands' products." (Id. ¶ 3) Iconix's common stock is "listed and trades on the NASDAQ Global Select Market ('NASDAQ')." (Id. ¶ 19)

Defendant Neil Cole worked at Iconix for more than twenty years, and served as the Company's President, Chief Executive Officer, and Chairman of the Board of Directors during the period relevant to this litigation. (Id. ¶ 20) Cole resigned on August 5, 2015. (Id.)

Defendant F. Peter Cuneo began serving as interim CEO and Chairman of the Board of Directors on August 6, 2015. (Id. ¶ 26)

---

dismiss, but joins in Iconix's motion and "adopts and incorporates the facts, legal arguments and authorities set forth therein." (Horowitz Moving Br. (Dkt. No. 108) at 2)

[2] The Court's statement of facts is drawn from the Complaint's factual allegations, which are presumed to be true for purposes of this motion. In deciding a motion to dismiss, a Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Defendant Warren Clamen served as Chief Financial Officer of Iconix from March 2005 until his resignation on March 18, 2014. (Id. ¶ 21)

Defendant Jeff Lupinacci replaced Clamen as CFO of Iconix on April 7, 2014, and served in that capacity until his resignation on March 30, 2015. (Id. ¶ 22)

Defendant David Blumberg has served as Executive Vice President and Chief Strategy Officer of Iconix since March 2016. (Id. ¶ 23) Blumberg served as the Company's Head of Strategic Development between February 2009 and February 2016. (Id.) Blumberg also served as interim CFO between March 2015 and June 2015 following the resignation of Lupinacci. (Id.)

Defendant David Jones has served as Executive Vice President and CFO of Iconix since June 17, 2015. (Id. ¶ 25)

Defendant Seth Horowitz served as Chief Operating Officer ("COO") of Iconix from March 18, 2014 until his resignation on April 13, 2015. (Id. ¶ 24)

**B. The Nature of Iconix's Business**

Iconix's business model is premised on the acquisition of intellectual property rights to certain brands, and the licensing of those rights to third parties. (Id. ¶ 40) The third-party licensees then design, produce, and distribute products bearing the licensed brand names, while Iconix is responsible for managing, advertising, and marketing the brands. (Id. ¶¶ 3, 40, 42) Pursuant to the licensing agreements, the third-party licensees must pay royalties from their net sales to Iconix. (Id. ¶ 41) Between 2005 and 2015, Iconix's portfolio grew to include 35 global brands, and the Company entered into 1,700 licensing agreements with third-party licensees. (Id. ¶¶ 38, 40)

According to Iconix, its "brand management" business model allows the Company to achieve high earnings without the costs and risks associated with traditional production, distribution, and inventory. (Id. ¶ 43) The success of Iconix's business model, however, depends in part on the Company's ability to maintain the popularity of its brands and to acquire new, more desirable brands to offset brands that decline in popularity over time. (Id. ¶¶ 4, 44)

The Amended Complaint alleges that, beginning in 2010, Iconix's business model began to face challenges. (See id. ¶¶ 45-53) Certain brands in Iconix's portfolio – including the men's apparel brands Ecko, Zoo York, Rocawear, and Ed Hardy[3] – began to decline in popularity, which resulted in declining royalty revenues. (Id. ¶¶ 46-49) At the same time, new competitors in the brand management sector emerged, which made Iconix's acquisition of new desirable brands more difficult and more expensive. (Id. ¶ 45) As a result, Iconix assumed a large amount of debt in order to finance the acquisitions of new brands, and between 2010 and 2015, the Company "nearly tripled its long-term debt, from approximately $548 million to $1.46 billion." (Id. ¶ 50) According to the Amended Complaint, the "ballooning debt, in turn, further limited [the Company's] ability to borrow the additional funds needed to acquire expensive, in-demand brands to offset the decline of its older brands." (Id.)

Faced with these trends, Iconix adopted a new business strategy of selling its brands to joint ventures that it formed with partners in the United States and abroad. (Id. ¶ 51) Pursuant to this strategy, Iconix formed new entities, contributed certain brand rights to the entity (such as the exclusive right to sell brands in a certain geographical region), and then sold a

[3] Between 2007 and 2013, Iconix spent approximately $508 million acquiring these four brands, which represented 18% of the Company's total consolidated assets as of December 31, 2013. (Am. Cmplt. (Dkt. No. 62) ¶ 46)

portion of the entity to a local partner as part of a joint venture. (See id. ¶¶ 5, 51) Iconix then collected a portion of the licensing revenue generated by the joint venture, with the remaining portion going to the local partner. (Id.) According to Iconix, these new joint ventures allowed the Company "to bring its brands to market more quickly and efficiently than . . . if it . . . buil[t] out wholly owned operations across the world," and created opportunities for the Company to increase global brand recognition by "leverag[ing]" the "networks" and "expertise" of the local partners in "new geographies." (Id. ¶¶ 52, 144, 193)

### C. Iconix's Alleged Accounting Improprieties During the Class Period

Against this backdrop, the Amended Complaint alleges that Defendants engaged in a "multiplicity of improper accounting practices" that allowed Iconix to "materially overstat[e] [its] financial results" and falsely report "'record' revenues[ and] strong cash flows, brand health and business growth." (Id. ¶¶ 6, 53) These alleged accounting manipulations allowed Iconix – notwithstanding the declining popularity of its brands and its growing debt – to "deceiv[e] the market" and "mask[]" the Company's "true financial condition and future prospects." (Id.)

The Amended Complaint highlights Iconix's "improper failure to consolidate joint ventures" in its financial statements. (Id. ¶¶ 6, 79, 288-293) Under Generally Accepted Accounting Principles ("GAAP"), a reporting company must "consolidate" any entity in which it has a controlling interest – that is, it must report the other entity's assets, liabilities, revenues, and expenses together with its own, as if the two functioned as a single unit. (Id. ¶¶ 288-289) Two models may be used to determine whether a company has a "controlling interest" in another entity: the "voting interest model" and the "variable interest entity ('VIE') model." (Id. ¶ 289) Under the variable interest entity model, a reporting company must consolidate another entity as a VIE where (1) the reporting company holds a variable interest in the other entity; (2) that other

entity is a variable interest entity; and (3) the reporting entity is the primary beneficiary of that variable interest entity. See Accounting Standards Codification ("ASC") 810, "Consolidation." An entity qualifies for VIE treatment where – although the reporting company does not have a controlling voting interest – the reporting company, inter alia, has the "power to direct the entity's most significant economic activities and has the ability to participate in the entity's economics." (Am. Cmplt. (Dkt. No. 62) ¶ 289)

According to Plaintiffs, Iconix improperly failed to consolidate certain international joint ventures formed during the Class Period and, in so doing, "overstate[d] reported gains on sale[s] associated with [those] joint ventures." (Id. ¶¶ 291-292) The Amended Complaint identifies, in particular, the following entities: Iconix Canada Joint Venture, which was formed during the second quarter of 2013 (id. ¶¶ 127-130); Iconix Israel Joint Venture and Iconix Southeast Asia Joint Venture, which were formed during the fourth quarter of 2013 (id. ¶¶ 143-147); LC Partners U.S., which was formed during the first quarter of 2014 (id. ¶ 158); and Iconix Middle East Joint Venture, which was formed during the fourth quarter of 2014 (id. ¶¶ 184-187).

The Amended Complaint alleges that Iconix committed other GAAP violations during the Class Period, including improperly (1) recognizing and reporting revenue from licensing arrangements, without adequate supporting documentation (id. ¶¶ 280-284); (2) delaying the recognition of retail support-related expenses on certain licensing agreements (id. ¶¶ 285-286); (3) characterizing certain costs as selling, general, and administrative ("SG&A") expenses and failing to net those costs against licensing or other revenue (id. ¶ 287); (4) accounting for intangible trademark assets, resulting in inflated gains on the sales of those trademarks (id. ¶¶ 294, 296); (5) characterizing one-time gains as revenues from its ongoing

operations (id. ¶¶ 300-301); (6) failing to disclose related-party transactions (id. ¶¶ 302-304); and (7) failing to timely write down uncollectible accounts receivable, goodwill and trademarks (id. ¶¶ 6, 305-307).

Iconix admits that these accounting errors occurred and – as explained below – in 2015 and 2016 it restated its historical financial statements in order to correct the errors. (See id. ¶¶ 74-82) The Amended Complaint claims that the these improper accounting practices were the product of intentional conduct by Iconix and the individual officer-Defendants, however. (See id. ¶¶ 83-84)

## D. Iconix's Financial Reporting During the Class Period

### 1. Positive Reporting and Projections of Future Growth

Between 2012 and February 2015, Iconix's public filings and accompanying press releases offered a highly positive portrait of the Company's financial condition and performance.

On February 22, 2012 – the first day of the Class Period – Iconix issued a press release announcing its financial results for 2011. (Id. ¶ 93) The Company reported "[r]ecord [r]evenue and [e]arnings," including an 11% year-over-year increase in total revenue and an 8% year-over-year increase in free cash flow. (Id. ¶ 94) The Company touted its new strategy of forming joint ventures as an important component of its future, contending that "international expansion [would serve] as the next big phase of growth" and would help the Company "to maximize the value of [its] brands around the world." (Id.) On February 29, 2012, Iconix issued a Form 10-K for 2011 that reiterated these financial results and outlooks. (Id. ¶ 96)

On February 20, 2013, Iconix issued a press release announcing its financial results for 2012. (Id. ¶ 113) Although the Company had reported "some near-term challenges" in its quarterly reports for that year (see id. ¶¶ 99-100), the Company maintained that it had "a

strong balance sheet and strong free cash flow[] . . . [that left it] well positioned to grow [its] business." (Id. ¶¶ 115-116) Iconix announced that it "was raising its full year 2013 revenue guidance to a range of $425-$435 million; raising its full year 2013 GAAP diluted [earnings per share] guidance to a range of $2.0-$2.15; and raising its full year 2013 free cash flow guidance to a range of $203-$210 million." (Id. ¶ 115) On February 28, 2013, Iconix filed a Form 10-K for 2012 reiterating these results. (Id. ¶ 117)

On February 20, 2014, Iconix issued a press release announcing "[r]ecord [r]evenue and [e]arnings" for 2013. (Id. ¶ 140) The Company reported increases in revenue and free cash flow in each quarter that year (see id. ¶¶ 121, 125, 132, 140), and reported that, for the full year, "total revenue had increased 22% year-over-year, to approximately $432.6 million, and free cash flow had increased 27% year-over-year, to approximately $229.9 million." (Id. ¶ 141) During a conference call with analysts and investors, Defendant Clamen touted the company's formation of "four new international joint ventures in Canada, Australia, Southeast Asia, and Israel" during 2013, and stated that "[o]ur strong top line primarily reflects our . . . continued focus on international expansion, including the formation of two new international joint ventures in Southeast Asia and Israel, which together contributed approximately $7 million to revenue." (Id. ¶¶ 143-144) On February 27, 2014, Iconix filed a Form 10-K for 2013 reiterating these financial results. (Id. ¶ 145)

On February 26, 2015, Iconix issued a press release announcing its financial results for 2014. (Id. ¶ 177) As in 2013, the Company reported "[r]ecord [r]evenue and [e]arnings," and increases in revenue and free cash flow in each quarter that year. (See id. ¶¶ 153, 160, 169, 177) For the full year of 2014, the Company reported that, inter alia, "total revenue had increased 7% year-over-year, to approximately $461.2 million." (Id. ¶ 178) During

a conference call with analysts and investors, Defendant Horowitz stated that the Company's "growth was driven[, in part,] by . . . global market expansion for [its] portfolio and the extension of [its] international joint venture platform." (Id. ¶ 180) The Company "raised its full year 2015 revenue guidance to a range of $490-$510 million; raised its full year GAAP diluted [earnings per share] guidance to a range of $3.06-$3.20; and established new full year 2015 free cash flow guidance in the range of $208-$218 million." (Id. ¶ 179)

As explained below, beginning in April 2015, a series of events relating to the discovery and disclosure of improper accounting practices at Iconix caused the Company to significantly underperform this guidance and to restate its historical financial statements, resulting in significant reductions to previously reported revenue and other metrics.

**2. Disclosures Relating to Joint Ventures and Other Matters**

Iconix disclosed in its periodic public filings details regarding the formation of the joint venture entities, as well as the basis of its accounting treatment of gains from sales of ownership interests in those entities. For example, in a Form 10-Q filed for the second quarter of 2013, Iconix provided details concerning the formation of Iconix Canada Joint Venture:

> In June 2013, the Company contributed substantially all economic rights to its brands in Canada to Iconix Canada L.P., ICO Brands L.P., and 8560854 Canada, Inc. (together, "Iconix Canada"), all then newly formed joint ventures with BII and its subsidiaries. In consideration for its aggregate 50% interest in Iconix Canada, BII agreed to pay $17.7 million in cash to the Company, of which approximately $8.8 million was paid upon closing of this transaction in June 2013, the remaining $8.8 million of which is a note payable to the Company to be paid over three years, with final payment in June 2016. Of the $8.8 million note receivable, $2.9 million is included in other assets – current, the remaining $5.9 [million] of which is included in other assets on the unaudited condensed consolidated balance sheet at June 30, 2013. As a result of this transaction, the Company recognized a gain of approximately $9.8 million which is included in licensing and other revenue on the unaudited condensed consolidated income statement for the Current Quarter and the Current Six Months.
>
> . . . .

> At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and BII, that Iconix Canada is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting.

(Id. ¶ 130) (emphasis altered)

Throughout the Class Period, Iconix made similarly detailed disclosures about the other disputed joint venture transactions – as well as other joint ventures not alleged to have been subject to improper accounting – and, for each, concluded that the joint ventures were not "variable interest entities" and therefore were "not subject to consolidation" for accounting purposes. (See id. ¶ 146 (Iconix Israel Joint Venture and Iconix Southeast Asia Joint Venture); id. ¶ 158 (LC Partners U.S.); id. ¶ 184 (Iconix Middle East Joint Venture); see also id. ¶¶ 104-105 (Iconix India Joint Venture))

During the Class Period, Iconix also included in its periodic disclosures details concerning other accounting decisions, including its treatment of certain sales of trademarks (see id. ¶¶ 149, 162, 166-167, 186) and its determinations of "doubtful accounts" – that is, estimates of amounts receivable that the Company was unlikely to collect in the future. (See id. ¶¶ 97, 119, 151, 188)

### 3. Disclosures Reviewed by Independent Auditors

Each of the annual Form 10-K reports filed by Iconix during the Class Period was reviewed by BDO USA, LLP ("BDO"), an independent, registered public accounting firm. Each filing included a "Report of Independent Registered Public Accounting Firm," in which BDO informed investors that it had conducted an audit of Iconix's annual financial statements, including an "assess[ment] [of] the accounting principles used," and determined that the reports were free of "material misstatement." (See Musoff Decl., Ex. 5 (2014 Form 10-K) (Dkt. No.

104-5) at 10; id., Ex. 4 (2013 Form 10-K) (Dkt. No. 104-4) at 10; id., Ex. 8 (2012 Form 10-K) (Dkt. No. 104-8) at 5)[4] The 2014 Form 10-K, for example, states:

> We have audited the accompanying consolidated balance sheets of Iconix . . . and Subsidiaries as of December 31, 2014 and 2013 and the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2014. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Iconix . . . and subsidiaries at December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States. . . .

(Id., Ex. 5 (2014 Form 10-K) (Dkt. No. 104-5) at 10; see also id., Ex. 4 (2013 Form 10-K) (Dkt. No. 104-4) at 10; id., Ex. 8 (2012 Form 10-K) (Dkt. No. 104-8) at 5)

In the same auditor reports, BDO also disclosed to investors that it had "audited Iconix['s] . . . internal control over financial reporting," and determined that, in its opinion, Iconix had "maintained, in all material respects, effective internal control over financial reporting." (See id., Ex. 5 (2014 Form 10-K) (Dkt. No. 104-5) at 5; Ex. 4 (2013 Form 10-K) (Dkt. No. 104-4) at 5; id., Ex. 8 (2012 Form 10-K) (Dkt. No. 104-8) at 5)

---

[4] All citations in this Order reflect page numbers assigned by this District's Electronic Case Filing system.

E. **Reporting and Disclosure of Improper Accounting Practices**

Beginning in late 2013, however, information began to emerge showing that Iconix had engaged in a number of improper accounting practices, even as it continued to report increases in its revenues and other financial metrics through the 2013 and 2014 fiscal years. These accounting errors caused the Company to overstate its revenues and future growth.

On November 25, 2013, Iconix received a comment letter from the SEC regarding the accounting and presentation of its cash flows in its 2012 Form 10-K. (Am. Cmplt. (Dkt. No. 62) ¶ 203) The SEC requested that Iconix adjust several of its financial disclosures on a going-forward basis and, in particular, provide more detail in future filings with respect to "restricted cash," "free cash flow," and "reconciliations from non-GAAP measures." (See Musoff Decl., Ex. 9 (Nov. 25, 2013 Comment Letter) (Dkt. No. 104-9)) The comment letter required Iconix to undertake "significant analysis and explication of [its] accounting practices" and "provide[] substantive responses" to the SEC. (Am. Cmplt. (Dkt. No. 62) ¶¶ 203, 350) On January 15, 2014, Iconix agreed to adjust aspects of its financial reporting and disclosures concerning "non-GAAP free cash flow." (Id. ¶ 350)

The Amended Complaint asserts that, as a result of efforts made to respond to the comment letter, Defendants were "notified or should have [been] notified . . . of the myriad GAAP violations and accounting errors present in the Company's financial statements." (Id.) Nonetheless, Iconix continued to report "[r]ecord [r]evenue and [e]arnings," including in the fourth quarter of 2013 and the first two quarters of 2014. (See id. ¶¶ 140, 153, 160)

On March 18, 2014, however, Defendant Clamen resigned as Iconix's CFO. Clamen had served in that role for nine years, and had signed and certified the Company's responses to the SEC's comment letter. (Id. ¶ 204) The Amended Complaint contends that

Clamen's resignation was related to Iconix's "carefully orchestrated fraud," and that "it was only a matter of months until investors began to learn of the Company's improper accounting and true financial condition." (See id.)

On October 28, 2014, Iconix announced "[r]ecord [r]evenue and [e]arnings" for the third quarter of 2014, including a 6% year-over-year increase in total revenue and a 14% year-over-year increase in free cash flow. (See id. ¶ 169) Three days later, on October 31, 2014, then-CEO Defendant Cole sold 1 million shares of Iconix common stock – "at a high price of $39.51" per share – resulting in proceeds of $39.5 million. (Id. ¶¶ 205, 326) At the time, this sale represented 32% of Cole's holdings.[5] Moreover, Cole had not sold Iconix stock since January 2012, and this sale was approximately four times larger than his previous sale. (Id. ¶ 326) Unlike his prior two sales of Iconix stock, this sale was not made pursuant to an executive trading plan. (Id.) Plaintiffs contend that this "unusually large and suspiciously timed sale [was] designed to maximize [Cole's] personal benefit from the artificial inflation in the Company's stock price." (Id.)

That same day – October 31, 2014 – Defendant Blumberg – who at then Iconix's Head of Strategic Development – sold 38,157 shares of Iconix common stock, resulting in proceeds of $1,524,512. (See id. ¶¶ 23, 328) Blumberg had sold a total of 170,965 shares on six other occasions since February 2012, resulting in proceeds of $5,833,485.[6] (See id. ¶ 328) Blumberg did not sell Iconix stock after October 31, 2014. (Id.)

---

[5] During the Class Period – between February 29, 2012 and March 5, 2015 – Cole's net holdings in Iconix common stock increased, however, from 1,753,153 shares to 2,111,643 shares. (See Musoff Decl., Ex. 17 (Dkt. No. 104-17))

[6] Blumberg's sales of Iconix stock between February 24, 2012 and October 31, 2014 amounted to 51% of his holdings. However, Blumberg's net holdings of Iconix stock increased during the Class Period, from 35,850 shares to 134,495 shares. (Musoff Decl., Ex. 19 (Dkt. No. 104-19))

On November 7, 2014, Iconix filed a Form 10-Q for the third quarter of 2014. (Id. ¶ 173) In the 10-Q, Iconix reiterated the financial results announced via press release on October 28, 2014, including increases in both total revenue and free cash flow. (Id. ¶¶ 169, 173) Iconix changed its presentation of cash flow in this filing, however, adding a new line for "gains on sale of trademarks." (See id. ¶¶ 8, 206) The Amended Complaint asserts that this change permitted outside analysts to more closely analyze the Company's accounting practices and "uncover a massive accounting fraud." (Id. ¶ 206)

Off Wall Street Consulting Group, Inc. – a third-party analyst – conducted a forensic accounting analysis of Iconix's publicly reported financial statements, and on December 14, 2014, it published an article concerning its analysis. (See id. ¶¶ 9, 207) The article raised concerns about Iconix's financial reporting, citing to organic sales declines in the Company's core portfolio brands, and alleging that the Company had engaged in "questionable" accounting practices, such as reporting "'questionable' one-time gains"; recognizing "revenue gains on joint venture transactions as income"; and "reclassifying old account receivables into 'other assets.'" (Id. ¶¶ 9, 56-57, 207) The Off Wall Street article contended that these "questionable" accounting practices had enabled the Company to "avoid bad debt expense[s] and reflect higher earnings." (Id. ¶ 207) In two days of trading after the article appeared – December 15 and 16, 2014 – the price of Iconix common stock dropped a total of 8.9%, from $39.25 per share to $35.84 per share. (Id. ¶ 209)

On February 26, 2015, Iconix issued a press release announcing its financial results for the fourth quarter of 2014 and for the full year. The Company also announced changes to the structure of its financial reporting. (See id. ¶ 210) For the first time since 2011, the Company's financial statements separated out "other revenue" – which includes gains from

one-time sales to joint venture partners – from "total revenue." (Id.) According to Plaintiffs, this change permitted analysts to distinguish the Company's "recurring, organic revenue" – derived from business activities such as licensing – from the Company's "non-growth-oriented" revenue, which included income from one-time joint venture sales. (See id.) According to the Amended Complaint, Iconix had reported all of this revenue in a single category of "total revenue" since 2011, thereby "artificially inflating" revenue growth.[7] (See id.)

In the February 26, 2015 press release, Iconix also announced that it would restate the amount of cash flow generated by its operations in 2013. (Id. ¶ 212) Iconix explained that it had mischaracterized gains on the sale of trademarks as being cash flow from operations, and – as a result – had overstated the cash flow generated by its operations by $29.6 million, or approximately 15%. (Id. ¶¶ 212-213)

Later that day – allegedly as a result of these announcements – the price of Iconix's common stock dropped by roughly 3%. (Id. ¶ 214)

On March 30, 2015, Defendant Lupinacci – who had been hired to replace Clamen as Iconix's CFO, and who had been at the Company for less than a year – resigned. (Id. ¶ 216) Blumberg replaced Lupinacci as interim CFO and served in that capacity for less than two months. Iconix then named Defendant Jones as the new CFO. (See id. ¶¶ 23, 25, 216)

On March 31, 2015, the price of Iconix common stock dropped 7.47%, from $36.39 per share to $33.67 per share. (Id. ¶ 218)

During the week of April 13, 2015, "Seeking Alpha" – "a public website featuring crowd-sourced financial commentary" – published three articles analyzing Iconix's publicly

---

[7] The Amended Complaint does not assert that Iconix's practice of merging these revenue categories amounted to a GAAP violation or otherwise constituted an improper accounting practice.

disclosed financial statements. (Id. ¶¶ 59, 220) According to the Amended Complaint, the articles "discussed in detail the Company's [allegedly] faulty accounting (such as under-reporting the cost basis of assets transferred to joint ventures), declining and under-marketed brands, diminishing real earnings from business operations, and increasing reliance on brand sales and non-cash gains to boost revenue and earnings." (Id. ¶ 220; see also id. ¶¶ 221-223)

Between April 10, 2015 and April 17, 2015 – while the Seeking Alpha articles were being published – the price of Iconix common stock dropped 8.31%, from $34.68 per share to $32.03 per share. (Id. ¶ 224)

On April 17, 2015, Iconix announced the resignation of its then-COO, Defendant Horowitz. (Id. ¶ 225) This announcement came about two weeks after Lupinacci had resigned as CFO, and marked the third executive resignation in a year. (Id. ¶ 226) The Amended Complaint alleges that Horowitz's departure confirmed the market's speculation concerning Iconix's "irregular accounting, inflated free cash flow, and questionable joint venture transactions." (Id.)

On April 20, 2015 – the first trading day after Horowitz's resignation was announced – the price of Iconix stock dropped 20.67%, from $32.03 per share to $25.41 per share. (Id. ¶¶ 227-228)

On April 29, 2015, Iconix issued a press release announcing disappointing financial results for the first quarter of 2015. (Id. ¶ 230) Due to a lack of new joint venture opportunities, the Company reported "[o]ther revenue [as] $0 in the first quarter of 2015." (Id.) Faced with "declining . . . growth" in its brands and without the gains from one-time sales of joint ventures to "prop up" revenue, the Company reported "decreases in . . . key metrics of licensing revenue, EBITDA, and free cash flow." (Id.) Iconix denied any financial or

managerial problems at the Company, however, and maintained that the "core licensing business remains healthy." (Id. ¶ 231)

On August 6, 2015, however, Iconix announced the resignation of then-CEO Defendant Cole, marking the fourth executive to leave the Company within a year-and-a-half. (Id. ¶¶ 234-235) Defendant Cuneo – who had been a member of Iconix's Board of Directors since 2006 – was appointed to replace Cole as Chairman of the Board and interim CEO. (Id. ¶ 235) Cole agreed to serve as "special advisor" to the Company through September 30, 2015. (Id.)

On August 7, 2015, the price of Iconix common stock dropped 23.88%, from $19.60 per share to $14.92 per share. (Id. ¶ 240)

On August 10, 2015, Iconix issued a press release announcing its financial results for the second quarter of 2015. (Id. ¶¶ 197-200, 241) The Company reported a 1% increase in licensing revenue, but reported that there was "no 'Other revenue'" and, as a result, "all metrics decreased." (Musoff Decl., Ex. 10 (Aug. 10, 2015 Press Release) (Dkt. No. 104-10) at 2) The press release also disclosed that Iconix was engaged in responding to an SEC comment letter, which addressed the Company's accounting as it related to certain joint venture transactions. The press release stated that the Company's Board of Directors had formed a "Special Committee" to review its accounting practices:

> Iconix also announced today that it is currently in a comment letter process with the [SEC] relating to an ongoing periodic review of the Company's Form 10-K for the year ended December 31, 2014. The current correspondence relates to the accounting treatment for the formation of the Company's international joint ventures under [GAAP] and whether such joint ventures should potentially have been consolidated in the Company's historical results. The Company's Board of Directors also formed a Special Committee consisting of independent directors to review the accounting treatment related to certain of the Company's international joint venture transactions.

(Id. at 3)

With respect to the accounting treatment afforded joint venture transactions, Iconix stated:

> The material terms of the joint venture agreements have been fully disclosed in the Company's prior filings, and the Company's independent auditors have audited and reviewed such filings. In the past three years, the gains that the Company recognized related to the formation of joint ventures were approximately $46.5 million in 2014, $24.6 million in 2013, and $5.6 million in 2012. If consolidation of the joint ventures is required, these gains would be reversed and treated as non-controlling interests. We continue to believe that the structure of our joint venture transactions should not result in consolidation and have presented our views and supporting accounting literature to the [SEC].
>
> While the ultimate outcome of the [SEC's] comment letter process is unknown and may have a material effect on the Company's historical financial statements, the Company believes that the results of the comment letter process will not have a material impact on historical free cash flow, will not impact the Company's reported results for the first half of 2015, and will not impact the Company's overall business strategy of forming joint ventures with large, well-capitalized partners that have local market expertise to organically grow the existing portfolio of brands globally. The Company will continue to work closely with the [SEC] to resolve any remaining open comments.

(Id.)

On August 10, 2015 – the same day as the press release – the price of Iconix common stock dropped 2.35%. (Am. Cmplt. (Dkt. No. 62) ¶ 246)

## F. First Restatement

On November 5, 2015 – the final day of the Class Period – Iconix filed a Form 8-K announcing the results of the Special Committee's review, and informing investors that the Company would have to restate certain financial statements. (Id. ¶¶ 63, 247) Item 4.02 of the Form 8-K states:

> Based on the Special Committee's review and additional review by the Audit Committee . . . of the Board and the Company's current management team, on October 30, 2015, the Board, the Audit Committee and the Company's current management team concluded that the Company will restate its historical financial statements in respect of (i) the fourth quarter and annual results of 2013, (ii) the 2014 fiscal year and each quarterly period thereof and (iii) the first and second quarters of 2015 (the "Restatement Periods") to correct certain errors in accounting. . . .

> . . . [I]nvestors should no longer rely upon the Company's previously filed financial statements and other financial disclosures in respect of the Restatement Periods. . . .

(Musoff Decl., Ex. 11 (Nov. 5, 2015 Form 8-K) (Dkt. No. 104-11) at 3)

The Company determined that restatements were necessary as a result of improper accounting practices that violated GAAP. Iconix had (1) "improperly reported revenue on licensing agreements without 'adequate support'"; (2) "improperly reported accrued expenses on license agreements"; and (3) "improperly classified [expenses] and not reported [expenses] as a reduction of revenue." (Am. Cmplt. (Dkt. No. 62) ¶ 64; see also id. ¶¶ 247, 280-287) Because of these improper accounting practices, the Company had, inter alia, overstated its (1) 2014 annual revenues by 4.83%; (2) 2014 annual net income by 2.38%; and (3) June 2015 quarterly revenues by 2.33%. (Id. ¶ 76) The Company also announced that it would have to "reduce[] 'revenue assumptions for the fourth quarter of 2015 related to the accounting adjustments recorded as a result of the Special Committee and current management team's reviews.'" (Id. ¶ 248) Iconix cut its 2015 guidance for earnings (from $2.00-$2.15 per share to $1.35-$1.40 per share), licensing revenue (from $410-$425 million to $370-$380 million), and other revenue (from $5-$15 million to zero). (Id.)

On November 6, 2015, the price of Iconix stock dropped 57.2% from $16.14 per share to $6.90 per share. (Id. ¶ 252)

### G. Second Restatement

According to the Amended Complaint, the "fallout from Defendants' accounting fraud continued to unfold after the end of the Class Period." (Id. ¶ 253)

On December 28, 2015, Iconix announced that the SEC had opened a formal investigation into its accounting related to the formation of certain joint ventures. (Id.)

On February 18, 2016, Iconix filed a Form 8-K announcing that the Company would have to restate for a second time. Item 4.02 of the Form 8-K states:

> As previously disclosed, the Company has been engaged in a comment letter process with the [SEC] relating to an ongoing review of the Company's Form 10-K for the year ended December 31, 2014. The Company has, as of the date hereof, responded to the [SEC] with a Confirming Letter on all of the questions the [SEC] has raised. As a result of the comment letter process, the Company's management team, Audit Committee . . . and the Board of Directors . . . have reviewed the Company's financial statements and assessed the accounting treatment applied by the Company to its joint ventures and other sales of intellectual property.
>
> Based on this review and assessment, the Board, the Audit Committee and the Company's management team, on February 11, 2016, concluded that the Company will restate its historical financial statements . . . to address [certain] accounting matters. . . .
>
> . . . [I]nvestors should no longer rely upon the Company's previously filed financial statements and other financial disclosures in respect of (i) the fiscal years ended December 31, 2013 and 2014 and (ii) the first three quarters of 2015, or any prior press releases or other communications that relate thereto.

(Musoff Decl., Ex. 12 (Feb. 18, 2016 Form 8-K) (Dkt. No. 104-12) at 4)

Iconix informed investors that the second restatement would affect multiple aspects of the Company's financial reporting for fiscal years 2013 and 2014, and would require the Company to take the following actions: (1) with respect to the Iconix Canada, Iconix Israel, Iconix Southeast Asia, Iconix Middle East, and LC Partners U.S. joint ventures, "revise [the] historical accounting treatment to consolidate the financial statements of these entities within the Company's financial statements and . . . eliminate previously reported gains on sale which were recorded at the time these transactions were consummated"; (2) "recalculat[e] the cost basis of the trademarks contributed to the respective joint ventures to determine the amount of the gain that should have been recorded at the time of the consummation of th[ose] transactions"; (3) with respect to the sales of certain trademarks, "recalculat[e] the cost basis of the trademarks sold to determine the amount of the gain that should have been recorded at the time of sale"; (4)

"reclassify[] the presentation of its income statement to reflect gains on sale of trademarks as a separate line item above the Operating Income line, and not as revenue, as previously reflected"; and (5) "reclassify[] the Equity Earnings on [the] Joint Ventures line to above the Operating Income line, from its previous location within the Other Expenses section." (Am. Cmplt. (Dkt. No. 62) ¶¶ 254-255; see also Musoff Decl., Ex. 12 (Feb. 18, 2016 Form 8-K) (Dkt. No. 104-12) at 4)

On March 30, 2016, Iconix filed a Form 10-K for 2015. (Am. Cmplt. (Dkt. No. 62) ¶ 79) Iconix disclosed the impact of restating its financial statements from fiscal years 2013 and 2014,[8] and explained that – as a result of its accounting errors – the Company had overstated its annual revenue by 10.77% and net income by 21.57% in 2013, and overstated its annual revenue by 17.82% and net income by 40.91% in 2014. (Id. ¶ 80) The Company also announced a "non-cash impairment charge of approximately $437.5 million in the fourth quarter of 2015 related to certain of the Company's trademarks and goodwill." (Id. ¶ 259) Plaintiffs allege that this write-down resulted from the Company "finally quantif[ying] its severe brand portfolio declines." (Id.)

## II. PROCEDURAL HISTORY

On June 23, 2015, this putative securities fraud class action was filed on behalf of purchasers of Iconix common stock during the Class Period. (Cmplt. (Dkt. No. 1)) On March 14, 2016, this Court consolidated the instant action with two related actions[9] and appointed lead

---

[8] According to the Amended Complaint, although Iconix has admitted misstatements in its financial statements prior to 2013, a complete set of the restated financial statements for those periods has not been disclosed. (Am. Cmplt. (Dkt. No. 62) ¶ 80 n.3)

[9] The other actions are Lazaro v. Iconix Brand Group, Inc., 15 Civ. 4981 (PGG), and Haverhill Retirement Sys., No. 15 Civ. 6658 (PGG).

plaintiffs and lead counsel. (Mar. 14, 2016 Order (Dkt. No. 53)) The Consolidated Amended Class Action Complaint was filed on May 13, 2016. (Dkt. No. 62)

On October 27, 2016, Defendants moved to dismiss the Amended Complaint, arguing that (1) Plaintiffs have not adequately alleged scienter; (2) many of the accounting judgments and statements are non-actionable; and (3) Plaintiffs have not alleged loss causation with respect to many of the alleged misstatements. (Def. Moving Br. (Dkt. No. 103) at 13-16)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Moreover, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). A court may also consider "legally required public disclosure documents filed with the SEC." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

### B. Standards for Pleading Securities Fraud

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012). First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).

The heightened pleading requirement under Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident

charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, 493 F.3d at 99 (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)). Pursuant to Rule 9(b), a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach, 355 F.3d at 170 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976))). "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

## II. PLAINTIFFS' SECTION 10(b) AND RULE 10b-5 CLAIMS

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co., 75 F.3d 801, 808 (2d Cir. 1996) ("To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury.").

Here, Defendants argue that the Amended Complaint should be dismissed because, inter alia, Plaintiffs have not adequately alleged scienter. (Def. Moving Br. (Dkt. No. 103) at 13-15, 29-45; Def. Reply Br. (Dkt. No. 105) at 9-26)

### A. Applicable Law

To establish scienter, "[t]he PSLRA requires plaintiffs to state with particularity . . . the facts evidencing . . . the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst, 425 U.S. at 194). As discussed above, "to qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (quoting Tellabs, 551 U.S. at 314).

"Plaintiffs may allege scienter by either (1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging 'strong circumstantial evidence of conscious

misbehavior or recklessness.'" Iowa Pub. Emp. Ret. Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013) ("IPERS") (emphasis in IPERS) (quoting In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 384 (S.D.N.Y. 2007)). In this regard, "[a]t least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" ECA, 553 F.3d at 199 (quoting Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000)). "[I]f Plaintiffs cannot make [a] 'motive' showing, then they [can] raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." Id. at 198-99 (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)). "'The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 357 (S.D.N.Y. 2012) (quoting Tellabs, 551 U.S. at 323-24).

Here, Plaintiffs seek to establish scienter through allegations of motive and opportunity to perpetrate fraud, as well as conscious misbehavior or recklessness.

### B. Motive and Opportunity

"To plead scienter under the 'motive and opportunity' prong, Plaintiff must allege that . . . Defendants 'benefitted in some concrete and personal way from the purported fraud.'" Id. at 357 (quoting ECA, 553 F.3d at 198). That is, "motive for scienter can 'be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly

misleading statements or nondisclosures; opportunity [can] be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged.'" Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 309 (2d Cir. 2015) (quoting S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108 (2d Cir. 2009)).

Here, the Amended Complaint alleges that Defendants were "financially motivated" to defraud Iconix's investors because (1) the officer-Defendants' compensation was "heavily tied" to the Company's financial performance, and (2) certain officer-Defendants benefited from the alleged fraud through stock sales at inflated prices. (See Am. Cmplt. (Dkt. No. 62) ¶¶ 325-338; Pltf. Opp. Br. (Dkt. No. 107) at 38-44)

**1. Performance-Based Compensation**

Plaintiffs argue that the officer-Defendants were "motivated to engage in accounting fraud because it increased the amount of their performance-based compensation tied to the achievement of certain Iconix financial targets." (Am. Cmplt. (Dkt. No. 62) ¶ 332; Pltf. Opp. Br. (Dkt. No. 107) at 42-44) In the Amended Complaint, Plaintiffs allege that Defendants received grants of stock options and annual cash bonuses, the vesting of which was tied to the Company achieving certain earnings-per-share targets. (Am. Cmplt. (Dkt. No. 62) ¶¶ 332-338) Plaintiffs further contend that, absent Iconix's inflated earnings, the earning-per-share targets would not have been achieved during the Class Period. (Id. ¶¶ 335-336)

"Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry, [however]." ECA, 553 F.3d at 198; accord S. Cherry St., LLC, 573 F.3d at 109. Accordingly, "Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase

their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. [Thus,] '[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'" Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) (citing Ferber v. Travelers Corp., 785 F .Supp. 1101, 1107 (D. Conn. 1991); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068-69 (5th Cir. 1994)); see also In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (noting that "compensation plans tied to the Company's performance . . . are typical of nearly every corporation").

In sum, Defendants' performance-based compensation is not sufficient to show motive for scienter purposes.

**2. Stock Sales**

Plaintiffs argue that Defendants Cole, Blumberg, and Clamen sold Iconix stock during the Class Period, and that evidence of these sales suffices to demonstrate a motive to defraud investors. (See Am. Cmplt. (Dkt. No. 62) ¶ 325; Pltf. Opp. Br. (Dkt. No. 107) at 39-42)

The Second Circuit has acknowledged that an inference of motive may arise where "corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." ECA, 553 F.3d at 198 (citing Novak, 216 F.3d at 308). However, such stock sales support a showing of motive only where "those trades are suspicious in timing or amount." In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 584 (S.D.N.Y. 2014), aff'd, 604 Fed. App'x 62 (2d Cir. 2015) (citing In re Keryx Biopharm., Inc., Sec. Litig., No. 13 Civ. 755 (KBF), 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014); Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011)). "'While "unusual" executive stock trading under some circumstances may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are

insufficient to support a strong inference of fraudulent intent.'" Id. at 584-85 (quoting In re Bristol-Myers Squibb, 312 F. Supp. 2d at 561).

As to Defendant Clamen, Plaintiffs allege that on February 20, 2013 – while serving as Iconix's CFO – Clamen sold 10,000 shares of Iconix common stock "at an artificially inflated price" of $23.91 per share, resulting in proceeds of $239,100. (Am. Cmplt. (Dkt. No. 62) ¶ 330) Plaintiffs further allege that Clamen had not sold Iconix stock in the past two years, and that this sale came just two days after the Company issued a press release that, as a result of certain accounting improprieties, reported artificially inflated financial metrics. (Id.) Clamen's February 20, 2013 Iconix stock sale amounted to less than 9% of his Iconix holdings at that time, however. (See Musoff Decl., Ex. 16 (Dkt. No. 106-16) at 6, 8) "[T]otal sales amounting to a relatively low percentage of an insider's percentage of stock holdings militate against an inference of scienter." In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009); see also Acito, 47 F.3d at 54 (sale of 11% of holdings not unusual). Moreover, Clamen's February 2013 stock sale occurred when – according to Plaintiffs – the alleged fraud was only just beginning to ramp up. Indeed, in each of the five quarters after this sale, Iconix announced "[r]ecord [r]evenue and [e]arnings," and the stock price surged from $23.91 per share to nearly $40 per share. (See Am. Cmplt. (Dkt. No. 62) ¶¶ 13, 121, 125, 132, 140, 153) Clamen sold no Iconix stock during these five quarters, however.

Moreover, Clamen's stock sales occurred before Iconix formed the disputed joint venture entities and improperly recognized unconsolidated gains with respect to these joint venture entities. (Am. Cmplt. (Dkt. No. 62) ¶¶ 127-130, 134-147, 158, 184-187) The accounting concerning these joint ventures is, of course, at the core of the alleged fraud.

Given these circumstances, the Court concludes that there is nothing "unusual" in Clamen's stock sales, and that they do not give rise to an inference of fraudulent intent.

This Court similarly concludes, as to Defendants Cole and Blumberg, that the Amended Complaint's allegations are not sufficient to give rise to an inference of fraudulent intent. Even assuming arguendo that the timing or amount of their sales of Iconix stock could support some inference of motive, other factors significantly undermine any such inference. As an initial matter, only two of the remaining six officer-Defendants are alleged to have sold stock under unusual circumstances. Notably, Plaintiffs do not allege that CFO Lupinacci and COO Horowitz – who each resigned after the Company's accounting practices came under scrutiny – sold stock during the Class Period. Courts have recognized that "the inference of scienter is undermined by the fact that [certain top executives, including a company's CFO and Comptroller] did not sell any stock" during the alleged class period. See In re Glenayre Techs., Inc. Sec. Litig., No. 96 Civ. 8252 (HB), 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998), aff'd sub nom. Kwalbrun v. Glenayre Techs., Inc., 201 F.3d 431 (2d Cir. 1999); see also Acito, 47 F.3d at 54 ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'"); San Leandro, 75 F.3d at 814 ("sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive"); In re Gildan Activewear, 636 F. Supp. 2d at 271-72 ("Plaintiffs have alleged insider trading by only two . . . insiders; the absence of any allegations of other insider trades before [the company disclosed negative news] . . . undercuts any finding of the requisite strong inference of scienter.").

Moreover, although Cole and Blumberg sold Iconix stock when the stock price was allegedly inflated, both Cole and Blumberg's net holdings of Iconix stock increased over the Class Period. (See Musoff Decl. (Dkt. No. 104) Exs. 17, 19) Indeed, both men continued to hold their Iconix stock even as it dropped precipitously in value over the months-long revelations concerning Iconix's faulty accounting. To the extent that Plaintiffs seek to establish scienter under the "motive" prong – based on a theory that the officer-Defendants engaged in "massive accounting fraud" to artificially inflate Iconix's financial metrics and sell their stock for profit at inflated stock prices – the fact that Cole and Blumberg's net holdings of Iconix stock increased over the Class Period is "wholly inconsistent with fraudulent intent."[10] In re Bristol-Myers Squibb, 312 F. Supp. 2d at 561 (citation omitted). Indeed, "[i]t defies reason that an [individual] looking to profit on a fraudulently inflated stock price would hold [most] . . . of [his] shares as share prices fell, while knowing that the information illuminating the fraud was seeping into the market." Glaser, 772 F. Supp. 2d at 593 (emphasis omitted).

The Court concludes that Plaintiffs have not offered evidence sufficient to raise an inference of scienter under the "motive" prong.

### C. Conscious Misbehavior or Recklessness

To survive dismissal under the "conscious misbehavior or recklessness" prong, Plaintiffs must show that

> "they alleged reckless conduct by [Defendants], which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of

---

[10] Plaintiffs argue that the net increase in Cole and Blumberg's Iconix stock holdings occurred as a result of stock-based compensation, and therefore "came at no cost to them." (Pltf. Opp. Br. (Dkt. No. 107) at 40-41 (citing In re Nevsun Res. Ltd., No. 12 Civ. 1845 (PGG), 2013 WL 6017402, at *13 n.7 (S.D.N.Y. Sept. 27, 2013); Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010)) The fact that Cole and Blumberg continued to hold Iconix stock is inconsistent with Plaintiff's theory, however, that Defendants committed accounting fraud in order to profit from selling their holdings of Iconix stock at artificially inflated prices.

> ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"

Kalnit, 264 F.3d at 142 (quoting Honeyman v. Hoyt (In Re Carter-Wallace, Inc. Secs. Litig.), 220 F.3d 36, 39 (2d Cir. 2000)). In this context, "reckless" means "'conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'" S. Cherry St., LLC, 573 F.3d at 109 (quoting Novak, 216 F.3d at 312) (emphasis in S. Cherry St., LLC). "'An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.'" Id. (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996)). Moreover, as noted above, "[t]he strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater if there is no motive." Pennsylvania Pub. Sch. Employees' Ret. Sys., 874 F. Supp. 2d at 358 (quoting ECA, 553 F.3d at 198-99).

Here, Plaintiffs' arguments under the "conscious misbehavior and recklessness" prong are premised on allegations of (1) Iconix's numerous GAAP violations and the nature and magnitude of the Company's financial restatements; (2) the nature of the alleged fraud – in particular, the failure to consolidate the Company's highly touted joint ventures as a means to conceal the Company's declining brand revenues; (3) the significance of the joint ventures to Iconix's core business operations; and (4) suspiciously timed resignations of four senior Iconix executives. (See Pltf. Opp. Br. (Dkt. No. 107) at 28; Am. Cmplt. (Dkt. No. 62) ¶ 322; id. ¶¶ 323-324, 339-345, 351)

As an initial matter, to demonstrate scienter through proof of conscious misbehavior or recklessness requires a plaintiff to offer "far 'more than a misapplication of accounting principles.'" IPERS, 919 F. Supp. 2d at 333 (quoting SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)). Indeed, "allegations of GAAP violations or accounting

irregularities, standing alone, are insufficient to state a securities fraud claim," Novak, 216 F.3d at 309 (citing Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999); Chill, 101 F.3d at 270), and "[o]nly where such allegations are coupled with evidence of 'corresponding fraudulent intent' might they be sufficient." Id. (quoting Chill, 101 F.3d at 270) (internal citations omitted); see also In re China Organic, 2013 WL 5434637, at *10 (S.D.N.Y. Sept. 30, 2013), aff'd, 482 Fed. App'x 618 (2d Cir. 2012) ("recklessness cannot be shown with [accounting standard] violations alone"). Moreover, "[a]lthough 'the magnitude [of a restatement resulting from accounting errors] can be relevant to the scienter inquiry[,] . . . it is clear that the size of the [alleged] fraud alone does not create an inference of scienter,'" and the magnitude of the restatement resulting from the accounting errors "must be presented in tandem with other circumstantial evidence to suggest scienter." In re Turquoise Hill Res. Ltd. Sec. Litig., No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) (quoting Dobina v. Weatherford Int'l Ltd., 909 F. Supp. 2d 228, 250-51 (S.D.N.Y. 2012)). "A restatement is simply a correction, after the fact, of an accounting or other error in financial results. The fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published." Id.

Accordingly, the magnitude and number of Iconix's accounting errors are not in themselves sufficient to raise a strong inference of scienter, and Plaintiffs are required to proffer additional factual allegations of "corresponding fraudulent intent." See Novak, 216 F.3d at 309. The Court concludes that the Amended Complaint's factual allegations, considered collectively, do not support such a showing.

Plaintiffs argue, inter alia, that Iconix's accounting errors involve "basic tenets of proper accounting,"[11] occurred over an extended period of time, and relate directly to the Company's core operations. (Pltf. Opp. Br. (Dkt. No. 107) at 30-35) In certain circumstances, allegations of this sort may constitute "some evidence of scienter." See In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897 (HB), 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009) ("when paired with allegations of knowledge or recklessness[,] the fact of the restatement, as well as its size and relation to a defendant's 'core operations' are all some evidence of scienter").

Here, however, other facts and circumstances significantly undermine any inference of scienter. Plaintiffs have cited Iconix's decision not to consolidate the newly-formed joint ventures in 2013 and 2014 as the primary means by which the Company concealed its "lack of licensing growth" and "artificially inflate[d]" its financial performance. (See Pltf. Opp. Br. (Dkt. No. 107) at 32-33, 35) But Iconix's decision not to consolidate the newly-formed joint ventures was publicly disclosed in the Company's public filings. Indeed, in its 2013 and 2014 Form 10-Q and Form 10-K filings, Iconix disclosed the details of its joint venture transactions and its determination that,

> in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and [the local partner], . . . [the joint venture] is not a variable interest entity and [is] not subject to consolidation. The Company has recorded its investment under the equity method of accounting.

(See Am. Cmplt. (Dkt. No. 62) ¶¶ 130, 137, 146-147, 158, 165, 174, 184-185, 195) Moreover, Iconix's financial statements and accounting judgments were subject to audit by BDO – an independent public accounting firm – which "assess[ed] the accounting principles used" by Iconix and reviewed its financial statements for "material misstatements." (See Musoff Decl.

---

11 Defendants contend that Iconix's accounting errors involved "complex" and "subjective" judgments. (See Def. Moving Br. (Dkt. No. 103) at 31; Def. Reply Br. (Dkt. No. 105) at 17-20)

(Dkt. No. 104) Ex. 5 (2014 Form 10-K) at 10; id., Ex. 4 (2013 Form 10-K) at 10; id., Ex. 8 (2012 Form 10-K) at 5) For the 2012, 2013, and 2014 fiscal years, BDO determined that, based on its review, Iconix's "financial statements . . . present fairly, in all material respects, the financial position of Iconix . . . and the results of [its] operations and [its] cash flows . . . , in conformity with accounting principles generally accepted in the United States." (See id.)

The Amended Complaint does not plead particularized facts showing that Defendants actually knew that they were engaged in improper accounting practices when reporting and disclosing "[r]ecord [r]evenue and [e]arnings" to investors during the Class Period. Indeed, the Amended Complaint cites no internal reports, documents, or communications that shed light on Defendant's knowledge of or conduct concerning the Company's accounting practices. Nor does the Amended Complaint contain statements of confidential witnesses addressing these issues. Cf. City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc., No. 10 Civ. 2835 (NRB), 2011 WL 4357368, at *1 (S.D.N.Y. Sept. 19, 2011) ("[U]nlike many securities class actions, plaintiffs do not rely on a single confidential witness or internal document in order to support their allegations.").

Although the absence of internal documents and statements from confidential witnesses does not preclude a finding that Plaintiffs have presented evidence raising a strong circumstantial inference of scienter, Iconix's public disclosures of its accounting practices and BDO's audits undermine such an inference here. See In re Turquoise Hill Res. Ltd., 2014 WL 7176187, at *6 (no inference of scienter where, inter alia, the complaint did "not allege that [defendants'] auditors disapproved of . . . [the disputed] accounting practices or found any lack of internal controls prior to the restatement"); In re Bausch & Lomb, Inc. Sec. Litig., 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) ("It is noteworthy that [the] outside auditor[s] did not

question [the corporate defendant's] accounting practices." (citing Kushner v. Beverly Enters., Inc., 317 F.3d 820, 829 (8th Cir. 2003))); cf. In re Bristol-Myers Squibb, 312 F. Supp. 2d at 570 (no inference of fraud where disputed accounting practice was "approved by the Company's independent auditors and, more importantly, each sale was explicitly and contemporaneously disclosed"). Indeed, while "'[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness,'" S. Cherry St., LLC, 573 F.3d at 109, the fact that BDO did not detect, observe, or otherwise note any improprieties in Iconix's financial accounting – over three consecutive audit years – is significant. This is particularly true given Plaintiffs' claim that Iconix's accounting errors involve "basic" accounting principles. Given these circumstances, a compelling inference arises that Iconix's accounting errors were not obvious or unreasonable.

In this regard, it is noteworthy that the Amended Complaint does not plead facts suggesting that BDO was in any way complicit in, or aware of, the alleged accounting fraud. Nor does the Amended Complaint suggest that BDO had any motive to disregard Iconix's improper accounting. Although Plaintiffs contend that the "same fraud perpetrated on the investing public could very well have been perpetrated on an auditor" (Pltf. Opp. Br. (Dkt. No. 107) at 45), the Amended Complaint contains no particularized allegations suggesting that Defendants gave Iconix's auditors incomplete information or prevented the auditors from detecting the allegedly "basic" accounting errors.

Finally, Plaintiffs contend that the "suspiciously timed resignations of four of [Iconix's senior executives]" during the Class Period support an inference of scienter. (Id. at 36-37) "In reality, [however,] there are any number of reasons that an executive might resign, most of which are not related to fraud." In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 446 (S.D.N.Y.

2005) (resignations of two former CFOs did not support inference of scienter). Here, Plaintiffs note that four senior executives resigned in succession over a year-and-a-half, during which Iconix's improper accounting practices came under scrutiny. (Pltf. Opp. Br. (Dkt. No. 107) at 37 & n.18) However, two of those executives – Lupinacci and Horowitz, Iconix's CFO and COO, respectively, during the 2014-2015 period – joined the Company after the alleged accounting fraud was well underway and remained with the Company for less than a year. Moreover, as discussed above, the Amended Complaint does not plead particularized facts connecting the resigning executives to fraudulent conduct. "In the absence of [such] facts . . . , it is more likely that [the resigning Defendants] were terminated and resigned as a result of company mismanagement, not securities fraud." Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 162 (D. Conn. 2007), aff'd, 312 Fed. App'x 400 (2d Cir. 2009) (collecting cases).

The Court concludes that the Amended Complaint's factual allegations, considered together, are not sufficient to raise a strong inference of scienter. Indeed, the Amended Complaint's factual allegations – which are entirely circumstantial and do not rely on any internal documents or confidential witnesses – support a more cogent and compelling inference of non-fraud: that Defendants attempted to comply with applicable accounting standards; that Defendants fully cooperated with the Company's outside auditors and disclosed the relevant accounting judgments in their public filings; that the accounting decisions at issue involve matters of judgment that were not – at the time – flagged as improper by the outside auditors or otherwise disapproved of by the outside auditors; that the Company's accounting determinations turned out to be improper; that the Company took steps to correct the errors, including by forming a special committee of the independent directors, by cooperating with the SEC, and by issuing restatements of historical financial filings; and that, as a result of the

Company's corporate mismanagement and failing financial metrics, a number of executives resigned from the Company. Because the Amended Complaint does not plead facts sufficient to raise a strong inference of scienter, Plaintiff's claims under Section 10(b) and Rule 10b-5 claims will be dismissed.[12]

## III. PLAINTIFFS' SECTION 20(a) CLAIM

The Amended Complaint includes a claim for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of securities law." Rombach, 355 F.3d at 177-78. Because this Court finds that Plaintiffs have not adequately pled a violation of the securities laws, their Section 20(a) claim will be dismissed.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to terminate the motion (Dkt. No. 102).

Plaintiffs have requested leave to amend in the event that this Court dismisses all or part of the Amended Complaint. (Pltf. Opp. Br. (Dkt. No. 107) at 63 n.51). "[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended complaint." Van Buskirk v. N.Y. Times Co., 325 F.3d 87, 91 (2d Cir. 2003) (citing Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)). "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).

---

12 Having concluded that Plaintiffs have not sufficiently alleged scienter, this Court does not reach the issues of whether the Amended Complaint adequately pleads misrepresentation and loss causation.

Here, Defendants have not pointed to any compelling reason why leave to amend should be denied. Accordingly, Plaintiffs are granted leave to amend. Any Second Amended Complaint will be filed by **November 14, 2017**.

Dated: New York, New York
October 24, 2017

SO ORDERED.

Paul G. Gardephe
United States District Judge