UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

In re ICONIX BRAND GROUP, INC., et al.　　:　　Civil Action No. 1:15-cv-04860-PGG

　　　　　　　　　　　　　　　　　　　　:

———————————————————————— :　　<u>CLASS ACTION</u>

　　　　　　　　　　　　　　　　　　　　:

This Document Relates To:　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　:

　　　　ALL ACTIONS.　　　　　　　　　　　:

———————————————————————— x


### LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' AND BDO'S MOTIONS TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

ARGUMENT ........................................................................................................................11

I.      STANDARDS ON A MOTION TO DISMISS ...........................................................11

II.     PLAINTIFFS HAVE ADEQUATELY ALLEGED CLAIMS AGAINST ICONIX
        AND THE INDIVIDUAL DEFENDANTS ................................................................12

        A.      Plaintiffs Have Adequately Alleged Scienter ......................................................12

                1.      Standard for Pleading Scienter .................................................................12

                2.      Plaintiffs' New Allegations Plead a Strong Inference of
                        Defendants' Scienter ................................................................................13

                        a.      The Circumstances Surrounding Defendants'
                                Representations of Timely Payment Support a Strong
                                Inference of Scienter ....................................................................13

                        b.      Defendants' Failure to Seek Recourse Against Its
                                Defaulting Joint Venture Partners, and the One-Sided
                                Nature of the Joint Venture Terms, Contribute to a Strong
                                Inference of Scienter ....................................................................16

                3.      Viewed Holistically with the Other Scienter Allegations Alleged in
                        the SAC, Plaintiffs' New Allegations Plead a Strong Inference of
                        Scienter ...................................................................................................19

                4.      Defendants' Miscellaneous Scienter Arguments Lack Merit ...................22

        B.      Plaintiffs Have Adequately Alleged Falsity ........................................................24

        C.      Plaintiffs Have Adequately Alleged Loss Causation............................................28

                1.      Standards for Pleading Loss Causation....................................................28

                2.      Plaintiffs Have Pled Loss Causation as to Iconix's Financial
                        Statements for Fiscal Years 2011 and 2012..............................................29

                3.      Plaintiffs Have Pled Loss Causation as to the Accounting Issues
                        Addressed in the Second Restatement ......................................................30

D.    Plaintiffs Have Adequately Alleged Control Person Liability ..............................34

III.    PLAINTIFFS HAVE ADEQUATELY ALLEGED BDO'S LIABILITY ......................34

A.    BDO Acted with Scienter When It Ignored Numerous Significant Red Flags Alerting It to Defendants' Fraud ....................................................................34

1.    Iconix Participated in Numerous Joint Ventures that Accounted for Large Percentages of Its Net Income at Quarter-End and with the Same Parties .............................................................................................35

2.    The Joint Ventures Lacked Economic Substance Because the Joint Venture Partners Could Not, or Would Not, Make Their Installment Payments ...................................................................................36

3.    The SEC Repeatedly Questioned Iconix's Accounting for the Joint Ventures and Whether They Qualified as VIEs .........................................39

4.    Analysts Published a Series of Articles Questioning Iconix's Accounting for the Joint Ventures ............................................................41

5.    Iconix's Management Had a History of Fraud ..........................................42

6.    Iconix Had Pervasive Weaknesses in Its Internal Controls ......................42

7.    Iconix's Most Senior Officers, Who Were Directly Involved in Negotiating the Joint Ventures, Successively Resigned ...........................43

B.    BDO's Audit Reports Were False and Misleading ................................................45

1.    BDO Had No Rational Basis for Its Audit Opinion ..................................46

2.    The Audit Opinion Contained False Embedded Facts ..............................48

3.    Omissions of Material Fact Rendered the Audit Report False and Misleading ................................................................................................49

C.    The SAC Establishes Loss Causation as to BDO ..................................................50

CONCLUSION ...............................................................................................................................50

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alpha Capital Anstalt v. Oxysure Sys.*,
  252 F. Supp. 3d 332 (S.D.N.Y. 2017)..................................................................28

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp.*,
  879 F.3d 474 (2d Cir. 2018)............................................................................30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................12

*Barrett v. PJT Partners Inc.*,
  2017 WL 3995606
  (S.D.N.Y. Sep. 8, 2017)................................................................................20

*Carlson v. Xerox Corp.*,
  392 F. Supp. 2d 267 (D. Conn. 2005).................................................................12

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)............................................................................29

*Chase Grp. All. LLC v. City of New York Dep't of Fin.*,
  620 F.3d 146 (2d Cir. 2010)............................................................................12

*Christine Asia Co. Ltd. v. Ma*,
  2017 WL 6003340
  (2d Cir. Dec. 5, 2017) ...................................................................................20

*Cruz v. TD Bank, N.A.*,
  742 F.3d 520 (2d Cir. 2013)............................................................................50

*Decker v. Massey-Ferguson, Ltd.*,
  681 F.2d 111 (2d Cir. 1982)............................................................................43

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*,
  454 F.3d 1168 (10th Cir. 2006) .......................................................................46

*Dobina v. Weatherford Int'l Ltd.*
  909 F. Supp. 2d 228 (S.D.N.Y. 2012).................................................................43

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..................................................................................28, 33

*Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*,
595 F. Supp. 2d 1253 (M.D. Fla. 2009),
*aff'd*, 594 F.3d 783 (11th Cir. 2010) .......................................................49

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .......................................................16

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
783 F.3d 395 (2d Cir. 2015) .......................................................28, 33

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) .......................................................24, 25

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......................................................30

*Glover v. Deluca*,
2006 WL 2850448
(W.D. Pa. Sept. 29, 2006) .......................................................40

*Harris v. AmTrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015),
*aff'd*, 649 Fed. Appx. 7 (2d Cir. May 16, 2016) .......................................................33

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) .......................................................48

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
2012 WL 3758085
(S.D.N.Y. Aug. 29, 2012) .......................................................44

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004) .......................................................34, 36

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) .......................................................12, 13

*In re Bristol Myers Squibb Co. Sec. Litig.*
586 F. Supp. 2d 148 (S.D.N.Y. 2008) .......................................................30

*In re Complete Management Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001) .......................................................39

*In re DNTW Chartered Accountants Sec. Litig.*
  172 F. Supp. 3d 675 (S.D.N.Y. 2016)..................................................44

*In re Enron Corp. Sec. Derivative, & ERISA Litig.*,
  2005 WL 3504860
  (S.D. Tex. Dec. 22, 2005)............................................................33

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
  2015 WL 249508
  (S.D.N.Y. Jan. 20, 2015)...........................................................27

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010).........................................11, 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005)............................................25

*In re Iconix Brand Group, Inc.*,
  2017 WL 4898228
  (S.D.N.Y. Oct. 25, 2017) ...........................................................13

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
  66 F. Supp. 2d 622 (E.D. Pa. 1999) ..............................................45

*In re IMAX Sec. Litig.*,
  587 F. Supp. 2d 471 (S.D.N.Y. 2008)..................................32, 34, 38

*In re Initial Pub. Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008).............................................29

*In re Lehman Brothers Securities and ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011).............................................49

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  2012 WL 2512280
  (S.D.N.Y. June 29, 2012)...........................................................33

*In re Longtop Financial Tech. Ltd. Sec. Litig.*,
  910 F. Supp. 2d 561 (S.D.N.Y. 2012).............................................39

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009).............................................22

*In re Nevsun Res. Ltd.*,
2013 WL 6017402
(S.D.N.Y. Sept. 27, 2013) ........................................................................12

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
988 F. Supp. 2d 406 (S.D.N.Y. 2013) ........................................18, 19, 25

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014) ........................................................34

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013) ......................................................46

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ..............................................................46

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) ......................................................27

*In re Petrobras Sec. Litig.*,
2016 WL 1533553
(S.D.N.Y. Feb. 19, 2016) ......................................................26, 46, 48, 50

*In re Phillip Services Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y. 2004) ........................................38, 39, 44

*In re Tronox, Inc. Sec. Litig.*,
2010 WL 2835545
(S.D.N.Y. June 28, 2010) .........................................................................35

*In re Washington Mutual, Inc. Sec., Deriv. & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009) ......................................45, 49

*In re Winstar Commc'ns*,
2006 WL 473885
(S.D.N.Y. Feb. 27, 2006) ...........................................33, 34, 36, 38

*In re Xethanol Corp. Sec. Litig.*,
2007 WL 2572088
(S.D.N.Y. Sept. 7, 2007) ..........................................................................50

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013) .....................................................................15

*Kux-Kardos v. VimpelCom, Ltd.*,
151 F. Supp. 3d 471 (S.D.N.Y. 2016)....................................................................32

*Lapin v. Goldman Sachs Group, Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006)....................................................................47

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005).................................................................................28

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .............................................................................32

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ...............................................................................32

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)..........................................................22, 28, 33, 50

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013)....................................................................47

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
900 F.2d 576 (2d Cir. 1990).................................................................................15

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).................................................................................43

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
135 S. Ct. 1318 (2015) ................................................................................ *passim*

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*,
595 F.3d 86 (2d Cir. 2010)...................................................................................15

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012)....................................................................22

*Pennsylvania Public School Employees' Retirement System v.*
*Bank of America Corp.*,
939 F. Supp. 2d 445 (S.D.N.Y. 2013)..............................................................40, 43

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)......................................................................32

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
  898 F. Supp. 2d 673 (S.D.N.Y. 2012) ....................................................32

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ............................................................24

*Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
  142 F. Supp. 2d 589 (D.N.J. 2001) ....................................................45

*SEC v. Kelly*,
  663 F. Supp. 2d 276 (S.D.N.Y. 2009) .................................................24

*SEC v. Okin*,
  137 F.2d 862 (2d Cir. 1943) ............................................................46

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008) ............................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .........................................................12, 20, 24

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ............................................................26

*Underland v. Alter*,
  2011 WL 4017908
  (E.D. Pa. Sept. 9, 2011) ................................................................25

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) .............................................28, 33

*Whalen v. Hibernia Foods PLC*,
  2005 WL 1799370
  (S.D.N.Y. Aug. 1, 2005) .................................................35, 39, 41, 44

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
  818 F. Supp. 2d 744 (S.D.N.Y. 2011) .................................................33

## STATUTES, RULES AND REGULATIONS

15 U.S.C
    §78j(b)...............................................................................................................34, 43
    §78u-4(b)(2)(A) ........................................................................................................12


Federal Rules of Civil Procedure
    Rule 8(a)(2)..............................................................................................................28
    Rule 9(b) ............................................................................................................28, 39
    Rule 12(b)(6)...........................................................................................................28
    Rule 15 ....................................................................................................................50

## LEGISLATIVE HISTORY

Private Securities Litigation Reform Act of 1995
    Pub. L. No. 104-67, 109 Stat. 737 (1995)........................................................12, 39

Sarbanes-Oxley Act of 2002
    Pub. L. No. 107-204 (2002)
        §304...................................................................................................................45

Lead plaintiffs City of Atlanta Firefighters' Pension Fund and City of Atlanta Police Officers' Pension Fund ("Lead Plaintiffs" or "Plaintiffs") respectfully submit this omnibus memorandum in opposition to Defendants' Motions to Dismiss.[1]

## INTRODUCTION[2]

During the Class Period, Iconix entered into a series of sham overseas joint ventures in order to cover up its deteriorating financial condition. Defendants' scheme was simple: Iconix would form overseas joint ventures, "sell" a purportedly 50% stake to local partners for millions of dollars, then immediately book the *entire* purchase price – of which the joint venture partners paid only a fraction at closing, with the majority due in installments over a number of years – as profits for the Company. Significantly, throughout the Class Period, Defendants repeatedly assured the SEC and investors that the joint venture partners were obligated to pay their installments in full; that these partners were "well-capitalized" and "predetermined" to pay; and that if they did not pay, Iconix had "full recourse" and would sue to collect. These statements were highly material, coming in direct response to an SEC inquiry into the Company's joint venture accounting. As would ultimately be revealed, Defendants' assurances were indisputably false.

Indeed, as the SAC alleges in detail, time and time again, Iconix's joint venture partners

---

[1] As used herein, "Defendants" refers to Iconix Brand Group, Inc. ("Iconix" or the "Company"), Neil Cole ("Cole"), Warren Clamen ("Clamen"), Jeff Lupinacci ("Lupinacci"), David Blumberg ("Blumberg"), Seth Horowitz ("Horowitz"), David K. Jones ("Jones"), and F. Peter Cuneo ("Cuneo"). "Individual Defendants" refers to all the Defendants except Iconix. Defendant BDO USA, LLP is referred to herein as "BDO."

[2] As used herein, "¶__" and "¶¶__, __" refer to paragraphs in the Second Consolidated Amended Class Action Complaint (the "SAC"). Unless otherwise noted, all emphasis in quotations is added, and all internal citations, footnotes, and quotation marks are omitted. "Joint Mem." refers to Defendants' Memorandum of Law in Support of their Joint Motion to Dismiss the Second Consolidated Amended Class Action Complaint. "BDO Mem." refers to the Memorandum of Law in Support of Defendant BDO USA, LLP's Motion to Dismiss. "Horowitz Mem." refers to the Joinder Memorandum of Law in Support of Defendant Seth Horowitz's Motion to Dismiss the Second Consolidated Amended Complaint.

failed – or refused – to make the installment payments they purportedly owed. For example, in June 2013, Iconix recorded $9.8 million in profits from Iconix Canada, a joint venture Iconix formed with Buffalo International ULC and its subsidiary (together, "BII"). Tellingly, although the joint venture agreement required BII to pay $3 million annually over the next three years, BII *missed its very first payment*, due in June 2014. Rather than disclose the default (which it later lied about) and seek recourse from BII, Iconix covertly gave BII a waiver – the Company told BII it could pay half of the $3 million a full *three years later*, in 2017, and the other half *four years later*, without charging a penny of interest or extracting any meaningful concessions. Not surprisingly, BII never made this delayed payment. To the contrary, when BII defaulted again, Iconix simply purchased BII's interest and claimed it got paid what BII owed as "part of the transaction." In other words, when BII refused to pay, Iconix paid itself the millions of dollars BII owed, in a "round trip" transaction that lacked any economic substance.

Significantly, BII was no anomaly; to the contrary, this pattern repeated itself throughout the Class Period. *No fewer than four separate joint venture partners* either failed or refused to make the installment payments they supposedly owed, and on each occasion, rather than seeking recourse, Iconix "purchased" the joint venture partner's interest and claimed it got paid as part of the transaction. Moreover, in February 2016 *the Company was forced to restate every single penny of revenue it had booked from these joint ventures*. Yet it assured investors that when its partners paid their installments in full, it would be able to "deconsolidate" these entities and re-recognize the reversed gains. The joint venture partners *never* paid, however, and *over 94% of the $63.4 million in joint venture income the Company reversed was never recognized*. The only plausible inference that can be drawn from these facts is that Iconix's joint venture partners were never truly obligated to pay, and they lacked the ability and willingness to do so.

In response to these detailed allegations, Defendants ask the Court to accept their denials of Plaintiffs' well-pled allegations and conclude, as a matter of law, that their repeated assertions about the joint venture partners being "well-capitalized" and obligated to pay their installments in full were true. As the facts demonstrate, however, the vast majority of the joint venture partners *never* made their payments, and Defendants were well aware during the Class Period that their joint venture partners were refusing to pay. Plaintiffs need do nothing more to plead scienter. Moreover, Defendants' argument that joint venture accounting involves "complex" accounting judgments is meritless. *The joint ventures were shams formed for the specific purpose of avoiding consolidation –* exactly what the accounting rules are designed to prevent.

BDO's motion to dismiss fares no better. BDO's main argument is that it was unaware of the numerous red flags showing that the joint ventures were shams because it did not know the details of the transactions. But as Defendants themselves assert, BDO directly advised the Company about its accounting treatment of the joint ventures, and then helped the Company defend this accounting in year-long public correspondence with the SEC. BDO's undeniable knowledge of the ins and outs of the joint venture transactions – and the multitude of red flags indicating that they were shams – are highly probative of BDO's scienter.

In sum, Plaintiffs plead two separate restatements, multiple SEC inquiries and analyst reports challenging the Company's venture accounting, the successive resignations of four of the Company's most senior officers (three of whom directly negotiated the sham joint ventures, and one of whom – the Company's founder – resigned just four days before the SEC announced it was investigating those joint ventures), and tens of millions of dollars in sham joint venture income that was reversed and never again recognized. Taken together, these allegations give rise to a strong

inference of scienter on the part of Defendants and BDO and state a claim for securities fraud.[3]

## STATEMENT OF FACTS[4]

From 2005 to 2008, Iconix – a global brand management company – acquired over $1.09 billion in new brands. ¶56. Over the next few years, as a result of the financial crisis, the emergence of well-funded competitors, and the rapidly declining popularity of Iconix's aging overall brand portfolio, the Company began to experience plummeting royalty revenues. *See generally* ¶¶56-60. Faced with declining cash flows, Iconix took on a large debt load to finance acquisitions, nearly tripling its long-term debt, from approximately $548 million to $1.46 billion. ¶61.

As a result, Iconix needed a way to generate revenue, or at least the appearance of revenue. Thus, Iconix began exporting its brands overseas by contributing its IP rights to newly formed international joint ventures in which it maintained a 50% stake, while purportedly selling the remaining 50% to a local joint venture partner. ¶¶5, 62. Although Iconix declared that its joint ventures were an effective means for the Company to establish a global presence quickly and efficiently, in truth they were sham transactions designed for the singular purpose of generating instant "paper" revenues to conceal Iconix's rapidly deteriorating financial state. ¶¶5, 63. Defendants falsely claimed that the Company "sold" its IP rights for millions of dollars to the joint ventures, while fraudulently recognizing these "sales" as revenue gains for Iconix – all in violation of Generally Accepted Accounting Principles ("GAAP"). *Id.*

To entice these joint venture partners to purchase a 50% stake, Defendants made substantial economic concessions to limit their risk. ¶¶6, 64, 76. For example, Iconix granted these partners

_____

[3] For all the reasons below, Defendants' and BDO's other miscellaneous defenses also lack merit.

[4] To avoid repetition, and to permit the Court to focus on the new allegations, Plaintiffs incorporate by reference the Statement of Facts from their memorandum of law opposing Defendants' first motion to dismiss (ECF No. 107).

multi-million dollar revenue guarantees while allowing them to pay a small fraction of the purchase price at closing, with the majority due in annual installments over multiple years. In turn, Iconix maintained control of the joint venture while immediately booking the entire multi-million dollar "sale" of the purported 50% stake as a "paper" revenue gain for the Company. ¶¶6, 64, 66. As would be revealed after the Class Period, however, the supposed obligation of the joint venture partners to make installment payments to Iconix was wholly fictitious. ¶¶7, 64-75.

During the Class Period, Iconix entered into at least five joint ventures with installment arrangements in which the joint venture partner paid half or less of the purchase price at closing, with the majority due in installments over a number of years – most of which were never paid. ¶¶64-75. Yet Defendants represented otherwise during the Class Period, stating, for example, on January 21, 2015, that "in each instance where an Installment Payment has been due, *the payment has been made to the Company on a timely basis.*" ¶230. This was simply untrue, as the Company's partner in the Iconix Canada joint venture had informed Iconix in early 2014 that it would miss its very first payment, which was due in June. ¶¶69, 232.

Indeed, several of the Company's joint venture partners missed installment payments over the life of the joint ventures (s*ee generally* ¶¶9-10, 69, 72, 74, 232, 236) – despite Defendants' Class Period representations to both the market and the SEC that the partners were "well-capitalized," such that their satisfaction of all installment payments was "pre-determined." ¶¶9, 66, 73, 95, 225, 241, 286. In truth, Defendants knew that many of the Company's joint venture partners were either unable or unwilling to pay the amounts they supposedly owed. ¶¶9, 74. Although the Company publicly represented that it could seek "recourse" against its joint venture partners for defaulting on the installment payments, it never did so. ¶¶69, 73-74, 97, 232, 240. Instead, it renegotiated the agreements on terms unfavorable to itself, or simply bought out the joint venture partner.

**Iconix Canada**: In June 2013, Iconix formed Iconix Canada, selling a 50% stake to BII. ¶74. Under the joint venture agreement, BII paid half of the $17.8 million purchase price at closing, with the remaining $8.9 million due in annual installments of $3 million each. ¶¶9, 68. The Company booked a $9.8 million gain from this transaction (based on the full $17.8 million purchase price). *Id*. In early 2014, however, BII informed Iconix that it would not pay its first $3 million installment, which was due in June. Instead of taking any action for collection – a right it repeatedly touted to the SEC in public correspondence (¶¶9, 69) – Iconix renegotiated the installment arrangement on terms highly unfavorable to the Company, allowing BII to pay $1.5 million of the missed $3 million installment *three years later*, in June 2017, with the other half due *four years later*, in June 2018. *Id*. When BII defaulted again in 2016, Iconix "purchased" the joint venture in its entirety, claiming it got paid as part of the transaction. ¶¶69, 413. Iconix effectively paid itself for the joint venture, in a classic "round trip" transaction. *Id*.

**Iconix Israel**: In November 2013, Iconix formed Iconix Israel. ¶74. The joint venture partner, MGS Sports Trading Ltd. ("MGS"), paid less than a third of the $3.35 million purchase price at closing, with the remaining $2.3 million payable in monthly installments over two years. ¶¶74, 173. Two months before MGS's last installment was due, Iconix amended the joint venture agreement to provide that the Company had "sole discretion" to direct the activities of the joint venture. ¶79. MGS received no consideration for agreeing to give up control. *Id*. Iconix Israel never satisfied its installment payments. ¶74. As with Iconix Canada, the Company never sought any recourse against Iconix Israel. ¶¶74, 415.

**Iconix Southeast Asia**: In June 2014, Iconix formed Iconix Southeast Asia (Europe, Turkey, and Korea). ¶74. Global Brands Group ("GBG"), the Company's joint venture partner, paid just a quarter of the $15.9 million purchase price at closing, with the remaining $12 million due in annual

installments over three years. ¶74. Three months later, Iconix formed Iconix Southeast Asia (Greater China), again partnering with GBG, which paid $4.3 million of the $21.5 million purchase price at closing, with the remaining $17.2 million balance due in annual installments over four years. *Id*. In December 2015, after only a few installments had been paid, Iconix bought the joint venture out, even though there was a $9.4 million balance of outstanding installments. *Id*. Iconix claimed that the $9.4 million balance was somehow offset against the purchase price. *Id*. Again, the Company paid itself back for its own note receivable – another "round trip" transaction. ¶¶74, 415.

**LC Partners** ("LCP"): Iconix formed LCP in March 2014. ¶72. Although Rise Partners paid only $800,000 of the $4 million purchase price at closing for its 50% interest (*id.*), Iconix still recognized the entire $4 million purchase price at that time. *Id*. Rise Partners made the first installment payment in March 2015, but missed the next annual installment, paying just half what it owed several months late. *Id*. Yet Iconix never sought any recourse against Rise Partners. *Id*. Instead, in December 2016, Iconix purchased LCP, claiming that Rise Partners paid the remaining installment balance of $2 million as part of the transaction. *Id*.

**Iconix Middle East and North Africa**: In December 2014, Iconix formed Iconix Middle East and North Africa ("Iconix MENA"), partnering again with GBG, which paid only a third of the $18.8 million purchase price at closing. ¶74. The remaining $12.5 million was due in annual installments over two years. *Id*. Iconix would later amend the joint venture agreement to give itself "sole discretion and power to direct the activities . . . that most significantly impact the joint venture's economic performance." ¶¶74, 78. Thus, for no consideration, GBG agreed to a significant amendment to its joint venture agreement that would deprive it of any control. ¶78.

In 2013 and 2014, Iconix booked *$16.8* million and *$46.6* million in profits, respectively, from these joint ventures – highly material amounts accounting for nearly *10%* of the Company's

pre-tax income in 2013, and more than *20%* of its pre-tax income in 2014.  ¶¶11, 408.  To be able to report those amounts as profits, however, Defendants had to conceal the true nature of the joint ventures.  ¶¶7, 65.  If it had been revealed that Iconix was – for all the reasons given above – the actual party in control of the joint ventures all along, as well as the party bearing most of the economic risk, the joint ventures would have been considered "variable interest entities" ("VIEs") under GAAP.  ¶¶8, 65-66.  As VIEs, the joint ventures would have to be "consolidated" on Iconix's own balance sheet – that is, treated as a single economic entity with Iconix – such that the Company could not record any gains upon Iconix's "sale" of its IP rights to the joint ventures, as Iconix would effectively be selling those rights to itself.  ¶¶8, 65, 78.

During the Class Period, Defendants repeatedly claimed that, based on the joint ventures' "corporate structure, voting rights and [the] contributions" of the Company and its joint venture partners, the joint ventures were *not* VIEs under GAAP.  ¶¶66, 159, 173, 185, 192, 200, 210.  As would later be revealed (¶¶22, 67, 93), however, the joint ventures displayed the classic hallmarks of VIEs, as Iconix was the true party in control from inception and bore the majority of the economic risk.  ¶¶12, 245.  Yet Defendants concealed that fact to be able to effect their true goal: ridding Iconix of failing assets while dramatically and artificially inflating its revenues with instant sham profits.  ¶¶12, 97.[5]

Iconix's auditor, defendant BDO, was well aware of and helped perpetrate Iconix's accounting fraud during the Class Period.  ¶¶9, 406-07.  As one of the largest audit firms in the

_____

[5] In addition to their improper use of joint ventures, Defendants improperly recognized revenue (¶¶323-27), inflated the Company's cash flows (¶¶351-56), misclassified expenses (¶330), inflated gains on sales of trademarks (¶¶337-42), and failed to timely write down uncollectible accounts receivable, goodwill and trademarks (¶¶307, 322, 348-50), all in violation of GAAP.  These accounting manipulations permitted Defendants to claim that Iconix had achieved "record" revenues, strong cash flows, brand health, and business growth, and further deceive the market as to the Company's financial condition and future prospects.  ¶¶13, 127-28, 151, 156, 169, 181, 183, 188, 197, 246, 274.

world, BDO knew the strategies, methods, and procedures required by Generally Accepted Auditing Standards ("GAAS") to conduct a proper audit. ¶405. Although BDO also claimed it was an expert in identifying VIEs (*id.*),[6] it ignored a multitude of blatant "red flags" putting it on notice that the joint venture transactions were shams designed to avoid consolidation. ¶¶407, 409, 412, 413. For example, BDO was aware: (i) that the Company had a tendency to enter the joint ventures at quarter-end, booking tens of millions of dollars in "paper" profits that allowed it to meet its guidance and claim that its revenues were growing (instead of declining); (ii) that these profits were highly material, accounting for nearly 10% of the Company's pre-tax income in 2013, and over 20% of its pre-tax income in 2014; (iii) that the joint venture partners could not and would not pay, as several months before BDO's issuance of its March 2, 2015 audit opinions, BII defaulted on its first $3 million installment payment for Iconix Canada; (iv) that in December 2014, the SEC began an extensive inquiry of the Company's accounting for its joint ventures, and specifically whether they qualified as VIEs; (v) that analysts had published a series of reports in December 2014 and early 2015 raising serious questions about the Company's accounting for the joint ventures; (vi) that, as Iconix would later admit, the Company had pervasive weaknesses in its internal controls; and (vii) that no fewer than four of the Company's most senior officers, three of whom were directly involved in the formation of the joint ventures, abruptly and successively resigned. *See id.* Yet, despite these obvious red flags, on March 2, 2015, BDO issued an audit opinion attesting that Iconix's accounting for the joint ventures was accurate and in accordance with GAAP.

Over the Class Period, the market slowly learned of Defendants' accounting improprieties

---

[6] Twice in the Joint Memorandum, Defendants cite ¶405 to argue that Plaintiffs "concede" or "admit" that BDO is a "variable interest entity (VIE) expert." *See* Joint Mem. at 7, 13. This argument does not help them, however, as BDO's expertise in VIEs and its failure to classify the joint ventures as such (as the SEC would later do), despite the plethora of red flags of which it was aware, only supports a strong inference of scienter.

and Iconix's true financial condition through a series of events, including:

- Successive and suspicious resignations of the Company's *CFO* (defendant Clamen) and his replacement (defendant Lupinacci), *COO* (defendant Horowitz), and founder and *CEO* for over 22 years (defendant Cole) (¶¶248, 260, 269, 278);

- A series of articles posted on the financial website *Seeking Alpha* challenging the propriety of the Company's accounting practices and revealing its true deteriorating financial condition (¶¶91-92);

- Various disclosures regarding Iconix's declining financial health, including reductions in 2015 earnings and revenue guidance (¶¶224, 291); and

- The Company's August 10, 2015 announcement – just four days after founder and CEO Cole resigned – that the SEC had been reviewing the Company's accounting for its joint ventures, and specifically whether they should have been consolidated as VIEs under GAAP (¶¶285-87). The Company also announced that its Board had formed a Special Committee of independent directors to review the Company's accounting. *Id.*

Then on November 5, 2015 – the last day of the Class Period – Iconix announced that, after completing its internal review of its accounting for joint venture transactions (¶290), the Company would be forced to restate its financial statements from 2013 through 2015 to "correct certain errors in accounting" that impacted a host of metrics, including revenue and operating income. *Id.* This First Restatement would reclassify "contractually obligated expenses, retail support and other costs as selling, general and administrative expenses, as opposed to netting such expenses against licensing or other revenue, as applicable" (¶290), and would correct "inadequate support for revenue recognition relating to certain license agreements" and "inadequate estimation of accruals related to retail support for certain license agreements." *Id.* In response, the price of Iconix stock fell *57.2%*, from a closing price of $16.14 per share on November 5, 2015, to a closing price of $6.90 per share on November 6, 2015, on unusually high trading volume. ¶295.

On December 28, 2015, Iconix announced that the SEC had upgraded its previous review of the Company's accounting for certain joint ventures to a formal investigation. ¶296. Less than two months later, on February 18, 2016, Iconix announced that it would issue *another* set of restatements

to correct its joint venture accounting (¶297) – the Second Restatement – which would require it to consolidate its financial statements with certain VIEs/joint ventures, and otherwise affect multiple aspects of the Company's financial reporting for fiscal years 2013 and 2014,[7] including, but not limited to: (i) "recalculat[ing] the cost basis of the trademarks contributed to the respective joint ventures to determine the amount of the gain that should have been recorded at the time of the consummation of these transactions"; and (ii) "reclassify[ing] the Equity Earnings on Joint Ventures line to above the Operating Income line, from its previous location within the Other Expenses section." ¶298; *see also* ¶¶341-47.

Finally, on March 28, 2016, Iconix announced disappointing financial results for the fourth quarter and fiscal year 2015, an impairment charge of $437.5 million linked to its men's brands, and a downward revision of earnings guidance for 2016. ¶302. On March 29, 2016, Iconix stock traded at just $7.40 per share, an 83% decline from its Class Period high of $44.22 per share. ¶23. Today, it is trading at $1.16.

## ARGUMENT

### I.    STANDARDS ON A MOTION TO DISMISS

"In ruling on a motion to dismiss an action alleging securities fraud, courts must accept the complaint's allegations as true . . . and draw all reasonable inferences in the plaintiff's favor. The court only assess[es] the legal feasibility of the complaint; it does not assay the weight of the evidence which might be offered in support thereof." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 394 (S.D.N.Y. 2010). A claim is facially plausible, and therefore sufficient, "when

---

[7] Although Iconix has admitted that its originally reported financial results before 2013 were also materially misstated, it has not published a complete set of restated financial statements for periods before 2013. The Company has admitted, however, that its originally reported 2012 operating income was understated by approximately 5.5%, and its originally reported 2011 net income was overstated by approximately 7.9%. ¶113 n.4.

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate "only if the plaintiff fails to provide factual allegations sufficient to raise a right to relief above the speculative level." *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).

## II. PLAINTIFFS HAVE ADEQUATELY ALLEGED CLAIMS AGAINST ICONIX AND THE INDIVIDUAL DEFENDANTS

### A. Plaintiffs Have Adequately Alleged Scienter

#### 1. Standard for Pleading Scienter

Under the Private Securities Litigation Reform Act (the "PSLRA"), a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §78u-4(b)(2)(A). In the Second Circuit, scienter can be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *12 (S.D.N.Y. Sept. 27, 2013) (Gardephe, J.). A court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference . . . ." *Tellabs*, 551 U.S. at 324. "[M]ost often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 287 (D. Conn. 2005). Importantly, at the motion to dismiss stage, "a tie on scienter goes to the plaintiff." *In re Banco*

*Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017).

## 2. Plaintiffs' New Allegations Plead a Strong Inference of Defendants' Scienter

In dismissing the Consolidated Amended Class Action Complaint (the "CAC"), the Court concluded that Plaintiffs had not pled a strong inference of scienter because, *inter alia*, Defendants had purportedly disclosed the terms of and accounting for the international joint ventures at issue. *See, e.g.*, *In re Iconix Brand Group, Inc.*, 2017 WL 4898228, at *18 (S.D.N.Y. Oct. 25, 2017) ("But Iconix's decision not to consolidate the newly-formed joint ventures was publicly disclosed in the Company's public filings."). As Plaintiffs' new allegations demonstrate, however, Defendants went to great lengths to hide or misrepresent other critical facts about those joint ventures – facts that demonstrate the status of those joint ventures as VIEs, and that support a strong inference of scienter.

### a. The Circumstances Surrounding Defendants' Representations of Timely Payment Support a Strong Inference of Scienter

In its January 21, 2015 response to an SEC comment letter issued in December 2014, the Company (through defendants Cuneo and Jones) represented that it had timely received all payments related to its joint venture installment arrangements: "[I]n each instance where an Installment Payment has been due, the payment has been made to the Company on a timely basis, confirming to date our expectation at Day 1 that each of our partners would honor its commitments." ¶230; *see also* Ex. 1 to the Declaration of Mark T. Millkey, dated March 29, 2018 (the "Millkey Dec."), at 13.[8] As this statement makes clear, Defendants were using these purportedly timely payments to validate their decision to accept installment payments for the balance of the joint venture partners' 50% interest, and their continuing confidence in that payment arrangement.

---

[8] Although Defendants claim they have provided the Court with the "numerous letters from Iconix to the SEC" on which "Plaintiffs expressly rely," *see* Joint Mem. at 8 (citing Musoff Exs. B-G), they do not attach the January 21, 2015 letter cited in ¶230.

In fact, however, the Company's joint venture partner in Iconix Canada – BII – had informed Iconix approximately a year earlier – in early 2014 – that it would *not* make the first of three $3 million payments, which was due in June 2014. ¶69. In an effort to suppress that fact, Iconix quietly "renegotiated" the installment arrangement the month before the payment was due on terms that were highly unfavorable to Iconix. *Id.* Specifically, the parties extended the number of installment payments from three to five (over five years instead of three), with minimal or no interest, and divided the June 2014 payment into halves that would be due years later – half in 2017 and half in 2018. *Id.*

Thus, when Iconix informed the SEC in January 2015 that, "in each instance where an Installment Payment has been due, the payment has been made to the Company on a timely basis" (¶230), that representation was indisputably false and misleading: Iconix did *not* receive the $3 million payment due in June 2014, and did *not* disclose the May 2014 renegotiation until April *2015* – three months after its January 2015 misrepresentation (as discussed below). Although the Company's Form 10-Q for the second quarter of 2014 (filed on August 6, 2014) refers to "a note payable to the Company to be paid over five years from the date of closing," it does not acknowledge that there had been a change to the terms of the note. Nothing in the four corners of the document apprises investors of that fact.[9]

Indeed, Iconix acknowledged the renegotiation in a letter to the SEC dated April 2, 2015, only *after* the SEC had pointedly and explicitly asked the Company if any renegotiations had

---

[9] Significantly, in the Forms 10-Q it filed *after* it was finally compelled to disclose the renegotiation of the original payment schedule, the Company included the words "as amended" in discussing the revised payment schedule. *See, e.g.*, Millkey Dec. Ex. 2 (Form 10-Q for the first quarter of 2015, filed on May 8, 2015) at 17 (". . . and the remaining $8.9 million of which are notes payable to the Company to be paid, *as amended*, over the five year period following the date of closing . . . ."). It did not do so previously. *See, e.g.*, Millkey Dec. Ex. 3 (Form 10-Q for the second quarter of 2014, filed on August 6, 2014) at 12 (". . . the remaining $8.8 million of which is a note payable to the Company to be paid over five years from the date of closing . . . .").

occurred. ¶236; *see also* Musoff Dec. Ex. D at 8 ("Tell us whether there have been any instances in which you renegotiated the terms of a note receivable after formation of a joint venture or were unable to collect the note receivable under its initial terms from a joint venture party."). Although Iconix finally acknowledged the renegotiation and the missed $3 million payment (*id.* at 9), it nonetheless continued to represent that "[i]n each instance where an installment payment has been due, the payment has been made to the Company on a timely basis." *Id.*

Defendants may try to argue that their representations of timely payment were true in the narrow, technical sense that Iconix renegotiated the payment schedule with BII *before* the first installment came due in June 2014; therefore, BII did not technically "miss" that payment. However, it is well settled in this Circuit that the "'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'" *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (quoting *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010)); *see also id.* ("Statements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors.'") (quoting (*McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). No reasonable investor would have understood Defendants' statement that every payment had been made "on a timely basis" to include payments that *would* have been missed but for an *undisclosed* renegotiation of the original terms before the first due date.

More importantly, Defendants' representation about the timeliness of those payments was in the service of a larger point – that Defendants were "confirm[ed]" in their "expectation at Day 1 that each of our partners would honor its commitments" *precisely because* "in each instance where an Installment Payment has been due, the payment has been made to the Company on a timely basis." Millkey Dec. Ex. 1 at 13. Because "each of [the Company's] partners" did *not* pay the Company "on

- 15 -

a timely basis" in "each instance" (*id.*), and had to resort to renegotiation to avoid default, the facts known to Defendants actually *contradicted* – rather than confirmed – their purported expectation that the joint venture partners would meet their obligations, and make the statement actionably false for this additional reason.

Put another way, if timely payment – had it occurred – would have confirmed Defendants' purported expectation that their partners would honor their commitments, then the inverse must also be true: the Company's awareness that BII would miss its very first installment payment apprised Defendants that their expectations were in fact *unfounded*. The fact that Defendants tried to conceal BII's inability or refusal to make its first installment payment through a renegotiation of the payment terms that remained undisclosed for almost a year – and then affirmatively *lied* about it by saying every payment had been made "on a timely basis" – conclusively shows that Defendants were acting with scienter, particularly when considered with all the other allegations of scienter Plaintiffs have pled. *See, e.g.*, *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (defendants' efforts to conceal excess inventory contributed to a strong inference of scienter).

> **b.  Defendants' Failure to Seek Recourse Against Its Defaulting Joint Venture Partners, and the One-Sided Nature of the Joint Venture Terms, Contribute to a Strong Inference of Scienter**

As a backstop to their representations that all installment payments were being timely made, such that all future payments were "pre-determined" (¶¶9, 66), Defendants also represented that – in the unlikely event of a default – Iconix maintained the ability to pursue legal recourse against the offending partner. *See, e.g.*, ¶95 ("To date, all of the Installment Payments have been paid in accordance with their contractual terms. *Nevertheless, in the event our partner fails to satisfy its obligations under the Installment Payments, the Company can seek full recourse against the partner*."); *see also* ¶¶69, 73, 231. That, too, turned out to be an empty representation, as Iconix never sought recourse against *any* of the defaulting joint venture partners in question. ¶¶9, 72, 74-

75, 97, 111, 232.

Instead, Iconix either renegotiated the payment schedule, as it did with BII (Iconix Canada), forgave the debt, as it did with MGS (Iconix Israel), and/or bought out the joint venture partner, claiming the outstanding installment balance was paid to Iconix as part of the transaction, as it did with BII (Iconix Canada), GBG (Iconix Southeast Asia), and Rise Partners (LCP). ¶¶74-75, 240. If the joint venture agreements were true, iron-clad commitments, there is no reason why these "well-capitalized" joint venture partners would not have paid, or why, when they did not, Iconix would not have sought recourse from them. Indeed, the only plausible reason for Iconix's repeated decision *not* to seek recourse is that it either did not have "full recourse," or did not want to confront its partners and disturb arrangements that were permitting it to book desperately needed revenue. Iconix did not, in other words, want to upset the apple cart.

That is also why Iconix agreed to such unfavorable, one-sided terms in negotiating the joint venture arrangements in the first place. In the typical arrangement, Iconix would permit the joint venture partner to pay only a fraction of the purchase price up front, with the bulk to be due in annual installments over a number of years, and the joint venture partner would receive revenue guarantees and "put" options to further limit its economic risk. ¶¶6, 64. In the case of Iconix Southeast Asia (June 2014 and September 2014), for example,[10] the Company granted GBG a five-year "put" option – giving GBG the right to force Iconix to absorb any losses by taking on more equity (¶6) – in addition to revenue guarantees (amounting to $2.5 million through 2015 and $5.1 million through 2017, respectively). ¶77. Iconix agreed to such terms, despite their disproportionality, because its concern was not to create a true joint venture of equals, but merely to

---

[10] Iconix Southeast Asia (Europe, Turkey, and Korea) was formed in June 2014, and Iconix Southeast Asia (Greater China) was formed in September 2014. ¶74. In both cases, GBG was the Company's joint venture partner. *Id.*

induce its partners to enter into a relationship with the *resemblance* of a 50-50 joint venture, so as to be able to avoid consolidation and book revenue. To do so, it had to minimize the partners' risk through mechanisms such as put options and revenue guarantees.

Indeed, Plaintiffs allege that it was *never* Defendants' intention to grant its joint venture partners equal control. ¶¶78, 237, 245. When Iconix announced the restatement of joint venture income in February 2016, it pointedly noted that, when its joint venture partners had satisfied all their installment payments, the Company would be able to "deconsolidate" those entities and recognize the reversed gains. ¶¶11, 78, 367. However, in the case of the only joint partner that ultimately fulfilled its contractual obligation – GBG in connection with Iconix MENA – Iconix did not do so. ¶78. Instead, after GBG completed its installment payments, the parties amended the joint venture agreement to give Iconix "sole discretion and power to direct the activities . . . that most significantly impact the joint venture's economic performance." *Id.* Because GBG received no consideration for this amendment, it would have had no reason to agree to this change unless it understood that Iconix had *always* been the true party in control. ¶79.[11]

Thus, this case presents the inverse situation of that in *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406 (S.D.N.Y. 2013), where the plaintiff alleged that the defendant company – New Oriental – improperly consolidated the assets and revenues of another company – NOC – comprising between 62% and 67% of New Oriental's assets and between 97% and 98.9% of its revenues. *Id.* at 425. Just as Defendants here contend that the joint venture agreements are sufficient to *avoid* consolidation, the defendants in *New Oriental* contended that "New Oriental's service agreements, exclusive option agreement, and equity pledge with NOC . . . were sufficient to

---

[11] The Company made the same amendment to the joint venture agreement for Iconix Israel, shortly after the Company's call option for that entity expired, and two months before MGS's last installment was due (that it ultimately never paid). ¶79. Like GBG, MGS did not receive any consideration for agreeing to give up control. *Id.*

- 18 -

*support* consolidation." *Id.* at 425-26. The court, however, disagreed. Citing New Oriental's financial dependence on NOC and the "obvious" "deficiencies in New Oriental's contractual arrangements with NOC," *id.* at 426, the court concluded that the plaintiff had alleged scienter:

> *Indeed, New Oriental derived nearly all of its value from consolidation and Yu and Hsieh were, respectively, New Oriental's CEO and CFO. Accordingly, if Yu and Hsieh were not fully aware of the conspicuous deficiencies in New Oriental's contractual arrangements, their lack of knowledge could only have arisen from an egregious refusal to see the obvious, which further supports a strong inference of recklessness.*

*Id.* The same is true here: Iconix relied on the joint ventures for badly needed revenue, and the lopsided nature of the joint venture agreements, as well as the failure of the joint venture partners to make timely payments, should have made it obvious to Defendants that consolidation was necessary. For all the reasons given by the court in *New Oriental*, therefore, Plaintiffs have adequately pled scienter. *See also New Oriental*, 988 F. Supp. 2d at 426 (rejecting auditor certification defense).

### 3. Viewed Holistically with the Other Scienter Allegations Alleged in the SAC, Plaintiffs' New Allegations Plead a Strong Inference of Scienter

In dismissing the CAC, the Court concluded that Plaintiffs had failed to plead a strong inference of scienter, despite Plaintiffs' numerous allegations of recklessness on the one hand, and motive and opportunity on the other. But whether or not those earlier allegations – which Plaintiffs reassert in the SAC – were sufficient to plead a strong inference of scienter, they are absolutely sufficient when considered collectively with Plaintiffs' *new* allegations of scienter discussed above.

Plaintiffs' earlier allegations include the following:[12]

- The magnitude and scope of the Iconix's two restatements, whereby the Company restated its financial statements from 2011 through the second quarter of 2015 – *18 quarters* – as a result of multiple accounting manipulations. *See* ¶¶113, 307, 312, 322-27, 330-42, 348-56; *see also* ECF No. 107 at 15-17.

---

[12] Because the Court has already considered the scienter allegations set forth in the CAC, Plaintiffs merely summarize them here, but incorporate by reference the case law and arguments they submitted in opposition to Defendants' motions to dismiss the CAC. *See* ECF No. 107 at 13-34.

- Defendants' pervasive violations of basic GAAP. *See* ¶¶99, 177, 216, 223, 254, 324, 327, 329, 343-44; *see also* ECF No. 107 at 17-19.

- Iconix's improper accounting for joint ventures, similar to Enron's fraudulent accounting for "special purpose entities." *See* ¶¶254, 331-36; *see also* ECF No. 107 at 19-20.

- An extensive SEC inquiry and series of news and analyst reports challenging the Company's accounting for its joint ventures, to which Defendants responded by misrepresenting the true nature of those joint ventures. ¶¶91-92, 159, 173, 185, 192, 200, 210, 285.

- Iconix's large write-downs of accounts receivable, goodwill, and trademarks. *See* ¶¶57-60, 100, 302, 307, 348-50; *see also* ECF No. 107 at 20-21.

- That the alleged fraud involved the core operations of Iconix's business, including strategic licenses and joint ventures. *See* ¶¶386-90; *see also* ECF No. 107 at 22-23; *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *9 (S.D.N.Y. Sep. 8, 2017) ("The core operations doctrine is a presumption that senior managers are aware of facts that are critical to the long term viability of the company and events affecting a significant source of income.").

- That four of Iconix's senior executives directly responsible for the Company's public disclosures, financial accounting, and formation and negotiation of the joint ventures – its CEO (Cole), two successive CFOs (Clamen and Lupinacci), and its COO (Horowitz) – resigned during a period of approximately two years. *See* ¶¶14, 20, 116, 248, 260, 269, 278, 285, 396; *see also* ECF No. 107 at 23-24.

- That the Individual Defendants falsely certified that Iconix's financial statements were accurate and its internal controls effective. *See* ¶¶384-85; *see also* ECF No. 107 at 24-25.

- Defendants' unusual insider sales. *See* ¶¶370-76; *see also* ECF No. 107 at 26-29.

- Defendants' inflated compensation. *See* ¶¶377-83; *see also* ECF No. 107 at 29-31.

Viewed altogether, and "draw[ing] all reasonable inferences in the plaintiff's favor," *Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d at 394, Plaintiffs' allegations create an inference of scienter that is "cogent and at least as compelling as any opposing inference . . . ." *Tellabs*, 551 U.S. at 324; *see also Christine Asia Co. Ltd. v. Ma*, 2017 WL 6003340, at *2 (2d Cir. Dec. 5, 2017) ("Considering '*all* of the facts alleged, taken collectively,' *Tellabs*, 551 U.S. at 323, 127 S. Ct. 2499, Plaintiffs adequately plead strong circumstantial evidence of scienter.") (emphasis in original).[13]

---

[13] Contrary to Defendants' assertion, Plaintiffs do not rely on group pleading to allege scienter. *See* Joint Mem. at 21 n.13; Horowitz Mem. at 2.

Specifically, Plaintiffs allege that Iconix, faced with stagnating growth and in desperate financial straits, offered potential joint venture partners extremely attractive, nearly risk-free terms to enter relationships that purported to be true 50-50 joint ventures – such that Iconix could recognize the resulting revenue without consolidating its balance sheet – but that in fact were legal shams. To induce would-be partners to enter these relationships, Iconix permitted them to make partial – indeed, fractional – upfront payments, with the balance to be paid in installments, and granted those partners multimillion dollar revenue guarantees and put options to permit them to offload additional risk onto the Company in the future.

Moreover, despite supposedly retaining the ability to seek legal recourse against its partners for any defaults on their payment obligations, Iconix never did so. Instead, rather than exercise that option in the case of defaults – which Defendants actively concealed, as the case of Iconix Canada makes clear – the Company always chose to renegotiate the payment terms or buy out the partners' interest altogether. It took these steps because it could not afford to have its partners abandon the relationships that were affording it life-saving revenue. Through these willful machinations, Iconix was able to bolster its financial results and conceal its faltering prospects by recognizing significant gains on the sale of brand rights to these joint venture partnerships, rather than consolidating the joint ventures with Iconix's financial statements as required by GAAP – *knowing* that its joint venture partners were either unwilling or unable to meet their financial obligations under the joint venture agreements, and *knowing* that those partners were defaulting on their obligations.

In addition, Defendants engaged in a variety of other accounting manipulations, including misclassifying expenses, inflating gains on sales of trademarks, and failing to timely write down uncollectible accounts receivable. Defendants knowingly or recklessly engaged in these accounting improprieties over an extended time period, resulting in two accounting restatements and the

resignation of four senior executives (including the Company's founder and two CFOs), while

selling tens of millions of dollars' worth of stock, until scrutiny by analysts and the SEC (and

Defendants' own admissions) slowly revealed the fraud. Defendants' proffered competing inference

– that the accounting principles at issue (many of which were entirely straightforward) were just too

"complex" to get right and too "subjective" to form the basis for a fraud (Joint Mem. at 10) – is not

more plausible than the inference that Defendants acted with scienter.[14]

### 4. Defendants' Miscellaneous Scienter Arguments Lack Merit

Defendants raise several miscellaneous arguments to attack the SAC's well-pled scienter

allegations.[15] In particular, they contend that "all of the relevant details" of the joint venture

transactions were publicly disclosed, Joint Mem. at 14, and rely on their own utterly self-serving

statements to the SEC, such as the following: "[t]he joint venture partners are highly sophisticated

---

[14] Even if the Court were to conclude that Plaintiffs had not alleged scienter as to any Individual Defendant, they have still alleged corporate scienter against Iconix. Corporate scienter is adequately pled as long as "the pleaded facts [] create a strong inference that *someone* whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-516 (S.D.N.Y. 2009). Significantly, "an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement or omission at issue." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012). Thus, even if Plaintiffs had not adequately pled the scienter of any of Individual Defendant, the indisputable knowledge of senior accounting executives concerning, for example, the falsity of Cuneo and Jones' January 21, 2015 misrepresentation to the SEC – that "in each instance where an Installment Payment has been due, the payment has been made to the Company on a timely basis" – is properly imputed to the Company. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015). Hence, Plaintiffs have adequately pled the Company's corporate scienter.

[15] Plaintiffs focus on Defendants' miscellaneous arguments specifically addressing Plaintiffs' new allegations. To the extent Defendants reassert arguments they made in their last motion to dismiss, Plaintiffs incorporate their responses to those arguments by reference. *See, e.g.*, Joint Mem. at 10 (again arguing that Plaintiffs do not cite internal reports or confidential witnesses); *see also* ECF No. 107 at 31-34 (rebutting Defendants' miscellaneous scienter arguments).

parties that have attempted to obtain the best terms possible from the Company . . ." (*id.* at 15); "[w]e cannot control or significantly influence our partners" (*id.*); "[i]n determining that the collectability of the notes receivable is reasonably assured, we considered the financial health of the obligor" (*id.* at 16); and Iconix's payment arrangement with its joint venture partners was "similar to typical installment payment arrangements in merger and acquisition transactions" (*id.* at 17).

In fact, Defendants did *not* disclose "all of the relevant details." As explained above, they did not disclose – and took affirmative steps to *hide* – the failure of BII to make its very first installment payment of $3 million. *See* §II.A.2.a, *supra*. This known failure, which Defendants concealed for months, put the lie to their publicly stated justification for entering into the installment payment arrangements in the first place: that it was a foregone conclusion – "pre-determined" (¶66) – that all payments would be made. As Cuneo and Jones wrote in January 2015: "[I]n each instance where an Installment Payment has been due, the payment has been made to the Company on a timely basis, *confirming to date our expectation at Day 1 that each of our partners would honor its commitments*." ¶230. At the time they made that statement, they had been aware for approximately seven months that BII – the Company's joint venture partner in Iconix Canada – had missed its very first installment payment. Moreover, BII was not a one-off. Time and time again, the Company's joint venture partners failed or refused to pay their installments, and Iconix sought no recourse.

Defendants had to lie about BII's missed payment, which they quietly agreed to renegotiate, for the same reason they misrepresented the significantly lopsided joint venture terms (permitting partial upfront payments, installment schedules with no obligation to pay in full, guaranteed revenue minimums, and put options). The substantial concessions Iconix made to minimize its joint venture partners' risk and responsibility so they would agree to enter (and stay in) the relationship required consolidation of those entities under GAAP, meaning Iconix could not book the revenue it so sorely

needed.  As explained above, this inference from the available facts is "cogent and at least as compelling" as the nonculpable (and implausible) one that Defendants promote – namely, that the repeated failure of Iconix's joint venture partners to pay their installments was a mere coincidence. *Tellabs*, 551 U.S. at 324.

### B.    Plaintiffs Have Adequately Alleged Falsity

Defendants do not dispute the falsity or materiality of the majority of their Class Period statements.  Indeed, by virtue of the two restatements, Defendants have admitted that Iconix's financial results were materially misstated during the Class Period as a result of numerous accounting improprieties, including the failure to consolidate joint ventures.  *See generally* ¶¶303-56.  "'[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.'"  *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) (citations omitted).  Likewise, "under [GAAP], a restatement issues only when errors are material."  *SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009).[16]

Despite their admissions of falsity, Defendants contend that their statements concerning Iconix's consolidation of joint ventures involved "complex accounting decisions" that constitute inactionable opinions under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015).  *See* Joint Mem. at 19-21.[17]  Defendants' reliance on

---

[16] Thus, Horowitz's statement concerning the $7.8 million in revenue that Iconix recognized from the sale of the Sharper Image domain name and trademark (¶189) was materially false and misleading because Iconix admitted, in the second restatement, that the gain was overstated by approximately 21% and should have been only $6.4 million.  ¶342.  *See* Horowitz Mem. at 2.

[17] The Court should disregard Defendants' citations to a speech and accounting literature (Joint Mem. at 20) because those materials are not incorporated by reference into the SAC and are not subject to judicial notice.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  Moreover, the materials cannot be considered for the truth of their contents because "they raise[] issues of fact that should not [be] determined at the pleading stage."  *Id.* at 511.  In any event, even if consolidation typically involves "highly complex and subjective" determinations (Joint Mem. at 20), the restatement itself constitutes an acknowledgment that Defendants' application of GAAP did not fall

*Omnicare* is misplaced, however, because the SAC does not challenge their "'subjective evaluation'" of whether the joint ventures should have been consolidated; rather, it alleges that Defendants "bypassed the asserted accounting methodology in perpetrating the alleged fraud . . . ." *Fresno Cty. Emps.' Ret. Ass'n*, 268 F. Supp. 3d at 546-47; *see also Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("Unlike a subjective evaluation . . . , nonconformance to a stated methodology . . . is a measurable objective fact.").

Specifically, Defendants repeatedly asserted that they had "*determined, in accordance with ASC 810*," that "based on the [joint ventures'] corporate structure, voting rights and [the] contributions of the Company and" its joint venture partners, the joint ventures were *not* VIEs "and not subject to consolidation." ¶¶159, 173, 185, 192, 200, 210. In truth, Defendants bypassed the criteria set forth in ASC 810 by concealing that Iconix was both the true party in control of the joint ventures and the party bearing most of the economic risk, because, among other things, the supposed obligation of the joint venture partners to make installment payments was illusory. ¶¶7-8, 64-75. Therefore, "this case is not about complex accounting judgments over which reasonable minds can differ." *Fresno Cty. Emps.' Ret. Ass'n*, 268 F. Supp. 3d at 546. Rather, "[D]efendants used the accounting standards" concerning the consolidation of joint ventures "as a cover to inflate revenues" by booking instant paper revenues from the sale of Iconix's IP rights to the joint ventures. *Id.* Those revenues could not have been recorded if the joint ventures had been consolidated on Iconix's balance sheet, since Iconix would have effectively been selling those rights to itself. ¶¶8, 65, 78. *See New Oriental*, 988 F. Supp. 2d at 421-22 ( "financial statements materially misled investors" by

---

within the range of reasonable accounting treatments. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 465 (S.D.N.Y. 2005) ("[a]ccounting may be an inexact science but . . . plaintiff has alleged that [defendant's] interpretation of the relevant accounting rule was unreasonable").

improperly consolidating a VIE, and analyzing the alleged misstatements as statements of fact).[18]

But even if Defendants' statements concerning the consolidation of Iconix's joint ventures are analyzed as opinions, they are actionable. In *Omnicare*, the Supreme Court held that a statement of opinion may be actionable *either* because: (1) "'the speaker did not hold the belief she professed'"; (2) "'the supporting fact[s] she supplied were untrue'"; *or* (3) the opinion, "though sincerely held and otherwise true as a matter of fact, . . . omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 135 S. Ct. at 1327, 1332). As the Supreme Court explained, a sincerely held and factually true statement of opinion is actionable if it omits "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 135 S. Ct. at 1332.

The SAC's allegations satisfy all three bases for liability under *Omnicare*. *First*, as discussed in the scienter section above, the SAC alleges that Defendants did not honestly believe that the joint ventures were, in fact, true joint ventures as they repeatedly professed. *See* §II.A.2, *supra*.[19] *Second*, the SAC alleges that Defendants supplied untrue facts – to both the SEC and the investing public – in support of their representations that the joint ventures were not VIEs subject to consolidation. In particular, Defendants stated that the joint ventures were "partnership[s] of equals" (¶¶76, 96, 234, 243) with "well-capitalized" partners whose ability to satisfy their installment payments was "pre-determined" (¶¶9, 66, 73, 95, 225, 241, 286), and in the unlikely event that a

---

[18] While Defendants do not explicitly raise challenges regarding Iconix's other restated financials, those statements "are actionable . . . as facts" for the reasons discussed at pages 35-41 of Plaintiffs' prior opposition brief (ECF No. 107). *In re Petrobras Sec. Litig.*, 2016 WL 1533553, at *4 (S.D.N.Y. Feb. 19, 2016) ("The supposition that financial statements are nonactionable opinions flies in the face of the statutory language of" the federal securities laws, which "require[] issuers to make factual statements about their financial health . . . .").

[19] For this reason, Defendants' cited authorities provide no assistance. *See* Joint Mem. at 21.

joint venture partner defaulted on an installment payment, Iconix would seek "recourse" against the joint venture partner. ¶¶69, 73-74, 97, 231, 239. In truth, many of the joint venture partners were either unable or unwilling to make the installment payments. ¶¶9, 64, 67, 75, 97, 232, 237, 240. Yet Iconix never sought recourse, and instead either: (i) restructured the agreement to allow the joint venture partner more time to pay; or (ii) bailed out the joint venture partner by purchasing the joint venture in its entirety and simply cancelling any remaining installment payments – effectively paying itself back for its own loan in a "round trip" transaction. ¶¶7, 9, 64, 70-71, 74-75.

*Finally*, even if Defendants' purported "opinion" that the joint ventures were not VIEs subject to consolidation was both sincerely held and factually true – which it was not – it is still actionable under *Omnicare*. The basis for such an opinion was, in part, that "each . . . Installment Payment" due from a joint venture partner "ha[d] been made to the Company on a timely basis." ¶230. However, the omission of the "particular (and material) fact[] going to [that] basis" – that BII's first installment payment was only technically "timely" because Iconix had agreed to extend the payment schedule by three-to-four years *after* learning that BII would *not* make its first payment on time (¶¶9, 69, 232) – rendered Defendants' purported opinion about consolidation "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 135 S. Ct. at 1332.[20]

---

[20] Defendants make two throwaway arguments – that "many" of their statements are inactionable "puffery," and that the SAC impermissibly relies on group pleading. Joint Mem. at 21 & n.13. With respect to puffery, Defendants do not point to any specific statements, and instead merely reference their prior motion to dismiss. Joint Mem. at 21; *see also* Horowitz Mem. at 2. As explained in Plaintiffs' opposition to that motion (ECF No. 107 at 41-43), because all of the statements Defendants challenged as puffery declare, in the face of reality, the financial vitality of the Company, they are all actionable. *See, e.g.*, *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("Whether a representation is 'mere puffery' depends, in part, on the context in which it is made."); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 249508, at *9 (S.D.N.Y. Jan. 20, 2015) (representation that company "had the present capacity to support its growth plan" was not puffery given the "historical fact that Fairway was heavily indebted and operating at a loss"). Moreover, "the extension of [Iconix's] international joint venture platform" was premised upon the sham transactions detailed herein, and therefore it did not "drive" a "strong year" for Iconix, as Horowitz represented. ¶206. With respect to group pleading, Plaintiffs are not

- 27 -

### C.     Plaintiffs Have Adequately Alleged Loss Causation

Defendants contend that Plaintiffs have failed to allege loss causation for two categories of misstatements – those contained in "the Company's financial statements for fiscal years 2011 and 2012" (*see* Joint Mem. at 22-23), and those relating to "the specific accounting issues addressed by the Company's Second Restatement" (*id.* at 23).  Defendants do *not* challenge the sufficiency of Plaintiffs' loss causation allegations as to the corrective disclosures in the First Restatement.

### 1.     Standards for Pleading Loss Causation

Loss causation is the "causal connection between [a] material misrepresentation and the [plaintiff's] loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  To plead loss causation, a plaintiff need only "provide a defendant with *some indication* of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347.  That is, the plaintiff must allege "'that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *Alpha Capital Anstalt v. Oxysure Sys.*, 252 F. Supp. 3d 332, 343 (S.D.N.Y. 2017) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).  As the Supreme Court has observed, meeting this standard – which is governed by the "short and plain statement" requirement of Rule 8(a)(2), not the "particularity" requirement of Rule 9(b)[21] – "should not prove burdensome for a plaintiff who has suffered an economic loss." *Dura*, 544 U.S. at 347; *see also Loreley*, 797 F.3d at 188 ("The essential point . . . is that where a potential causal link is evident, it is not necessary for the plaintiff to plead loss causation in detail . . . ."). Loss causation is generally "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395 (2d Cir. 2015).

---

attempting to hold any of the Individual Defendants liable for statements they did not make, or for conduct that occurred while they were not at the Company.

[21] *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 469 (S.D.N.Y. 2013).

### 2. Plaintiffs Have Pled Loss Causation as to Iconix's Financial Statements for Fiscal Years 2011 and 2012

Defendants contend that Plaintiffs have failed to allege loss causation as to Iconix's financial statements for fiscal years 2011 and 2012 because those periods are addressed in the Second Restatement, which was issued after the Class Period and is not alleged to have caused a stock price decline. Joint Mem. at 22-23. In fact, Plaintiffs have alleged numerous Class Period corrective disclosures linked to the 2011 and 2012 misstatements that negatively impacted Iconix's stock price. *See* ¶¶130, 134, 139, 143, 149 (identifying reasons for falsity of 2011 and 2012 financial statements).

At the pleading stage, a plaintiff need only allege a disclosure by which "the available public information regarding the company's financial condition [was] corrected," *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014), and a negative reaction to that disclosure from the market. *Id.* "[C]orrective disclosures [need not] emanate from the company itself, so long as the truth is disclosed in some fashion." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008). Here, Plaintiffs allege, for example, that the December 14, 2014 Off Wall Street report, which addressed Iconix's historical accounting practices going back to 2011, revealed facts concerning the Company's improper gains on sales of trademarks included in revenue (¶¶88, 251), its improper classification of old accounts receivable (*id.*), its overstatement of free cash flow (¶251), and, by virtue of the foregoing, its overstatement of its financial results and violations of GAAP. In response to these and other disclosures (¶88), the price of Iconix stock fell a total of 8.9% ($3.44 per share) on December 15 and 16, 2014. ¶253. Approximately two months later, Iconix announced that it was revising its financial reporting of revenue to reveal its non-growth "other revenue" generated from one-time sales to joint venture partners, and that it had misrepresented its previously reported operating cash flow and reported free cash flow (¶¶254-55;

*see also* ¶¶22-24), causing the price of Iconix stock to drop approximately 3% in one day. ¶258.[22]

In addition, as Plaintiffs allege, on February 26, 2015, the Company itself announced that it was revising its financial reporting to break out "other revenue" from total revenue, such that one-time sales to joint venture partners would not be included with gains from organic revenue growth. ¶¶254, 258. The price of Iconix stock fell 3% in reaction to the Company's February 26, 2015 announcements. ¶258. Also, in a series of three April 2015 articles analyzing Iconix's financial statements, accounting practices, and joint venture structure (¶¶264-68), *Seeking Alpha* revealed, *inter alia*, accounting improprieties distorting Iconix's fiscal year 2011 and 2012 financial statements, including the underreporting of the cost basis of assets transferred to joint ventures, and red flags such as inconsistencies in the Company's free cash flow reporting. ¶264; *see also* ¶¶15-16, 88, 252-53, 265-67. The price of Iconix stock experienced a series of declines from April 10-17, 2015, totaling 8.31% ($2.65 per share). ¶268.

Therefore, Plaintiffs have indeed alleged several corrective disclosures during the Class Period in connection with the 2011 and 2012 misstatements that adversely impacted the Company's stock price. *See Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp.*, 879 F.3d 474, 480 n.3 (2d Cir. 2018) ("A 'corrective disclosure' is an announcement or series of announcements that reveals to the market the falsity of a prior statement.").[23]

### 3. Plaintiffs Have Pled Loss Causation as to the Accounting Issues Addressed in the Second Restatement

Defendants contend that, because the Second Restatement came out after the end of the Class

_____

[22] During the Class Period, on August 12, 2015, Iconix also revealed the first "material weakness" in its disclosure controls and procedures. ¶118.

[23] *See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("'[A] corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events.'") (quoting *In re Bristol Myers Squibb Co. Sec. Litig.* 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008)).

Period, Plaintiffs have failed to allege loss causation as to four categories of accounting issues addressed in that restatement: (i) Iconix's failure to consolidate certain joint ventures; (ii) its accounting for trademarks; (iii) its mischaracterization of one-time gains as revenues from ongoing operations; and (iv) its failure to disclose related-party transactions. Joint Mem. at 23-24. Plaintiffs have already addressed the Class Period disclosures of the truth as to the second and third categories in the previous section. *See* Section II.C.2, above; *see also* ¶¶88-89, 251.

As to the first category – the Company's failure to consolidate certain joint ventures – Iconix issued a press release on August 10, 2015 revealing that, through a comment letter process, the SEC was looking into its "accounting treatment for the formation of the Company's international joint ventures under [GAAP] and whether such joint ventures should potentially have been consolidated in the Company's historical results." ¶285. While attempting to downplay any impact of the SEC inquiry on its financial results (¶286), the Company acknowledged that such consolidation would result in the reversal of gains it had recognized from the formation of the joint ventures, and it announced the formation of a Special Committee of independent directors to review the Company's accounting. ¶285. In response to this news, the price of Iconix stock dropped 2.35%, falling from a closing price of $14.92 per share on Friday, August 7, 2015, to a closing price of $14.57 per share on Monday, August 10, 2015, on unusually heavy trading volume. ¶289.[24]

Defendants ask the Court to find that the August 10, 2015 announcement of the SEC inquiry

---

[24] Defendants' failure to disclose related-party transactions (the fourth category) is inextricably tied to their failure to properly account for joint ventures. Iconix's May 6, 2015 letter to the SEC, for example, falsely states that "the Company determined that its JV partner does not meet the definition of a related party in ASC 850-10-20." Musoff Dec. Ex. E at 7. As part of the Second Restatement, however, the Company admitted that it lacked controls "to formally identify related parties and ensure that proper measures were taken to analyze transactions with these parties before they were entered into and that they were properly disclosed in the financial statements." *See* Iconix annual report on Form 10-K for 2015 (the "2015 Form 10-K") (Millkey Dec. Ex. 4) at 49. The Company also admitted that the joint ventures were in fact related parties. *Id.* at 110-11.

into its accounting practices, and in particular its accounting for international joint ventures, is insufficient to establish loss causation. Joint Mem. at 24 n.16. In this Circuit, however, "the announcement of . . . investigations may qualify as partial disclosures for purposes of loss causation." *Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 477 (S.D.N.Y. 2016); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015) ("the disclosure of an investigation 'into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice'") (collecting cases). *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 485-86 (S.D.N.Y. 2008) (revelation of SEC investigation into company's "multiple element accounting" sufficiently specific to constitute corrective disclosure with respect to misstatements about application of that accounting procedure.).[25]

Defendants also argue that Plaintiffs "may not rely on analyst commentaries or Internet posts on the *Seeking Alpha* website" to establish loss causation. Joint Mem. at 24. As an initial matter, Iconix itself made certain corrective disclosures during the Class Period. *See* ¶¶254-58. Moreover, the Company ultimately validated the Off Wall Street and *Seeking Alpha* disclosures in the First and Second Restatements, as discussed above.[26] As one court in this District stated, in a decision affirmed on appeal: "To be sure, a short seller's report can constitute a corrective disclosure *if the*

---

[25] Defendants' reliance on *Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014) (Joint Mem. at 24 n.16), is misplaced. The Ninth Circuit has more recently held that loss causation is adequately pled where there was an announcement of an investigation and – as here (¶¶331-36) – a subsequent disclosure that corrected the prior misstatements implicated in the investigation, even though the subsequent disclosure itself did not result in a stock price drop. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). *See also Plumbers & Pipefitters Nat'l Pension Fund*, 89 F. Supp. 3d at 620 ("In any event, *Loos* is plainly not controlling within the Second Circuit.").

[26] Defendants argue that the Off Wall Street report "is not alleged to have been publicly available to investors." Joint Mem. at 25 (citing *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 686-87 (S.D.N.Y. 2012) (corrective disclosure, made on a private conference call, never reached the public)). Because a report from a noted research firm is entirely distinguishable from a private conference call, Defendants' argument is meritless.

*report reveals accurate information about a company that exposes actual misstatements by the company.*" *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015), *aff'd*, 649 Fed. Appx. 7 (2d Cir. May 16, 2016). Because that is precisely what happened here, Plaintiffs' allegations concerning the Off Wall Street report and the *Seeking Alpha* articles, in addition to the Company's own disclosures, adequately plead loss causation. *See Van Dongen*, 951 F. Supp. 2d at 462, 476-78 & n.10 (reports by "alternative research and consulting firm," which were later validated by the company's admissions, established loss causation); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2012 WL 2512280, at *12 (S.D.N.Y. June 29, 2012) ("Loss causation is buttressed by the well-pled facts demonstrating price drops in response to the analyst reports . . . .").[27]

Moreover, Plaintiffs need not, at the pleading stage, disaggregate the losses resulting from the announcement of the SEC inquiry from losses resulting from the Company's quarterly results announced the same day, as Defendants contend. Joint Mem. at 25. The Second Circuit has made it clear that disaggregation is *not* required at the pleading stage. *Loreley*, 797 F.3d at 189 (plaintiff has no "pleading obligation to rule out other contributing factors or alternative causal explanations"). Rather, Plaintiffs need only allege that a misrepresentation caused "at least *some* of the economic harm it suffered."[28] *Fin. Guar.*, 783 F.3d at 403. Plaintiffs have satisfied that modest obligation.

---

[27] *See also In re Winstar Commc'ns*, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (noting that the Supreme Court's "paramount concern" in *Dura* was "the inherent veracity of the information," and that "the exposure of the falsity of the fraudulent representation" is "the critical component of loss causation"); *In re Enron Corp. Sec. Derivative, & ERISA Litig.*, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005) ("Thus besides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud a number of sources: *e.g.*, from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.").

[28] Thus, Defendants' reliance on *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 757 (S.D.N.Y. 2011) is misplaced. Joint Mem. at 25. *See Fin. Guar.*, 783 F.3d at 404-05.

### D. Plaintiffs Have Adequately Alleged Control Person Liability

Defendants seek to dismiss Plaintiffs' control person claims on the grounds that Plaintiffs have failed to plead a primary violation of Section 10(b), and have not pled the "culpable participation" of the Individual Defendants. *See* Joint Mem. at 25; *see also* Horowitz Mem. at 2. As discussed above, however, Plaintiffs *have* alleged a primary violation, including the scienter of each Individual Defendant, which is "more than sufficient" to plead their culpable participation. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014).

## III. PLAINTIFFS HAVE ADEQUATELY ALLEGED BDO'S LIABILITY

### A. BDO Acted with Scienter When It Ignored Numerous Significant Red Flags Alerting It to Defendants' Fraud

The SAC establishes a strong inference of BDO's scienter because it alleges, at length, that BDO was aware of, and consciously disregarded, a multitude of significant "red flags" that, at a minimum, put it on notice of Defendants' fraud, including the sham nature of the overseas joint ventures. Despite the presence of these red flags, BDO rubber stamped Defendants' accounting misconduct, in effect performing "no audit at all" and giving rise to a strong inference of BDO's scienter. *See IMAX*, 587 F. Supp. 2d at 483 ("A complaint might reach th[e] 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags' that 'would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'"); *Winstar*, 2006 WL 473885, at *11 ("An auditor's reckless disregard of red flags, coupled with allegations of GAAP and GAAS violations, is sufficient to support a strong inference of scienter."); *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (same).[29]

---

[29] BDO mischaracterizes the legal standard for auditor scienter and the allegations of the SAC in its motion. While it is true that "[c]onscious recklessness cannot be inferred from alleged accounting errors or GAAP violations *alone*," BDO Mem. at 6, that is not what the SAC alleges. The SAC

1. **Iconix Participated in Numerous Joint Ventures that Accounted for Large Percentages of Its Net Income at Quarter-End and with the Same Parties**

Iconix's formation of numerous joint ventures at quarter-end and with the same parties – which accounted for increasingly large percentages of the Company's net income, allowing it to meet its guidance – is a significant red flag alerting BDO to the fraud. GAAS explicitly recognizes that "[s]ignificant unusual transactions, especially those close to period end that pose difficult 'substance over form' questions, can provide opportunities for companies to engage in fraudulent financial reporting," precisely because they are obviously designed to inflate the Company's publicly reported financial results. ¶¶408-09. In 2014 alone, Iconix entered into four separate joint venture transactions, at quarter end, with three of those transactions being with the same joint venture partner, GBG. *See id.* These transactions accounted for over $42 million in bogus revenues the Company recorded that year. Indeed, the December 2014 Off Wall Street report flagged these transactions with GBG as suspicious, noting that they "*allow[ed] [Iconix] to make the guidance and the street's earnings estimates.*" ¶¶17, 85-86. Significantly, the Off Wall Street report also noted that, if these sales were backed out of Iconix's financials, the Company's revenues in the first three quarters of 2014 would have *declined*, rather than grown. *Id.*

These sizeable end-of-quarter transactions, resulting in Iconix recording substantial profits

---

alleges these violations were coupled with several significant red flags, all of which concerned a critical issue that BDO directly advised the Company on: whether its joint ventures qualified as VIEs under GAAP. These allegations establish a strong inference of BDO's scienter. *See, e.g.*, *Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) ("Plaintiffs allege far more than GAAP and GAAS violations. PwC knew about and ignored a wide variety of 'red flag' incidents or events, that should have put PwC on notice that fraud was afoot, and that taken together they are sufficient for the Court to find a strong inference of recklessness."); *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *10 (S.D.N.Y. June 28, 2010) ("While allegations of accounting errors by themselves do not meet this standard, when coupled with sufficiently attention-grabbing 'red flags,' pervasive GAAP and GAAS violations are sufficient to support a strong inference of scienter.").

and being able to meet its guidance, constituted a blatant and significant red flag that, on its own, establishes BDO's scienter. *See AOL Time Warner*, 381 F. Supp. 2d at 240 ("late-in-the-quarter revenue recognition . . . sufficient to support a claim of scienter" against an accounting firm that ignored it); *Winstar*, 2006 WL 473885, at *11 (plaintiffs adequately pled scienter where one of the "red flags" was a "pattern" of "suspicious transactions," including "significant end-of-quarter transactions, which [Grant Thornton] allegedly knew, but either intentionally or recklessly ignored").

> **2.** **The Joint Ventures Lacked Economic Substance Because the Joint Venture Partners Could Not, or Would Not, Make Their Installment Payments**

BDO was also aware of numerous facts indicating that the joint ventures – which accounted for increasingly large percentages of the Company's earnings (nearly 10% of pre-tax income in 2013 and over 20% in 2014) – lacked economic substance. Specifically, the joint venture transactions allowed the joint venture partners to pay only a fraction of the multi-million dollar purchase price at closing, with the rest due in installments over a number of years *that the joint venture partners had no actual obligation to pay*. As the SEC concluded based on its "plain reading" of ASC 810 (the accounting guidance for identifying VIEs) (¶417), the mere fact of installment payments *presumptively* rendered the joint ventures "de facto" agents of the Company, requiring heightened scrutiny as to whether they qualified as VIEs (*see id.*) – and specifically, whether the joint venture partners could and would pay all of their installments in full. Yet BDO did not apply this required heightened scrutiny. In fact, BDO failed to do so despite significant evidence that *the joint venture partners had already defaulted on their installments*.[30]

---

[30] The joint ventures also contained "call" and "put" options designed to further limit the joint venture partners' risk. Tellingly, BDO's own literature – in an article entitled "BDO Knows: Variable Interest Entities" – states that "[t]hese call or put options *will often constitute variable interests* as they expose the reporting enterprise to positive or negative variability in the underlying net assets of the entity." ¶420 n.13. Thus, these transactions had multiple features that should have caused BDO to engage in heightened scrutiny as to whether they qualified as VIES – but it did not.

Indeed, in June 2014, before BDO completed its 2014 audit, BII failed to make its first $3 million installment for Iconix Canada, which the Company later lied about. *See* § II.A.2.a, *supra*. Rather than seek legal recourse, however, the Company covertly agreed to permit BII to make the payment years later – an accommodation Iconix did not publicly acknowledge for months. Despite the accommodation, BII *never* made the payment in question, defaulting again in 2016, and ultimately sold its interest back to Iconix. Although Iconix claimed that the millions of dollars BII owed in outstanding installments were somehow satisfied as "part of the transaction," in reality the Company paid itself for its own loan. ¶413.

These events should have set off alarms for an auditor that was required to verify that the joint venture partners' obligation to pay was real, and that the joint venture agreements were valid, binding contracts between "equals." They should have also alerted BDO to the possibility that Iconix's other joint venture partners could not or would not pay, prompting it to inquire about their ability and intent to do so. ¶414. Indeed, a similar scenario played out for the other joint ventures, including Iconix Israel, LCP, and Iconix Southeast Asia. *See generally* ¶¶74, 415. Yet in each instance BDO turned a willful blind eye to the failure of the so-called joint venture partners to pay.

BDO's response to these allegations is telling. BDO does not dispute that the sham nature of the joint ventures was an egregious red flag; it instead claims *it did not know the details of the joint ventures*.[31] BDO Mem. at 13. If that is the case, BDO is *admitting* that it failed to satisfy its obligations as an auditor. Far more likely, however, is that BDO *did* know those details because it

---

[31] BDO also argues that the SAC merely alleges that Defendants exercised poor business judgment in entering joint ventures that caused Iconix to bear most of the economic risk, *see* BDO Mem. at 11, but that misses the point. The fact that Iconix entered joint ventures on such lopsided terms revealed that the joint ventures were not, in fact, "50/50 partnerships of equals" – one of the main factors qualifying the joint ventures as VIEs under GAAP – a subject on which BDO purports to be an expert. ¶405. Defendants' business judgment is irrelevant to BDO's obligation to scrutinize such transactions as the Company's auditor.

was *actively advising Iconix on whether its joint ventures qualified as VIEs that should be consolidated.* That Class Period work necessarily required BDO to examine each transaction against the guidance in ASC 810 – including an evaluation of whether, due to the installment payments, the joint ventures were "de facto" agents of the Company. Thus, BDO was *obligated* to check if each joint venture partner was willing and able to make all installment payments.

In fact, before issuing its March 2, 2015 opinions, BDO assisted the Company in its year-long correspondence with the SEC concerning, *inter alia*, whether the joint ventures qualified as VIEs – *including specific questions regarding Iconix Canada and BII's default*, *i.e.*, what BDO now claims to know nothing about. *See* BDO Mem. at 13; ¶¶232, 425-26; *see also* ¶427 (in the Company's February 24, 2015 response to the SEC about the joint ventures, it stated: "Please be advised that this letter has been reviewed by BDO USA, LLP, the Company's independent audit firm, including its National Office, and they agree with the accounting considerations and conclusions expressed herein."). BDO was therefore aware of this highly significant red flag.

These particularized allegations establish a strong inference of BDO's scienter. *See IMAX*, 587 F. Supp. 2d at 484-85 (finding allegations of auditor scienter sufficient even in the absence of allegations that "PWC actually reviewed" specific documents because "IMAX's approach to revenue recognition was an ongoing subject of review by PWC," and "PWC was regularly consulted by IMAX management" about that issue); *Winstar*, 2006 WL 473885, at *12 (auditor liability adequately alleged where defendant "sought [Grant Thornton's] professional advice regarding the manner in which to account for the bogus transactions").

BDO's argument that these allegations lack particularity because they do not detail BDO's specific audit procedures is unavailing. BDO Mem. at 13-14. That information is peculiarly within BDO's possession, and the law does not require Plaintiffs to plead it at this stage. *See In re Phillip*

*Services Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004) (facts concerning, *inter alia*, the audit procedures used "are peculiarly within Deloitte's knowledge, and thus are not required at the pleading stage"); *Whalen*, 2005 WL 1799370, at *2 ("To plead with particularity does not require at this stage that Plaintiff spell out the very moment PwC should have known about the alleged fraud or that PwC had actual knowledge of the scope or particulars of the scheme."); *In re Complete Management Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 334-35 (S.D.N.Y. 2001) ("*how* it is that Andersen would have been aware [of the red flags] . . . is more than Rule 9(b) and the PSLRA demand at this stage in the litigation, and a strong inference of willful blindness is stated on the face of the complaint through the allegations of the various 'red flags'").

### 3. The SEC Repeatedly Questioned Iconix's Accounting for the Joint Ventures and Whether They Qualified as VIEs

BDO also ignored another enormous red flag – repeated regulatory questioning of Iconix's joint venture accounting throughout the Class Period. Indeed, in December 2014 – well before BDO issued its March 2, 2015 audit opinion – the SEC began probing the Company's accounting for its joint ventures, and specifically whether they qualified as VIEs. ¶426. Between December 2014 and March 2, 2015, Iconix responded to no fewer than *three* separate SEC letters questioning its accounting for these entities dating back to 2013, and *BDO assisted the Company in responding to these letters*. ¶¶426-27. These letters probed all aspects of the Company's joint ventures, from whether the joint venture partners were willing and able to pay their installments in full, to whether both parties bore equal economic risk. This detailed and continuing inquiry constituted a significant red flag alerting BDO to the sham nature of the joint ventures.

The public nature of the SEC letters does not negate their significance as red flags, and the case law on which BDO relies is not to the contrary. In *In re Longtop Financial Tech. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012), the court determined that the alleged red flags

were "not 'red flags' at all," as even after their public disclosure, neither the SEC nor the investing public detected any fraud. Here, by contrast, the SEC required Iconix to reverse over $60 million in profits it had improperly recognized from the sham joint ventures. Moreover, *Iconix lied to the SEC in its responses*, making a series of false statements asserting that the joint ventures were true "partnerships of equals," and that the joint venture partners were "well-capitalized" and "pre-determined" to make their installment payments in full. As post-Class Period events would confirm, however, these statements were false. Thus, while the SEC correspondence did not tip off the investing public about the fraud, it did tip off BDO, a self-proclaimed expert in VIEs that directly assisted the Company in concealing the true nature of the joint ventures from the SEC.[32]

BDO also claims the SEC letters that post-date its audit opinion cannot constitute a red flag. That is not so. Under GAAS, the auditor has a continuing obligation to update its report if it becomes aware of subsequent information that would render the report misleading. ¶428; *see also* ¶431 (AU-C Section 560 requires the auditor to raise subsequently discovered facts with management and determine if financials statements need to be revised). BDO was aware of SEC comment letters after March 2, 2015 because *BDO assisted the Company in responding to those letters*. The red flags raised by this continuing correspondence – and BDO's active participation in Defendants' multiple false assertions and reaffirmations that the joint ventures had no characteristics of VIEs – are highly probative of BDO's scienter.

---

[32] The cases BDO cites in support of its assertion that an SEC inquiry is not a red flag are distinguishable. In *Pennsylvania Public School Employees' Retirement System v. Bank of America Corp.*, 939 F. Supp. 2d 445 (S.D.N.Y. 2013), the plaintiff alleged the existence of a single SEC comment letter that questioned the bank's accounting, without any allegations that the accounting was fraudulent. In *Glover v. Deluca*, 2006 WL 2850448 (W.D. Pa. Sept. 29, 2006), the plaintiff alleged that the SEC questioned the Company's accounting, but failed to allege why the accounting was fraudulent. Here, Plaintiffs allege the existence of prolonged SEC correspondence in which the SEC probed deeper and deeper into features of the joint ventures showing they were designed to fraudulently circumvent the accounting rules pertaining to VIEs. In the end, the SEC concluded that the joint ventures were VIEs, rejecting Defendants' representations to the contrary.

### 4. Analysts Published a Series of Articles Questioning Iconix's Accounting for the Joint Ventures

Analyst reports questioning the Company's Class Period joint venture accounting raised another red flag that BDO ignored. Specifically, in December 2014 – the same month the SEC began inquiring whether the Company's joint ventures qualified as VIEs – the December 2014 Off Wall Street report highlighted that: (i) the profits from the Company's joint venture partners made the difference between the Company meeting its guidance and not, and between its revenues growing and declining; and (ii) the joint venture deals were highly imbalanced – *i.e.*, they were "great, low-risk" deals for the joint venture partners, but not for the Company. ¶18. Similarly, *Seeking Alpha* published a series of five articles questioning the Company's recording of "sales" of its IP rights to its joint venture partners as profits. ¶430.

BDO argues these articles were not red flags because they post-dated its audit report and it supposedly was not aware of them. Both of these arguments are meritless. First, the December 2014 Off Wall Street article occurred concurrently with BDO's year-end audit procedures – and at the same time the SEC began questioning the Company's joint venture accounting, a few months after BII had defaulted on its first $3 million installment payment, and just after the Company booked a series of quarter-end joint venture transactions accounting for a staggering amount of its profits and allowing it to meet its guidance. "[W]hen all the 'flags' are run up the same pol[e], it seems inescapable that a reasonable auditor was on notice, and acted recklessly when it disregarded all the 'flags.'" *Whalen*, 2005 WL 1799370, at *4. Second, with regard to the *Seeking Alpha* articles, BDO may have already issued its opinion, but it was continuing to actively assist the Company in responding to the SEC – which involved reaffirming the statements in its audit opinions that the Company's financials were proper under GAAP. Third, BDO's claim that it was unaware of these articles is implausible and at most presents an issue of fact that cannot be determined on a

motion to dismiss.[33]  *See* ¶430.

## 5. Iconix's Management Had a History of Fraud

Ernst & Young ("E&Y"), the Company's auditor before BDO, resigned in 1999 because it was "unable to obtain sufficient evidentiary support to determine the appropriateness of the accounting that the Company had applied to certain transactions."  ¶437.  This resignation led to several lawsuits and an SEC investigation, resulting in the SEC issuing a cease-and-desist order in 2003 based on findings that the Company's senior management, *including defendant Cole*, had engaged in a years-long fraudulent scheme involving "prematurely recognized revenue" from "illusory sales transactions with a barter company."  ¶441.  So too here, the Company sought to recognize revenue from multi-million dollar illusory "sales," of which only a fraction of the purchase price had actually been paid, to joint ventures Iconix effectively controlled.  While BDO claims it was not aware of these past events because they are "ancient history," they in fact occurred *just before BDO became Iconix's auditor in 1999*, and persisted for several years, through at least 2003. Moreover, while BDO asserts these events did not directly relate to the fraud at issue here, they were not only quite similar but also involved the same parties (Cole).[34]

## 6. Iconix Had Pervasive Weaknesses in Its Internal Controls

During the Class Period, BDO represented that it had audited, in accordance with Public Company Accounting Oversight Board ("PCAOB") standards, Iconix's internal controls over financial reporting.  It concluded that those controls were "in all material respects, effective" as of December 31, 2014. ¶444.  As Iconix admitted in its 2015 Form 10-K, however, its internal controls

---

[33] BDO also claims the *Seeking Alpha* articles were not red flags because they were purportedly written by a short seller, but that is irrelevant.  Short seller or not, if the article raised issues that the SEC and other analysts were also raising, it constituted a red flag requiring BDO's attention.

[34] BDO asserts the fraud was not similar because it was called something different – "bill and hold" – but, as set forth above, the substance was largely the same.  BDO Mem. 17 n.13.

had numerous pervasive material weaknesses, resulting in multiple restatements. ¶¶445-46. Those weaknesses included "ineffective controls to formally identify related parties and ensure that proper measures were taken to analyze transactions with these parties before they were entered into and that they were properly disclosed in the financial statements" (¶123) – *i.e.*, the procedures pertaining to identifying, and properly accounting for, VIEs. The pervasiveness of these weaknesses, resulting in two separate restatements, constituted a red flag putting BDO on notice of the fraud.[35]

### 7. Iconix's Most Senior Officers, Who Were Directly Involved in Negotiating the Joint Ventures, Successively Resigned

Defendant Clamen, who was directly involved in negotiating the sham joint ventures, resigned in March 2014, months before BDO's March 2, 2015 audit opinion. ¶¶279, 366. Defendant Lupinacci resigned mere weeks after BDO issued its audit opinion, followed not long after by defendants Horowitz and Cole, both of whom were also directly involved in creating and negotiating the sham joint ventures. *See id.* Moreover, Cole resigned just days before Iconix issued a press release revealing that the SEC was investigating its accounting of the joint ventures and whether they should have been consolidated as VIEs. ¶285. These suspicious resignations

---

[35] The cases BDO cites in support of its argument that weaknesses in internal controls cannot be a red flag for auditor scienter do not stand for that proposition. BDO Mem. at 17. *Novak* did not hold that weaknesses in internal controls were not a red flag, but rather summarized the holding in another case that generalized allegations that the auditor failed to detect problems in the company's internal controls do not state a claim for Section 10(b) liability. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citing *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir. 1982)). *Pennsylvania Pub. Sch. Emps.' Ret. Sys. Bank of Am. Corp.* did not address whether internal control weaknesses were a red flag for purposes of showing auditor scienter, but rather held that the plaintiffs failed to show that the individual defendants in that case acted with scienter when they did not disclose weaknesses in the subject bank's internal controls. 939 F. Supp. 2d at 452. Finally, in *Dobina v. Weatherford Int'l Ltd.*, plaintiffs failed to allege that E&Y, which issued an opinion attesting to the effectiveness of the company's internal controls, had ever been made aware of issues with the company's internal controls. 909 F. Supp. 2d 228, 256 (S.D.N.Y. 2012). Here, BDO was aware of multiples issues that would have alerted it to material weaknesses in Iconix's internal controls, and specifically those pertaining to VIEs – the most significant of which was the sham nature of the joint ventures that accounted for substantial portions of the Company's earnings.

constituted another red flag BDO ignored. Even though Horowitz's and Cole's resignations occurred shortly after BDO's audit opinions, BDO had an obligation to update its opinion when it became aware of new facts calling that opinion into question. Instead of doing so, BDO continued to assist the Company in its responses to SEC letters about the joint ventures, in which Iconix falsely asserted the joint ventures had no characteristics of VIEs.

In sum, BDO was aware of numerous, significant red flags that alerted it to Defendants' fraud. "[T]hese facts, which must at this stage of the litigation be taken as true, illustrate at the very least behavior that could not conceivably escape a rational auditor's critical eye, if his eyes were open." *Whalen*, 2005 WL 1799370, at *3. Moreover, while BDO claims it had no motive to engage in fraud, the fact that it had been Iconix's auditor for fifteen years, since 1999 – coupled with the numerous significant red flags it ignored – suggest otherwise. Indeed, "[b]ecause the 'red flags' would be clearly evident to any auditor performing its duties, one could reasonably conclude that [BDO] must have noticed the 'red flags,' but deliberately chose to disregard them to avoid antagonizing [Iconix] and incidentally frustrating its fraudulent scheme." *Phillip Servs. Corp.*, 383 F. Supp. 2d at 475. Because this is sufficient to establish a strong inference of scienter, BDO's motion should be denied.[36]

---

[36] The cases BDO relies on to argue that these red flags, considered together, do not establish its scienter are distinguishable. In *In re DNTW Chartered Accountants Sec. Litig.*, the court held that a single end-of-quarter suspicious transaction was not a red flag, but acknowledged that if there was a pattern of such transactions – as here – it would have been indicative of scienter. 172 F. Supp. 3d 675, 687 (S.D.N.Y. 2016). In addition, the court determined that the other red flags alleged were not themselves indicative of fraud. Here, by contrast, each of the red flags alleged signals that the joint ventures lacked economic substance, and that the Company was attempting to circumvent GAAP and the rules pertaining to VIEs in order to fraudulently book large one-time phantom gains. In *In re Advanced Battery Techs., Inc. Sec. Litig.*, the court determined that most of the alleged red flags were either not red flags (CFO turnover unrelated to the fraud, high profit margins, suspicious transactions that occurred years after the auditor's last opinion, etc.) or not known to the auditor (plaintiffs alleged merely that the auditor had "access" to documents that could have revealed the fraud, but not that it actually reviewed them). 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012). Here, there is no question that the red flags alleged in the SAC are, in fact, red flags showing that the joint

### B. BDO's Audit Reports Were False and Misleading

During the Class Period, BDO represented that it performed its 2014 audit in conformance with GAAS-PCAOB Standards,[37] and certified that Iconix's financial statements "present[ed] fairly, in all material respects, the financial position of Iconix Brand Group" in accordance with GAAP, and that the Company's internal controls were effective. ¶456. These representations were materially false and misleading and lacked a rational basis.

First, Iconix's multiple restatements establish that its financial statements were not, in fact, prepared in accordance with GAAP. ¶¶98-115. As discussed above, Iconix's financial statements were false due to "a multiplicity of accounting manipulations over a nearly four-year period, ultimately forcing Iconix to announce two separate restatements." ¶¶2, 21-22, 99, 110-15, 320-56. *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 66 F. Supp. 2d 622, 633 (E.D. Pa. 1999) (plaintiff sufficiently identified "the offending financial practices and explain[ed] how those practices violated GAAP and/or GAAS"); *Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 610 (D.N.J. 2001) (GAAP and GAAS allegations sufficiently particularized auditor's false statements).

Second, BDO's representations that its audits complied with GAAS are actionable because GAAS has verifiable procedural requirements that BDO failed to follow. *In re Washington Mutual, Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009) (compliance with

---

ventures were shams, and that BDO, with which the Company specifically consulted on the issue of whether the joint ventures constituted VIEs, was aware of them.

[37] The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that registered public accounting firms are required to follow. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, Generally Accepted Auditing Standards, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. For simplicity, all references to GAAS herein include the standards of the PCAOB. ¶401.

standards is a "verifiable factual statement"); *Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1176 (10th Cir. 2006) (auditor's statements that its audits were performed in accordance with GAAS were factual assertions). BDO was required to perform audits with "due professional care" and "professional skepticism," which it failed to do. ¶¶455, 458-61. The SAC alleges, for example, that BDO failed to exercise professional skepticism regarding, *inter alia*, Iconix's joint venture accounting. ¶¶408-21.

Plaintiffs also state a claim against BDO under *Omnicare*, in which the Supreme Court rejected an issuer's attempt to limit its liability for misstatements of opinion to those made with subjective disbelief. *Omnicare*, 135 S. Ct. at 1329; *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 399 (S.D.N.Y. 2013) ("auditors may not shield themselves from liability . . . merely by using the word 'opinion' as a disclaimer"); *SEC v. Okin*, 137 F.2d 862, 864-65 (2d Cir. 1943) (inserting "in my opinion" into a statement of fact does not alter its factual nature). Indeed, BDO cannot transform the factual statements in its audit report, concerning GAAP and GAAS compliance and the adequacy of Iconix's internal controls, into statements of belief simply by calling them "opinions." BDO Mem. at 3, 24. Moreover, under *Omnicare*, a plaintiff can state a claim for a false and misleading statement of opinion that: (i) lacks a rational basis for the opinion; (ii) highlights false statements of fact that are "embedded" in the opinion; or (iii) identifies "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes [it] misleading to a reasonable person reading the statement fairly and in context." *Petrobras*, 2016 WL 1533553, at *3-4 (quoting *Omnicare*, 135 S. Ct. at 1327, 1332). The SAC's allegations regarding BDO's false statements satisfy all of these standards.

### 1. BDO Had No Rational Basis for Its Audit Opinion

BDO opined that Iconix's financial statements were accurate and in accordance with GAAP

when it either knew, or recklessly disregarded, that they were not. Indeed, BDO was aware of multiple red flags, discussed in §III.A above, indicating that the joint ventures were shams – including, most significantly, that the joint venture partners were unwilling or unable to pay their installments in full, and in fact were never obligated to pay. BDO therefore knew that the joint ventures were designed to circumvent consolidation as VIEs under GAAP, and that, by definition, they were not accounted for in accordance with GAAP. BDO issued its audit opinion anyway.

BDO asserts, without explanation, that the SAC fails to allege it knew its audit opinion was false because the red flags described above are "dubious." BDO Mem. at 21. To the contrary, the joint venture partners' failure or refusal to make multi-million dollar installment payments that they were supposedly required to make is compelling evidence of fraud. Indeed, the red flags described above – including BII's default and Iconix's inexplicable failure to seek recourse, the multiple quarter-end material joint venture transactions that were the difference between the Company meeting its guidance and not, and the analysts and the SEC directly questioning the validity of the joint venture profits and whether the joint ventures qualified as VIEs – were specific. And they all pointed toward one inevitable conclusion: the joint ventures were sham attempts to get around the accounting rules and book large one-time phantom gains.

Moreover, because the SAC adequately alleges that BDO acted with scienter in fraudulently issuing its audit opinions on Iconix's financial statements, Plaintiffs have also satisfied the standard for pleading subjective falsity. *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 133 (S.D.N.Y. 2013) ("because Plaintiffs must adequately allege [auditor's] scienter to survive a motion to dismiss, this is a distinction without a difference"); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239-40 (S.D.N.Y. 2006) (contested statements of opinion were actionable because, assuming plaintiffs' allegations to be true, "there is enough to suggest that

Defendants were aware of undisclosed facts that seriously undermined the accuracy of their professed opinions or beliefs").

### 2. The Audit Opinion Contained False Embedded Facts

**Iconix's false and misleading 2014 financial statements.**  BDO is liable under *Omnicare* for its certification of Iconix's materially misleading 2014 financial statements because the "facts of [those] financial statements [are] embedded in [BDO's] audit opinions."  *See Petrobras*, 2016 WL 1533553, at *3-4.  An auditor's opinion would be useless without underlying financials that are consistent with that opinion.  As Judge Rakoff explained, "[o]ne measure of how embedded" these facts are within BDO's opinion is "the de minimis value investors would place on [BDO's Audit Opinion] were the facts excluded."  *Id.* at *4.  When BDO opined that Iconix's 2014 financial statements fairly presented its financial position in accordance with GAAP – meaning, among other things, that the Company had been properly accounting for the joint ventures by not consolidating them as VIEs – that opinion had to rest on the factual assertion that the joint venture transactions were legitimate.  Plainly, that assertion was wrong, and BDO knew it was wrong.  BDO is statutorily liable for these facts, which investors, reading the Audit Opinion in "context," *Omnicare*, would have understood to be true.  *Petrobras*, 2016 WL 1533553, at *4.  To hold otherwise gives the auditor, rather than the public investor, the benefit of the doubt at the pleading stage, reversing the burden.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

**Compliance with GAAS.**  BDO declared that its 2014 audit complied with GAAS.  ¶¶281-82.  BDO's failure to follow the fundamental procedures mandated by GAAS was not a question of opinion – it is a question of fact: either BDO followed GAAS or it did not.  Here, the SAC amply establishes that BDO did not.  ¶¶407-62; *see e.g.*, ¶306 ("BDO ignored numerous, obvious and blatant 'red flags' that alerted it to the fact that Iconix was seeking to circumvent these accounting rules to enter into as many overseas joint ventures as it could . . . .").  BDO further failed to apply the

procedures necessary to obtain satisfaction concerning the purpose, nature, and extent of the joint venture transactions and their effect on the Company's financial statements. ¶419. As Plaintiffs allege in detail, this is because BDO ignored the fact that the joint ventures lacked economic substance, and were not true joint ventures. ¶¶408-21. These GAAS failures are consistent with the "no audit at all" standard. Whether or not an accountant employed "PCAOB standards is a verifiable factual statement" that is material to investors reviewing an audit opinion. *Wash. Mut.*, 694 F. Supp. 2d at 1224; *see also Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1282 (M.D. Fla. 2009) (auditor's statement of compliance with generally accepted auditing standards is a verifiable statement of fact), *aff'd*, 594 F.3d 783 (11th Cir. 2010). BDO affirmed that it conducted an audit in compliance with GAAS when it did not. BDO cannot escape liability by couching that statement as an opinion. *See Wash. Mut.*, 694 F. Supp. 2d at 1224.[38]

### 3. Omissions of Material Fact Rendered the Audit Report False and Misleading

The SAC explains in detail that BDO omitted numerous material facts from its audit opinion, each of which, if disclosed, would have undermined that opinion in the eyes of a reasonable investor. Chief among these omissions was that the joint ventures were shams, and designed to circumvent GAAP and the specific rules pertaining to the consolidation of VIEs.

BDO's argument that the determination of whether the joint ventures were VIEs was "complex and subjective" is nonsensical. BDO Mem. at 23. Again, the joint ventures were shams specifically intended to avoid consolidation under GAAP. There is therefore no "complexity" or "subjectivity" involved. Indeed, the true nature of the joint ventures – of which BDO was fully

---

[38] BDO's reliance on *In re Lehman Brothers Securities and ERISA Litigation* is misplaced. In *Lehman*, the court dismissed claims against the auditor, finding that "plaintiffs' allegations [are] . . . conclusory and do not contain factual matter sufficient to support a plausible claim for relief." 799 F. Supp. 2d 258, 301 (footnote omitted). Here, the SAC is replete with detailed allegations concerning red flags and BDO's related failures to follow GAAS. ¶¶407-48.

aware – exhibited the classic hallmarks of VIEs. They relied on installment arrangements that the joint venture partners either could not or would not pay – and that Iconix did not require them to pay. They were also designed so that Iconix bore more of the economic risk by far. They therefore should have been consolidated, and the Company should not have recorded its "sales" of 50% joint venture stakes as profits. BDO's failure to disclose these highly material facts in its audit opinion renders it liable under the securities laws.

### C. The SAC Establishes Loss Causation as to BDO

BDO attested to the validity of Iconix's 2014 financial statements, which, at the end of the Class Period, were revealed to be false. BDO's audit opinions were significant to investors, not least because the Company routinely invoked BDO as the stamp of legitimacy for its decision to not consolidate the joint ventures as VIEs, including in its extensive public back-and-forth with the SEC. Although BDO claims no part of the stock drop can be attributed to its audit opinions, BDO Mem. at 25, that is clearly incorrect. *See Petrobras*, 2016 WL 1533553, at *3 ("the plaintiffs here have alleged that the financial statements reviewed by PwC were incorrect and that Petrobras acknowledged as much through the writedowns and consolidated reports published on April 22, 2015, in the midst of plaintiffs' losses"). In any event, this is a fact-based inquiry not amenable for resolution on a motion to dismiss. *In re Xethanol Corp. Sec. Litig.*, 2007 WL 2572088, at *2 n.2 (S.D.N.Y. Sept. 7, 2007) ("loss causation is a fact based inquiry generally, and . . . it is not an appropriate issue to decide on a motion to dismiss").

### CONCLUSION

Plaintiffs respectfully request that the Court deny the motion to dismiss in its entirety.[39]

---

[39] Should the Court determine that any part of the SAC is deficient, Plaintiffs respectfully request leave to amend. As the Second Circuit has held, "it is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013); *see also Loreley*, 797 F.3d at 190 (reaffirming the "liberal standard set forth in Rule 15").

DATED: March 29, 2018

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
MARK T. MILLKEY
ERIN W. BOARDMAN
ROBERT D. GERSON

*/s/ Robert M. Rothman*
ROBERT M. ROTHMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
mmillkey@rgrdlaw.com
eboardman@rgrdlaw.com
rgerson@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JACK REISE (*Pro Hac Vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com

SAXENA WHITE P.A.
JOSEPH E. WHITE, III
LESTER R. HOOKER (*Pro Hac Vice*)
JORGE A. AMADOR (*Pro Hac Vice*)
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: 561/394-3399
561/394-3382 (fax)
jwhite@saxenawhite.com
lhooker@saxenawhite.com
jamador@saxenawhite.com

SAXENA WHITE P.A.
STEVEN B. SINGER
KYLA GRANT
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone:  (914) 437-8551
Facsimile:  (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com

*Co-Lead Counsel for Lead Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Mark T. Millkey, hereby certify that on March 29, 2018, I caused a true and correct copy of

the foregoing:

Lead Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' and BDO's
Motions to Dismiss

to be served via e-mail on all counsel of record listed below:

Jay B. Kasner
Scott D. Musoff
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Email:jkasner@skadden.com
Email:smusoff@skadden.com
Email:Alexander.Drylewski@skadden.com

*Attorneys for Iconix Brand
Group, Inc. and F. Peter Cuneo*

John A. Nathanson
Agnès Dunogué
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Phone: (212) 848-4000
Email:John.Nathanson@shearman.com
Email:Agnes.Dunogue@shearman.com

*Attorneys for Warren Clamen*

John N. Orsini
Eric Corngold
FRIEDMAN KAPLAN
SEILER & ADELMAN LLP
7 Times Square
New York, New York 10036
Phone: (212) 833-1100
Email:jorsini@fklaw.com
Email:ecorngold@fklaw.com

*Attorneys for David Blumberg*

Lorin L. Reisner
Richard A. Rosen
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Phone: (212) 373-3000
Email:lreisner@paulweiss.com
Email:rrosen@paulweiss.com

*Attorneys for Neil Cole*

Stephen M. Baldini
Carolyn Mattus Cornell
AKIN GUMP STRAUSS
HAUER AND FELD LLP
One Bryant Park
New York, New York 10036
Phone: (212) 872-1000
Email:sbaldini@akingump.com
Email:cmcornell@akingump.com

*Attorneys for David K. Jones*

Thomas J. Fleming
Brian A. Katz
Adrienne Marie Ward
Lori Marks-Esterman
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300
Email:tfleming@olshanlaw.com
Email:bkatz@olshanlaw.com
Email:award@olshanlaw.com
Email:lmarksesterman@olshanlaw.com

*Attorneys for Seth Horowitz*

Brian E. Maas
Andrew J. Ungberg
FRANKFURT KURNIT
KLEIN & SELZ PC
488 Madison Avenue
New York, New York 10022
Phone: (212) 980-0120
Email:bmaas@fkks.com
Email:aungberg@fkks.com

*Attorneys for Jeff Lupinacci*

Jason Daniel Gerstein
Seth L. Friedman
McDERMOTT WILL &
EMERY LLP
340 Madison Avenue
New York, New York 10173
(212) 547-5400
Email:jgerstein@mwe.com
Email:sfriedman@mwe.com

*Attorneys for BDO USA LLP*

_/s/ Mark T. Millkey_

MARK T. MILLKEY