UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re ICONIX BRAND GROUP, INC., et al.

**ORDER**

15 Civ. 4860 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a securities class action against Iconix Brand Group, Inc. ("Iconix" or the "Company"), Neil Cole, Warren Clamen, Jeff Lupinacci, David Blumberg, Seth Horowitz, David K. Jones, and F. Peter Cuneo (collectively, the "Iconix Defendants"), and auditor BDO USA, LLP ("BDO"), pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5. Plaintiffs purchased shares of Iconix common stock and contend that Defendants knowingly engaged in "a host of improper accounting practices" in order to "materially overstat[e] [Iconix's] financial results and mask[] the true operating performance of Iconix's business." (Second Consolidated Am. Class Action Cmplt. (hereinafter "Second Amended Complaint" or "SAC") (Dkt. No. 114) ¶ 81) As a result of this alleged "accounting fraud," Iconix announced two separate restatements of its financial reports for fiscal years 2011, 2012, 2013, 2014, and the first two quarters of 2015 – a period spanning 18 quarters – in order to correct the accounting errors. (See id. ¶ 2)

On October 25, 2017, this Court dismissed the Amended Complaint's claims against the Iconix Defendants for failure to plead facts sufficient to raise a strong inference of scienter, but granted Plaintiffs leave to amend. See In re Iconix Brand Grp., Inc., No. 15 CIV. 4860 (PGG), 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017). On November 14, 2017, Plaintiffs

filed the Second Amended Complaint, which names as defendants the Iconix Defendants and BDO. (Dkt. No. 114) On April 27, 2018, the Iconix Defendants and BDO moved to dismiss the Second Amended Complaint. (Dkt. Nos. 132, 135)

On September 17, 2019, Plaintiffs moved for preliminary approval of a class action settlement between them and the Iconix Defendants. (Dkt. No. 145) On September 23, 2019, this Court granted preliminary approval of the proposed settlement, and terminated the motion to dismiss filed by the Iconix Defendants as moot. (Dkt. No. 149) Still pending before the Court, however, is Defendant BDO's motion to dismiss the Second Amended Complaint. (Dkt. No. 132) For the reasons stated below, BDO's motion will be granted.

## BACKGROUND

## I. FACTS

### A. Parties

Plaintiffs are a class of individuals and entities that purchased Iconix securities between February 22, 2012 and November 5, 2015 (the "Class Period"). (SAC (Dkt. No. 114) ¶ 1) City of Atlanta Firefighters' Pension Fund and City of Atlanta Police Officers' Pension Fund serve as Lead Plaintiffs. (Id. ¶¶ 28-29)

Iconix is a brand management company that "owned a diversified portfolio of over 35 global consumer brands in the women's and men's apparel, entertainment, and home industry [sectors]." (SAC (Dkt. No. 114) ¶ 30) Iconix "monetizes" the brands it owns "by licensing [their] intellectual property rights . . . to retailers and wholesalers," who are "responsible for manufacturing and distributing the brands' products." (Id. ¶ 3) Iconix's common stock is "listed and trades on the NASDAQ Global Select Market ('NASDAQ')." (Id. ¶ 30)

BDO served as Iconix's auditor during the Class Period. (Id. ¶ 38)

### B. Overview of Plaintiffs' Allegations

The allegations in the SAC largely parrot those set forth in the Amended Complaint. They are recounted here for background purposes, although previously summarized in this Court's order dismissing the Amended Complaint.[1]

#### 1. The Nature of Iconix's Business

Iconix's business model is premised on the acquisition of intellectual property rights to certain brands, and the licensing of those rights to third parties. (SAC (Dkt. No. 114) ¶ 52; Am. Cmplt. ("AC") (Dkt. No. 62) ¶ 40)[2] The third-party licensees then design, produce, and distribute products bearing the licensed brand names, while Iconix is responsible for managing, advertising, and marketing the brands. (SAC (Dkt. No. 114) ¶ 52; AC (Dkt. No. 62) ¶¶ 3, 40, 42) Pursuant to the licensing agreements, the third-party licensees must pay royalties from their net sales to Iconix. (SAC (Dkt. No. 114) ¶ 52; AC ¶ 41) Between 2005 and 2015, Iconix's portfolio grew to include 35 global brands, and the Company entered into 1,700 licensing agreements with third-party licensees. (SAC (Dkt. No. 114) ¶ 51; AC (Dkt. No. 62) ¶¶ 38, 40)

In 2010, this business model began to face challenges, after certain Iconix brands declined in popularity and new competitors entered the market. (See SAC (Dkt. No. 114) ¶¶ 56-61; AC (Dkt. No. 62) ¶¶ 45-53) Certain brands in Iconix's portfolio – including the men's apparel brands Ecko, Zoo York, Rocawear, and Ed Hardy[3] – began to decline in popularity,

---

[1] Familiarity with the Court's decision in In re Iconix, 2017 WL 4898228, is presumed.

[2] The SAC's allegations set forth in Sections 1 and 2 of this Order parallel allegations in the Amended Complaint (Dkt. No. 62).

[3] Between 2007 and 2013, Iconix spent approximately $508 million acquiring these four brands, which represented 18% of the Company's total consolidated assets as of December 31, 2013. (SAC (Dkt. No. 114) ¶ 57; AC (Dkt. No. 62) ¶ 46)

which resulted in declining royalty revenues. (SAC (Dkt. No. 114) ¶¶ 58-60; AC (Dkt. No. 62) ¶¶ 46-49) At the same time, new competitors in the brand management sector emerged, which made Iconix's acquisition of new desirable brands more difficult and more expensive. (SAC (Dkt. No. 114) ¶ 56; AC (Dkt. No. 62) ¶ 45) As a result, Iconix assumed a large amount of debt in order to finance the acquisitions of new brands, and between 2010 and 2015, the Company "nearly tripled its long-term debt, from approximately $548 million to $1.46 billion." (SAC (Dkt. No. 114) ¶ 61; AC (Dkt. No. 62) ¶ 50) According to the SAC, the "ballooning debt, in turn, further limited [the Company's] ability to borrow the additional funds needed to acquire expensive, in-demand brands to offset the decline of its older brands." (SAC (Dkt. No. 114) ¶ 61; AC (Dkt. No. 62) ¶ 50)

Faced with these trends, Iconix adopted a new business strategy of selling its brands to joint ventures that it formed with partners abroad. (SAC (Dkt. No. 114) ¶ 62; AC (Dkt. No. 62) ¶ 51) Pursuant to this strategy, Iconix formed new entities, contributed certain brand rights to the entity (such as the exclusive right to sell brands in a certain geographical region), and then sold a portion of the entity to a local partner as part of a joint venture. (See SAC (Dkt. No. 114) ¶¶ 5, 62, 64; AC (Dkt. No. 62) ¶¶ 5, 51) Iconix then collected a portion of the licensing revenue generated by the joint venture, with the remaining portion going to the local partner. (SAC (Dkt. No. 114) ¶¶ 5, 62, 64; AC (Dkt. No. 62) ¶¶ 5, 51) According to Iconix, these new joint ventures allowed the Company "to bring its brands to market more quickly and efficiently than . . . if it . . . buil[t] out wholly owned operations across the world," and created opportunities for the Company to increase global brand recognition by "leverag[ing]" the "networks" and

"expertise" of the local partners in "new geographies."[4] (SAC (Dkt. No. 114) ¶¶ 5, 62, 171, 208; AC (Dkt. No. 62) ¶¶ 52, 144, 193)

### 2. Iconix's Alleged Accounting Improprieties During the Class Period

Against this backdrop, Plaintiffs allege that Iconix engaged in a "multiplicity of . . . accounting manipulations" that allowed it to "materially overstat[e] [its] financial results" and falsely report "'record' revenues, strong cash flows, brand health and business growth." (See SAC (Dkt. No. 114) ¶¶ 2, 13, 81; AC (Dkt. No. 62) ¶¶ 6, 53) These alleged accounting manipulations allowed Iconix – notwithstanding the declining popularity of its brands and its growing debt – to "deceive the market" and "mask the Company's true financial condition and future prospects." (See SAC (Dkt. No. 114) ¶¶ 2, 13, 81; AC (Dkt. No. 62) ¶¶ 6, 53, 356)

Plaintiffs highlight Iconix's "improper failure to consolidate joint ventures" in its financial statements. (SAC (Dkt. No. 114) ¶¶ 8, 112, 331-36; AC (Dkt. No. 62) ¶¶ 288-93) Under Generally Accepted Accounting Principles ("GAAP"), a reporting company must "consolidate" any entity in which it has a controlling interest – that is, it must report the other entity's assets, liabilities, revenues, and expenses together with its own, as if the two functioned as a single unit. (SAC (Dkt. No. 114) ¶¶ 331-36; AC (Dkt. No. 62) ¶¶ 288-89) Two models may be used to determine whether a company has a "controlling interest" in another entity: the "voting interest model" and the "variable interest entity" ("VIE") model. (SAC (Dkt. No. 114) ¶ 332; AC (Dkt. No. 62) ¶ 289) Under the variable interest entity model, a reporting company must consolidate another entity as a VIE where (1) the reporting company holds a variable

---

[4] Plaintiffs allege, however, that the Iconix "Defendants' joint venture strategy had little to do with establishing a global presence for Iconix, and everything to do with manufacturing sizeable short-term revenue gains to cover up Iconix's rapidly declining financial condition." (SAC (Dkt. No. 114) ¶ 63)

interest in the other entity; (2) the other entity is a variable interest entity; and (3) the reporting entity is the primary beneficiary of that variable interest entity. See Accounting Standards Codification ("ASC") 810, "Consolidation." An entity qualifies for VIE treatment where – although the reporting company does not have a controlling voting interest – the reporting company has, inter alia, the "power to direct the entity's most significant economic activities and the ability to participate in the entity's economics." (SAC (Dkt. No. 114) ¶ 332; AC (Dkt. No. 62) ¶ 289)

According to Plaintiffs, Iconix improperly failed to consolidate certain international joint ventures formed during the Class Period. In failing to consolidate these entities, Iconix "overstate[d] reported gains on sale[s] associated with [those] joint ventures." (SAC (Dkt. No. 114) ¶¶ 334-35; AC (Dkt. No. 62) ¶¶ 291-92) Plaintiffs identify the following as entities that should have been consolidated: Iconix Canada Joint Venture, which was formed during the second quarter of 2013 (SAC (Dkt. No. 114) ¶¶ 156-59; AC (Dkt. No. 62) ¶¶ 127-30); Iconix Israel Joint Venture and Iconix Southeast Asia Joint Venture, which were formed during the fourth quarter of 2013 (SAC (Dkt. No. 114) ¶¶ 170-73; AC (Dkt. No. 62) ¶¶ 143-47); LC Partners U.S., which was formed during the first quarter of 2014 (SAC (Dkt. No. 114) ¶ 185; AC (Dkt. No. 62) ¶158); and Iconix Middle East Joint Venture, which was formed during the fourth quarter of 2014. (SAC (Dkt. No. 114) ¶ 210; AC (Dkt. No. 62) ¶ 184-87)

Plaintiffs allege that Iconix committed other GAAP violations during the Class Period, including improperly (1) recognizing and reporting revenue from licensing arrangements, without adequate supporting documentation (SAC (Dkt. No. 114) ¶¶ 99, 320, 323-27; AC (Dkt. No. 62) ¶¶ 280-84); (2) delaying the recognition of retail support-related expenses on certain licensing agreements (SAC (Dkt. No. 114) ¶¶ 320, 328-29; AC (Dkt. No. 62) ¶¶ 285-86); (3)

characterizing certain costs as selling, general, and administrative ("SG&A") expenses and failing to net those costs against licensing or other revenue (SAC (Dkt. No. 114) ¶¶ 320, 330; AC (Dkt. No. 62) ¶ 287); (4) accounting for intangible trademark assets, resulting in inflated gains on the sales of those trademarks (SAC (Dkt. No. 114) ¶¶ 321, 337-42; AC (Dkt. No. 62) ¶¶ 294, 296); (5) characterizing one-time gains as revenues from its ongoing operations (SAC (Dkt. No. 114) ¶¶ 321, 343-44; AC (Dkt. No. 62) ¶¶ 300-01); (6) failing to disclose related-party transactions (SAC (Dkt. No. 114) ¶¶ 321, 345-47; AC (Dkt. No. 62) ¶¶ 302-04); and (7) failing to timely write down uncollectible accounts receivable, goodwill, and trademarks. (SAC (Dkt. No. 114) ¶¶ 322, 348-50; AC (Dkt. No. 62) ¶¶ 6, 305-07).

It is undisputed here that these accounting practices violated GAAP. After internal and SEC investigations, Iconix admitted these accounting errors occurred, and in 2015 and 2016 Iconix restated its historical financial statements in order to correct the errors. (See SAC (Dkt. No. 114) ¶¶ 98-115; AC (Dkt. No. 62) ¶¶ 74-82) Plaintiffs allege, however, that Iconix knew at the time that these accounting practices were improper and intentionally used them to defraud shareholders, in violation of Section 10(b) of the Exchange Act. (See SAC (Dkt. No. 114) ¶¶ 116-17, 471-75; AC (Dkt. No. 62) ¶¶ 83-84)

Both the Amended Complaint and Second Amended Complaint include additional facts relating to various Iconix press releases, financial statements, BDO auditor reports, Iconix's disclosure of its accounting practices, public reporting of Iconix's accounting practices, the Iconix special committee, and Iconix's communications with the SEC. Except for the differences discussed in Sections C and D below, the factual allegations concerning these matters are substantially the same in both complaints and to the extent relevant, are discussed this

Court's Order dismissing the Amended Complaint. See In re Iconix, 2017 WL 4898228, at *4-11.

### C. Comparison of Scienter Allegations in Amended Complaint and Second Amended Complaint

As noted above, the Iconix Defendants have entered into a settlement with Plaintiffs, and their motion to dismiss is no longer at issue. Plaintiffs' theory against BDO is, however, that BDO ignored certain "red flags" in connection with the Iconix Defendants' accounting treatment of joint venture transactions, and that BDO thereby aided in the fraud being perpetrated by the Iconix Defendants. (Pltf. Opp. (Dkt. No. 140) at 45-46) Accordingly, it is relevant to determine whether Plaintiffs' scienter allegations in the SAC are sufficient as to the Iconix Defendants, because if Plaintiffs have not adequately alleged that the Iconix Defendants engaged in securities fraud, BDO could not have aided their alleged securities fraud. See In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 478 (S.D.N.Y. 2006) ("In the absence of adequate allegations that MMC engaged in fraudulent accounting that would render the certification of MMC's financial statements false, Plaintiffs may not premise [the auditor's] liability on its audit opinions. Accordingly, the allegations of D & T's allegedly false audit opinions fail to state a claim against D & T under Section 10(b)."); see also In re DNTW Chartered Accountants Sec. Litig., 96 F. Supp. 3d 155, 165 (S.D.N.Y. 2015) (quoting In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015)). Accordingly, the Court compares below the scienter allegations set forth in the Amended Complaint – which this Court previously found inadequate – to those set forth in the SAC.

#### 1. Scienter Allegations in Amended Complaint

In contending that the Iconix Defendants acted with scienter in employing the faulty accounting practices, the Amended Complaint asserts that the Iconix Defendants were

financially motivated to commit fraud because (1) their compensation was tied to Iconix's financial performance, and (2) the individual defendants sold stock during "suspicious" time periods. (AC (Dkt. No. 62) ¶¶ 325-338); see In re Iconix, 2017 WL 4898228, at *15. As to compensation, Plaintiffs argue that the individual defendants were "motivated to engage in accounting fraud because it increased the amount of their performance-based compensation tied to the achievement of certain Iconix financial targets." (AC (Dkt. No. 62) ¶ 332; Pltf. Opp. (Dkt. No. 107) at 42-44) In the Amended Complaint, Plaintiffs allege that Defendants received grants of stock options and annual cash bonuses, the vesting of which was tied to the Company achieving certain earnings-per-share targets. (AC (Dkt. No. 62) ¶¶ 332-338) Plaintiffs further contend that, absent Iconix's inflated earnings, the earning-per-share targets would not have been achieved during the Class Period. (Id. ¶¶ 335-336)

As to stock sales, the Amended Complaint pointed to stock sales by Defendants Cole, Blumberg, and Clamen during the Class Period. (See id. ¶ 325; Pltf. Opp. (Dkt. No. 107) at 39-42) According to the Amended Complaint, the stock sales occurred at a time when the Iconix stock price was "artificially inflated" because of the improper accounting practices. (AC ¶¶ 329-331) Plaintiffs argued that this evidence sufficed to demonstrate a motive to defraud investors. (Id. ¶¶ 325-331)

The Amended Complaint further contends that (1) the magnitude of GAAP violations, (2) the nature of the alleged joint venture fraud, (3) the significance of the joint ventures to Iconix's core business operations, and (4) suspiciously timed resignations of four Iconix executives all support a strong inference of scienter. (Id. ¶¶ 322-24, 339-45, 351; In re Iconix, 2017 WL 4898228, at *17) As to the number of GAAP violations, the Amended Complaint asserts that the "Company's multiplicity of GAAP violations and the issuance of

multiple successive restatements (and amended financial filings) correcting four-and-a-half years of financial statements support a strong inference of Defendants' scienter." (AC (Dkt. No. 62) ¶ 323) In addition, the GAAP violations – specifically the joint venture violations – involved Iconix's "core operations," which "support Defendants' knowledge of and reckless disregard of such operation and financial matters." (Id. ¶ 341-345) The Amended Complaint also points to the fact that "four of the seven individual Defendants resigned" during the Class Period. (Id. ¶ 351) These "sudden, suspicious departures, under highly questionable circumstances, provide strong additional support that [Defendants] knew of the Company's pervasive accounting fraud during their tenure with the Company." (Id.)

**2. Second Amended Complaint's Scienter Allegations**

**a. Iconix Defendants**

The SAC repeats the same scienter allegations set forth in the Amended Complaint but adds new allegations and presents a different fraud theory as to the Company's joint ventures. (See Pltf. Opp. (Dkt. No. 140) at 29-32) Whereas the Amended Complaint alleges that the accounting treatment of the joint ventures was fraudulent, the SAC alleges that the joint ventures were "sham" transactions from their "inception." (SAC (Dkt. No. 114) ¶¶ 5, 12, 62-67, 76, 232, 245, 366) Plaintiffs' new theory is that the joint ventures never had a legitimate business purpose, but instead were entered into by the Iconix Defendants for the sole purpose of booking "instant 'paper' revenues" from sale of the Company's 50% stake. (See id. ¶¶ 5, 62-80, 242) The SAC further alleges that Iconix "structured the joint ventures to appear as if both parties shared equal risks and rewards for the purpose of avoiding consolidation under GAAP – when, in reality, these transactions displayed the classic hallmarks of [variable interest

entities]: namely, Iconix was the true party in control from inception and bore the majority of the economic risk." (Id. ¶¶ 12, 67, 76)

To support this claim, the SAC makes three primary allegations. First, it points to details in the joint venture agreements that are indicative of Iconix's significant economic risk, and Iconix's control over the joint venture entities. (Id. ¶¶ 64-67, 77) For example, Iconix "guarantee[d] minimum revenues for the first few years of the joint venture, and includ[ed] 'put' options that would allow the joint venture partner to force Iconix to absorb any losses by purchasing additional equity." (Id. ¶¶ 64, 77) Most of the joint venture agreements also include two-year "call options" to purchase more stock in the joint venture, which would allow Iconix "to take control of the joint venture entity upon exercise." (Id.) Moreover, the bulk of the 50% stake sales were not due immediately but conducted through a down payment followed by periodic installment payments. (Id. ¶¶ 9, 64-66, 73-74, 95)

Moreover, all but one of the installment payment plans resulted in partial default.[5] (Id. ¶¶ 64, 66-67, 74-75, 78) Iconix did not attempt to collect or sue for the defaulted payments, but either "renegotiated" the agreements on "unfavorable terms," or "bought out its joint venture partner, claiming the outstanding balance was somehow paid to Iconix as part of the transaction." (Id. ¶¶ 7, 70-71, 74-75, 230, 232, 240) Additionally, after the Class Period and restatements, Iconix "claimed . . . it would 'deconsolidate' the joint ventures when the installments payments

---

[5] Global Brands Group ("GBG"), the Iconix Middle East joint partner, paid its obligations in full. (SAC (Dkt. No. 114) ¶ 78) The Iconix Defendants also point out that there were other joint venture transactions – before the Class Period – that are not detailed in the SAC, which were paid in full. (Iconix Def. Reply (Dkt. No. 138) at 8 n.5; see Drylewski Decl. Ex. B (Dkt. No. 139-2) at 5-8)

were made and re-recognize the gains that were reversed."[6] (Id. ¶ 80) Ultimately, however, only $3.8 million in revenue was re-recognized. (Id.) According to the SAC, the inference to be drawn from these facts is that Iconix only cared about "claim[ing] the sizeable revenue gain f[rom] the 'sale,'" that Iconix did not ever intend to collect the full payment from the joint venture partner, and that Iconix purposefully designed the joint ventures "from inception to ensure Iconix would remain in control and bear most of the economic risk, qualifying them as VIEs." (Id. ¶¶ 8, 67, 111 237, 366; see Pltf. Opp. (Dkt. No. 140) at 27-28)

Plaintiffs further contend that the Iconix "Defendant's went to great lengths to hide or misrepresent . . . critical facts about [the] joint ventures" to the SEC. (See Pltf. Opp. (Dkt. No. 140) at 23) The SAC points to Iconix's 2015 response to an SEC letter stating that all of the joint venture payments had been received up to that point. (SAC (Dkt. No. 114) ¶¶ 230-31) At the time Iconix made that statement, Iconix had renegotiated its payment schedule with BII, one of the joint ventures partners, after BII informed Iconix that it "would not make its first payment." (Id. ¶¶ 69, 232) According to Plaintiffs, the fact that this renegotiation occurred makes Iconix's statement to the SEC "indisputably false and misleading" and demonstrates a "strong inference of scienter." (Pltf. Opp. (Dkt. No. 140) at 23-26)

**b. Defendant BDO**

BDO was, of course, not named as a defendant in the Amended Complaint. (See AC (Dkt. No. 62)) Although Plaintiffs name BDO as a defendant in the SAC, their theory of liability as to BDO is not clear. At the outset of the SAC, Plaintiffs claim that BDO and Iconix "conspired to fraudulently conceal the true nature of the joint ventures." (SAC (Dkt. No. 114) ¶¶

---

[6] The Iconix Defendants point out that this statement, in context, makes clear that deconsolidation "depend[s] on the facts and circumstances that exist at that time." (Iconix Def. Br. (Dkt. No. 136) at 26)

9, 66) In the portion of the SAC that details BDO's alleged misconduct, however, "conspiracy" is not mentioned. (Id. ¶¶ 401-61) Instead, Plaintiffs claim that BDO "knew [of] or recklessly disregarded" "red flags" that should have made Iconix's improper accounting practices clear. (Id. ¶¶ 421, 438, 449, 457) The alleged "red flags" are the features of the joint venture agreements cited in both the SAC and the Amended Complaint and include the following: (1) the joint venture transactions "accounted for increasingly large percentages of [Iconix's] net income" (id. ¶¶ 408-11); (2) the joint venture partners defaulted on their installment payments and Iconix did not attempt to collect (id. ¶¶ 412-22); (3) the SEC's investigation of Iconix's accounting practices (id. ¶¶ 423-29); (4) news articles questioning Iconix's accounting practices (id. ¶¶ 430-32); (5) prior SEC enforcement actions against the individual defendants named in this action (id. ¶¶ 433-42); (6) internal control weaknesses (id. ¶¶ 443-47); and (7) the multiple resignations of Iconix executives (id. ¶ 448).

According to Plaintiffs, the fact that BDO approved the non-consolidation of the joint ventures under these circumstances shows that "BDO rubber stamped [the Iconix] Defendants' accounting misconduct, in effect performing 'no audit at all,'" thereby "giving rise to a strong inference of BDO's scienter." (Pltf. Opp. (Dkt. No. 140) at 44)

## II. PROCEDURAL HISTORY

On June 23, 2015, this putative securities fraud class action was filed on behalf of purchasers of Iconix common stock during the Class Period. (Cmplt. (Dkt. No. 1)) On March 14, 2016, the Court consolidated the instant action with two related actions[7] and appointed lead

[7] The other actions are Lazaro v. Iconix Brand Group, Inc., 15 Civ. 4981 (PGG), and Haverhill Retirement Sys. v. Iconix Brand Grp., et al., No. 15 Civ. 6658 (PGG).

plaintiffs' counsel. (Mar. 14, 2016 Order (Dkt. No. 53)) The Consolidated Amended Class Action Complaint was filed on May 13, 2016. (Dkt. No. 62)

On October 27, 2016, the Iconix Defendants moved to dismiss the Amended Complaint, arguing that (1) Plaintiffs had not adequately alleged scienter; (2) many of the accounting judgments and statements are non-actionable; and (3) Plaintiffs had not alleged loss causation with respect to many of the alleged misstatements. (Iconix Def. Br. (Dkt. No. 103) at 13-16)

On October 25, 2017, this Court dismissed the Amended Complaint for failure to adequately allege scienter, but granted leave to amend. In re Iconix, 2017 WL 4898228, at *14-20. Plaintiffs filed the Second Amended Complaint on November 14, 2017. (Dkt. No. 115) On April 27, 2018, the Iconix Defendants moved to dismiss the SAC , arguing that (1) Plaintiffs have not alleged facts providing a strong inference of scienter; (2) Plaintiffs have not alleged facts demonstrating that the misstatements at issue are materially false and misleading; (3) Plaintiffs have not pled loss causation; and (4) Plaintiffs have not pled control person liability. (Mot. (Dkt. No. 135); Iconix Br. (Dkt. No. 136)) On April 27, 2018, BDO moved to dismiss the SAC. BDO's motion raises similar arguments, including that Plaintiffs have not pled facts demonstrating that BDO had a motive to commit fraud or that it acted with conscious recklessness.

## DISCUSSION

## I. LEGAL STANDARDS

### A. Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Moreover, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). A court may also consider "legally required public disclosure documents filed with the SEC." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

**B. Securities Fraud Pleading Standards**

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012). First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).

The heightened pleading requirement under Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, 493 F.3d at 99 (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)). Pursuant to Rule 9(b), a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach, 355 F.3d at 170 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)). "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as

compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

## II. SECTION 10(b) AND RULE 10(b)(5) CLAIMS

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co., 75 F.3d 801, 808 (2d Cir. 1996) ("To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury.").

Defendant BDO argues, inter alia, that the SAC does not adequately plead scienter under Section 10(b) and Rule 10b-5 of the Exchange Act. (BDO Br. (Dkt. No. 133) at 13-26)

### A. Pleading Scienter

To establish scienter, "[t]he PSLRA requires plaintiffs to state with particularity . . . the facts evidencing . . . the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst, 425 U.S. at 194). As discussed above, "to

qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (quoting Tellabs, 551 U.S. at 314).

"Plaintiffs may allege scienter by either (1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging 'strong circumstantial evidence of conscious misbehavior or recklessness.'" Iowa Pub. Emp. Ret. Sys. v. Deloitte & Touche LLP (IPERS), 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013) (emphasis in IPERS) (quoting In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 384 (S.D.N.Y. 2007)). In this regard, "[a]t least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" ECA, 553 F.3d at 199 (quoting Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000)). "[I]f Plaintiffs cannot make [a] 'motive' showing, then they [can] raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." Id. at 198-99 (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)). "'The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 357 (S.D.N.Y. 2012) (quoting Tellabs, 551 U.S. at 323-24).

**a. Motive and Opportunity**

"To plead scienter under the 'motive and opportunity' prong, Plaintiffs must allege that . . . Defendants 'benefitted in some concrete and personal way from the purported fraud.'" Id. at 357 (quoting ECA, 553 F.3d at 198). That is, "motive for scienter can 'be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity [can] be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged.'" Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 309 (2d Cir. 2015) (quoting S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108 (2d Cir. 2009)).

**b. Conscious Misbehavior or Recklessness**

To survive dismissal under the "conscious misbehavior or recklessness" prong, Plaintiffs must allege

> reckless conduct by [Defendants], which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."

Kalnit, 264 F.3d at 142 (quoting In Re Carter-Wallace, Inc. Secs. Litig., 220 F.3d 36, 39 (2d Cir. 2000)). In this context, "reckless" means "'conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'" S. Cherry St., LLC, 573 F.3d at 109 (emphasis omitted) (quoting Novak, 216 F.3d at 312). "'An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.'" Id. (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996)). Moreover, as noted above, "[t]he strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater if there is no motive." Pa. Pub. Sch. Employees' Ret. Sys., 874 F. Supp. 2d at 358 (quoting ECA, 553 F.3d at 198-99).

"[F]or an independent auditor, the conduct 'must, in fact approximate an actual intent to aid in the fraud being perpetrated by the audited company,' as, for example, when a defendant conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that the defendant must have been aware of them." In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)) (citing Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 160-61 (2d Cir. 2012)); see also Rothman, 220 F.3d at 98 ("For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company" (internal quotation marks omitted)). "Mere 'allegations of GAAP violations or accounting irregularities,' or even a lack of due diligence, will not state a securities fraud claim absent 'evidence of corresponding fraudulent intent.'" In re Advanced Battery Techs., 2015 WL 1321233, at *4 (quoting Novak 216 F.3d 300, 309 (2d Cir. 2000)) (citing S. Cherry St., LLC, 573 F.3d at 112).

Where a plaintiff attempts to plead scienter by conscious misbehavior, the allegations must demonstrate "deliberate illegal behavior" by the auditor. In re China Organic Sec. Litig., No. 11 Civ. 8623 (JMF), 2013 WL 5434637, at *10 (S.D.N.Y Sept. 30, 2013). The auditor's behavior "also must reflect accounting judgments that 'no reasonable accountant would have made . . . if confronted with the same facts.'" IPERS, 919 F. Supp. 2d at 333 (quoting SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)) (alterations in IPERS). Accordingly, to hold an auditor liable for securities fraud, the accounting practices employed by the auditor must be '"so deficient that the audit amounted to no audit at all,' meaning 'an

egregious refusal to see the obvious, or to investigate the doubtful.'" Id. (quoting Price Waterhouse, 797 F. Supp. at 1240).

Another "crucial limitation to . . . recklessness-based scienter is the insufficiency of allegations of 'fraud by hindsight.'" IPERS, 919 F. Supp. 2d at 334 (quoting Novak, 216 F.3d at 309). The allegations may not "rest[] on a post hoc ergo propter hoc approach to the complex issue of scienter." Id. at 335.

However, '"[a] complaint might reach [the] "no audit at all" threshold by alleging that the auditor disregarded specific "red flags" that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'" In re China Organic, 2013 WL 5434637, at *10 (quoting In re Longtop Fin. Techs. Ltd. Sec. Litig., 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012) (quoting In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008))) (alterations in In re China Organic). However, courts have declined to "extend 10b-5 liability to instances where an auditor fails to investigate certain red flags that, while themselves are not indicative of actual fraud, could, if pursued, lead to the discovery of fraud." Iowa Pub. Emp. Ret. Sys. v. Deloitte & Touche LLP, 973 F. Supp. 2d 459, 465 (S.D.N.Y. 2013).

## B. Analysis

### 1. Motive and Opportunity

As discussed above, the Amended Complaint alleges that the Iconix Defendants had motive because (1) the officer Defendant's compensation was tied to the Company's financial performance and (2) certain officer Defendants sold stock during the class period at "inflated prices." (See AC (Dkt. No. 62) ¶¶ 325-338) The Court rejected both arguments. As to the first, the Court found that performance-based compensation is common to all corporate

officers and therefore cannot constitute motive. See In re Iconix, 2017 WL 4898228, at *14-15 (citing ECA, 553 F.3d at 198; accord S. Cherry St., LLC, 573 F.3d at 109). As to the stock sales, the Court found that the allegations were not sufficiently unusual "to give rise to an inference of fraudulent intent." Id. at *15-17. Defendant Clamen's stock sales were only 9% of his holdings and occurred before Iconix formed the joint ventures. Id. at *15. Furthermore, the stock holdings of the other individual Iconix Defendants actually increased during the class period, and it was not alleged that Defendant Lupinacci or Horowitz sold any stock. Id. at *16.

The SAC does not include any new allegations concerning the Iconix Defendants' motive and opportunity. (Compare SAC (Dkt. No. 114) ¶¶ 249, 370-376, with AC (Dkt. No. 62) ¶¶ 205, 332-338) Accordingly, the SAC does not plead facts sufficient to establish scienter on a "motive and opportunity" theory on the part of the Iconix Defendants.

Even if the SAC had pled facts sufficient to show the Iconix Defendants' scienter on a "motive and opportunity theory," Plaintiffs have not pled facts demonstrating that BDO "'benefitted in some concrete and personal way from the purported fraud.'" Pa. Pub. Sch. Employees Ret. Sys., 874 F. Supp. 2d at 357 (quoting ECA, 553 F.3d at 198). The only motive to commit fraud that the SAC suggests as to BDO is a desire to receive professional fees in exchange for auditing Iconix's financial statements. (See SAC (Dkt. No. 114) ¶ 406) But that motive is insufficient, because "'the current state of the case law holds . . . that no independent auditor would risk ruination of its reputation for the fees it would collect in order to suppress fraud.'" In re DNTW, 96 F. Supp. 3d at 164-65 (quoting Whalen v. Hibernia Foods PLC, No. 04 Civ. 3182 (HB), 2005 WL 1799370), at *2 (S.D.N.Y. Aug. 1, 2005)); In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008). Plaintiffs do not respond to BDO's argument on this point, nor do Plaintiffs contend that they have otherwise adequately alleged that BDO had

a motive to commit fraud. (See Pltf. Br. (Dkt. No. 140) at 44-54) Accordingly, the Court finds that Plaintiffs have not sufficiently pled motive as to BDO.

### 2. Conscious Misbehavior or Recklessness

#### a. Iconix Defendants

The Amended Complaint's "conscious misbehavior or recklessness" argument was premised on allegations of (1) Iconix's numerous GAAP violations and the nature and magnitude of the Company's financial restatements; (2) the nature of the alleged fraud – in particular, the failure to consolidate the Company's highly touted joint ventures as a means to conceal the Company's declining brand revenues; (3) the significance of the joint ventures to Iconix's core business operations; and (4) suspiciously timed resignations of four senior Iconix executives. (See AC (Dkt. No. 62) ¶ 322-24, 339-345, 351; Pltf. Opp. (Dkt. No. 107) at 28)

The Court found these allegations insufficient to demonstrate conscious misbehavior or recklessness. In particular, the Court found that GAAP violations alone are not sufficient to show intent regardless of the number or magnitude of the violations. In re Iconix, 2017 WL 4898228, at *17-18 (citing Novak, 216 F.3d at 309; Chill, 101 F.3d at 270; In re China Organic, 2013 WL 5434637, at *10 (S.D.N.Y. Sept. 30, 2013); In re Turquoise Hill Res. Ltd. Sec. Litig., No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014)). In addition, any showing of scienter on this theory was rebutted by the fact that Iconix disclosed its basis for the joint venture accounting, and the fact that BDO, an independent auditor, approved the accounting. Id. at *18. Moreover, the Amended Complaint did not cite "internal reports, documents, or communications that shed light on Defendant's knowledge of or conduct concerning the Company's accounting practices. Nor d[id] the Amended Complaint contain statements of confidential witnesses addressing these issues." Id. Finally, as to the resignations,

the Court found that it was "'more likely that [the resigning Defendants] were terminated and resigned as a result of company mismanagement, not securities fraud.'" Id. at *19 (quoting Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 162 (D. Conn. 2007), aff'd, 312 F. App'x 400 (2d Cir. 2009)).

The SAC's new allegations, discussed above, do not remedy these deficiencies. As an initial matter, Plaintiffs' new claim against BDO adds nothing to the scienter allegations against the Iconix Defendants. The "conspiracy" language used in relation with BDO appears to reflect an effort on Plaintiffs' part to cure the Court's finding in its prior decision that the audit rebuts an inference of scienter. In re Iconix, 2017 WL 4898228, at *19 ("[I]t is noteworthy that the Amended Complaint does not plead facts suggesting that BDO was in any way complicit in, or aware of, the alleged accounting fraud.")

As to Plaintiffs' newly-added allegations regarding BDO, they add nothing to Plaintiffs' claims against the Iconix Defendants, and – as discussed below – do not make out scienter as to BDO. As an initial matter, although Plaintiffs add a conclusory assertion at the outset of the SEC that BDO and Iconix "conspired," (see SAC (Dkt. No. 114) ¶ 9), Plaintiffs do not allege facts showing that BDO and Iconix conspired or agreed to commit fraud. Moreover, the thrust of the fraud claim against BDO is that it "knew [of] or recklessly disregarded" red flags of improper accounting practices. (Id. ¶¶ 421, 435, 438, 449, 457) But BDO either "conspired" with Iconix to commit fraud or saw red flags and consciously or recklessly disregarded them. Given that Plaintiffs charge of conspiracy is made at the outset of the SAC and never alluded to again, the Court concludes that BDO consciously or recklessly disregarded red flags. This claim against BDO does not assist Plaintiffs in demonstrating scienter as to the Iconix Defendants.

As for Plaintiffs' new overarching theory of the joint venture transactions, Plaintiffs claim that Iconix was in control of the joint entities and bore most of the economic risk. (Id. ¶¶ 6, 12, 64-67, 76-78) Even assuming the truth of these allegations, they do not demonstrate that Iconix realized that, by retaining control and bearing the risk, the ventures had to be consolidated, or that Iconix was intentionally not consolidating in violation of GAAP. Moreover, Plaintiffs have not shown that Iconix's decisions with respect to its joint ventures represents "'an extreme departure from the standards of ordinary care.'" Kalnit, 264 F.3d at 142 (quoting In re Carter-Wallace, 220 F.3d at 39). The installment payments and the "put" and "call" options that Plaintiffs argue are evidence of Iconix bearing a large amount of risk were all reviewed by BDO and disclosed in Iconix's financial statements. (See, e.g., Drylewski Decl., Ex. D (Iconix SEC Form 10-Q for the period ending March 31, 2014) (Dkt. No. 139-4) at 4-6 (disclosing the installment payments, and any put and call options for LC Partners, Iconix Israel, Iconix Canada, Iconix Southeast Asia, and Iconix Canada)) Without allegations that Iconix and BDO were working together to defraud shareholders, or that Iconix did not give BDO all relevant information, the fact that BDO, an expert accounting firm, took these details into consideration and still approved the non-consolidation status continues to rebut the assertion that Iconix knew the joint ventures had to be consolidated. Furthermore, the fact that Iconix disclosed the relevant information in its public financial statements further rebuts any indication of recklessness or intentionality. See IPERS, 919 F. Supp. 2d at 334 (noting that a "strong indicator[] of recklessness" is a factual allegation that defendant "possessed knowledge of facts or access to information contradicting their public statements"). Accordingly, what Plaintiffs allege is more "fraud by hindsight." Novak, 216 F.3d at 309.

Plaintiffs cite to In re New Oriental Education & Technology Group Securities Litigation, 988 F. Supp. 2d 406 (S.D.N.Y. 2013) in support of their argument that auditor approval does not rebut scienter. (Pltf. Opp. (Dkt. No. 140) at 28-29) In New Oriental, the court denied a motion to dismiss where the plaintiffs alleged that defendants improperly consolidated entities on their financial statements using "critically and obviously deficient" agreements. In re New Oriental, 988 F. Supp. 2d at 421, 426. The court found that although "reliance on third party auditors . . . provide[s] some evidence of non-fraudulent intent," the auditor defense was not particularly persuasive in these circumstances because, "there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements." Id. at 426-27. Here, the SAC alleges that BDO had access to information that, according to Plaintiffs, makes clear that the joint ventures should have been consolidated. (SAC (Dkt. No. 114) ¶¶ 420-421) Indeed, the entire premise of Plaintiffs claim against BDO is that BDO was provided with information showing "red flags," which BDO ignored in order to approve the financial statements. (Id.) Thus, unlike in New Oriental, there is no allegation that BDO was deprived of information and, as explained above, Plaintiffs have not sufficiently pled that BDO had a motive to commit fraud. Moreover, Plaintiffs have not sufficiently alleged that the joint venture accounting practices are "critically and obviously deficient." In re New Oriental, 988 F. Supp. 2d at 421.

The appointment of the Iconix Special Committee and Iconix's disclosure of its joint venture accounting practices distinguish this case from New Oriental on two other grounds, and further rebut Plaintiffs' scienter argument in this case. First, the court in New Oriental rejected the defendants' argument that the appointment of an independent investigation committee rebutted scienter because "the independent committee terminated their investigation

without reaching any conclusion about whether consolidation was appropriate." In re New Oriental, 988 F. Supp. 2d at 427. Here, the exact opposite happened – the Iconix Special Committee investigated the accounting practices, determined they were improper, and restated the financial statements. (SAC (Dkt. No. 114) ¶¶ 21, 98, 285, 290, 296); see Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010) ("Ordering an investigation as soon as [the defendants] learned [of the irregularities] . . . was 'a prudent course of action that weakens rather than strengthens an inference of scienter.'" (quoting Horizon Asset Mgmt. Inc. v. H&R Block, Inc., 580 F.3d 755, 763 (8th Cir. 2009))).

Second, the court in New Oriental also rejected the defendants' argument that disclosure of certain information in its financial statements rebutted scienter because the "disclosure [was not] broad enough to cover the relevant risk." In re New Oriental, 988 F. Supp. 2d at 427. Here, all the relevant information, including the installment payments, put options, and call options, were disclosed. (SAC (Dkt. No. 114) ¶¶ 159, 165, 173-74, 185, 192, 200, 210-211, 221) Moreover, not only was the relevant information disclosed in Iconix's financial statements, but Iconix extensively explained the basis for its joint venture accounting in its responses to SEC comment letters. (See, e.g., Musoff Decl., Ex. C. (Feb. 24, 2015 Iconic SEC Comment Letter Response) (Dkt. No. 137-3) at 29-82); see Kuriakose v. Fed. Home Loan Mortg. Corp., No. 08 CIV. 7281 JFK, 2011 WL 1158028, at *12 (S.D.N.Y. Mar. 30, 2011) (finding that Plaintiffs did not adequately allege scienter where defendant "gave the public sufficient information to question [defendant's] accounting decisions"), aff'd, Cent. States v. Fed. Home Loan Mortg. Corp., 543 F. App'x 72 (2d Cir. 2013).

Moreover, the SAC still does not cite "internal reports, documents, or communications that shed light on [the Iconix] Defendants' knowledge of or conduct concerning

the Company's accounting practices. Nor does the [SAC] contain statements of confidential witnesses addressing these issues." In re Iconix Brand Grp., Inc., 2017 WL 4898228, at *18.

In light of the above, this excerpt from the Court's order granting the Iconix Defendants' motion to dismiss the Amended Complaint remains true today:

> [Plaintiffs'] factual allegations – which are entirely circumstantial and do not rely on any internal documents or confidential witnesses – support a more cogent and compelling inference of non-fraud: that Defendants attempted to comply with applicable accounting standards; that Defendants fully cooperated with the Company's outside auditors and disclosed the relevant accounting judgments in their public filings; that the accounting decisions at issue involve matters of judgment that were not – at the time – flagged as improper by the outside auditors or otherwise disapproved of by the outside auditors; that the Company's accounting determinations turned out to be improper; that the Company took steps to correct the errors, including by forming a special committee of the independent directors, by cooperating with the SEC, and by issuing restatements of historical financial filings; and that, as a result of the Company's corporate mismanagement and failing financial metrics, a number of executives resigned from the Company.

Id. at *19; Tellabs, 551 U.S. at 324 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."). Plaintiffs' argument that the Iconix Defendants went to "great lengths to hide or misrepresent [] critical facts about th[e] joint ventures" in one statement the Company made to the SEC, did not sue to collect the defaulted installment payments, and discussed the possibility of "deconsolidation" (Pltf. Opp. (Dkt. No. 140) at 23-29), does not give rise to an inference of scienter at least as strong as this non-fraudulent inference. Tellabs, 551 U.S. at 324.

First, Iconix's "indisputably false" statement to the SEC relates to one joint venture partner – BII – with whom Iconix had renegotiated its payment plan. (SAC (Dkt. No. 114) ¶ 69) In January 2015, Iconix represented to the SEC that its joint venture partners had been making timely payments. Plaintiffs contend this is "indisputably false" because, under the original terms of its note, BII's payment was due in June 2014. (Pltf. Opp. (Dkt. No. 140) at 24)

As Plaintiffs acknowledge, however, the payment from BII was not in default at the time that Iconix made its statement to the SEC, because Iconix and BII had renegotiated the terms of the note such that no payment was due in June 2014. (Id. at 23-25) Moreover, Plaintiffs' argument ignores that Iconix had entered into other joint venture transactions with partners who were up to date on their installment payments at the time the statement was made. (Drylewski Decl., Ex. B (Iconix SEC Form 10-Q for the year ending 2012) (Dkt. No. 139-2) at 5-8) Viewed in this context, the fact that Iconix had renegotiated this one payment is not strong evidence that they intended to lie to the SEC.

Relatedly, the renegotiation of the joint venture agreements, in lieu of filing a lawsuit, does not demonstrate fraudulent intent. Plaintiffs' theory for why Iconix did not sue—because Iconix never intended to collect the full amount of installment payments in the first place – is illogical since Iconix did collect the full amount from some partners. (SAC (Dkt. No. 114) ¶ 237) For example, GBG, the joint venture partner with Iconix MENA, fully settled its installment payments. (Id. ¶ 78)

Moreover, renegotiating to buy out the joint venture partner instead of suing to collect the installment payment is a sensible approach. For example, the SAC discusses Iconix buying out GBG, the Iconix Southeast Asia joint venture partner, stating, "after only a few installments had been paid, Iconix bought the joint venture out, despite a $9.4 million balance of outstanding installments – and claimed that the $9.4 million balance was 'offset' against the $24.7 million purchase price." (Id. ¶ 74) But the purchase price did offset the outstanding $9.4 million balance, and Iconix received the value of the $9.4 million in outstanding installment payments. (See Drylewski Decl., Ex. A (excerpts from SEC Form 10-k for the fiscal year ended December 31, 2016) (Dkt. No. 139-1) at 11) In any event, these allegations do not show that the

Iconix Defendants acted "highly unreasonabl[y]" or made "an extreme departure from the standards of ordinary care." Kalnit, 264 F.3d at 142 (quoting In Re Carter-Wallace, 220 F.3d at 39). Accordingly, the renegotiations are not sufficient evidence of fraudulent intent.

For these reasons, the SAC does not demonstrate scienter – on a conscious misbehavior or recklessness theory – against the Iconix Defendants. Because the SAC does not demonstrate that the Iconix Defendants committed fraud, the SAC does not adequately plead that BDO aided in the Iconix Defendants' commission of fraud.

**b. Defendant BDO**

Plaintiffs' failure to demonstrate scienter on the part of the Iconix Defendants on a conscious misbehavior or recklessness theory, is fatal to their claim that BDO is liable under this theory.

Plaintiffs claim that BDO's audit opinions stating that (1) Iconix's financial statements were prepared in accordance with GAAP; and (2) BDO's audit complied with the Generally Applicable Audit Standards (GAAS), were false and misleading. (Pltf. Opp. (Dkt. No. 140) at 55) Plaintiffs further allege that BDO made these statements with an "intent to defraud" under Rule 10(b)(5) through the "conscious misbehavior or recklessness" prong. (Id. at 54) Plaintiffs' recklessness argument is premised on the "red flag" line of cases, which hold that a complaint can allege recklessness by an auditor "by alleging that the auditor disregarded specific 'red flags' that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." In re China Organic, 2013 WL 5434637, at *10 (quoting In re Longtop Fin. Techs. Ltd. Sec. Litig., 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012)).

The fundamental problem with Plaintiffs' allegations against BDO is that, as discussed above, Plaintiffs have not alleged an adequate securities fraud claim against the Iconix Defendants. At best, Plaintiffs have alleged that Iconix was engaged in legitimate business activities and negligently accounted for those activities. Consequently, even if BDO ignored "red flags" that should have alerted it to the proper way to account for the joint venture transactions, Plaintiffs have not pled facts sufficient to demonstrate that BDO intended to "'aid in the fraud being perpetrated by the audited company,'" because Plaintiffs have not adequately alleged facts showing that the Iconix Defendants engaged in securities fraud. In re DNTW, 96 F. Supp. 3d at 165 (quoting In re Advanced Battery Techs., Inc., 781 F.3d at 644) Accordingly, BDO's motion to dismiss will be granted.

## CONCLUSION

For the reasons stated above, Defendant BDO's motion to dismiss the Second Amended Complaint is granted. The Clerk of Court is directed to terminate the motion (Dkt. No. 132).

Dated: New York, New York
September 30, 2019

SO ORDERED.

Paul G. Gardephe
Paul G. Gardephe
United States District Judge